**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA, . CRIMINAL NO. 1:17-cr-10092-NMG
     Plaintiff      .
                . BOSTON, MASSACHUSETTS
        v.       . OCTOBER 5, 2017
                .
GARY P. DeCICCO,      .
     Defendant     .
. . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:  UNITED STATES ATTORNEY'S OFFICE
                     BY: Kristina E. Barclay, AUSA
                     One Courthouse Way, Suite 9200
                     Boston, MA 02210
                     617-748-3371
                     kristina.barclay@usdoj.gov

For the Defendant:   Robert L. Sheketoff, Esquire
                     One McKinley Square
                     Boston, MA 02109
                     617-367-3449
                     sheketoffr@aol.com

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

1                            **I N D E X**

2    **WITNESSES**            **DIRECT**    **CROSS**     **REDIRECT**

3    **Defendant's:**

4    PHILLIP BALDI           5         24         51

5                                                        **PAGE**

6    **ARGUMENT BY MR. SHEKETOFF**                       59

7    **RESPONSE**                                        66

8    **FURTHER ARGUMENT BY MR. SHEKETOFF**               71

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 COURT CALLED INTO SESSION

2 (2:22:44 P.M.)

3          THE CLERK:  The United States District Court is

4 now in session.  Please be seated.  The Honorable David H.

5 Hennessy presiding.  Today's October 10, 2017, in the case

6 of the United States versus Gary DeCicco, (inaudible) 10092.

7          Would counsel please identify yourself for the

8 record?

9          MS. BARCLAY:  Good afternoon, Your Honor.

10 Kristina Barclay for the United States, and with me at

11 counsel table is Special Agent Matt Elio from the FBI.

12          MR. SHEKETOFF:  And good afternoon, Your Honor.

13 As you're aware, I've just entered my appearance about a

14 week ago.  Robert Sheketoff for Mr. DeCicco.  Also with me

15 is Carlos (inaudible), a brand new lawyer, sworn in in June.

16 The defendant is present.

17          And Your Honor, as I understand your order, please

18 correct me if I'm wrong, you're allowing me to put Phil

19 Baldi on the witness stand in order to decide whether or not

20 you're going to reopen this hearing based on his testimony.

21          THE COURT:  That's exactly right.  And just to

22 bring you up to speed, because I recognize you're new to the

23 case, it was represented to me by Mr. Kendall that Mr. Baldi

24 was not available at the time of the March 22 detention

25 hearing, and his testimony is testimony, among other things,

1  about the note and the flowers.  So the question is is that

2  going to be material to an assessment.

3          MR. SHEKETOFF:  Understood.

4          So Mr. Baldi is present.  I'm not sure if he's

5  actually in the courtroom, and he has -- his lawyer, George

6  Vien is also present.

7          I understand from Mr. Vien that he's a recent

8  inductee into Brookline High School Athletic Hall of Fame.

9  I was threatened if I didn't say that, that there would be

10 consequences.  So I've said it.

11         And Your Honor, one of the affidavits that you

12 have in front of you is from -- filed earlier is from Mr.

13 DeCicco's sister, Noelle, and she's present in the

14 courtroom.  If you want her sequestered, I will ask her to

15 leave.  If not, she can stay.

16         THE COURT:  I don't see a need for it.  What's the

17 government's view?

18         MS. BARCLAY:  Umm --

19         THE COURT:  I'm not expecting we're going to hear

20 testimony from her, but.

21         MS. BARCLAY:  Yeah, no, that's fine, Your Honor.

22         THE COURT:  Okay.  All right.  Let's swear the

23 witness.

24    DEFENDANT WITNESS PHILLIP BALDI SWORN

25         THE CLERK:  Please state your name and spell your

1  last name for the record.

2         THE WITNESS:  Sure.  My name is Phillip Baldi.  My

3  last name is spelled B-A-L-D-I.

4         MR. SHEKETOFF:  Thank you, Judge.

5                    DIRECT EXAMINATION

6  BY MR. SHEKETOFF:

7  Q.   Mr. Baldi, can you tell us how old you are and what

8  town you presently reside in?

9  A.   I'm 59, and I reside in Winthrop, Massachusetts.

10 Q.   And were you a long-term of employee of some company?

11 A.   Yes.  The Flatly Company in Braintree, Massachusetts.

12 Q.   When were you employed by Flatly?

13 A.   From 1986 or so to 2002.  Somewhere in there.

14 Q.   And what was your final position at Flatly?

15 A.   For all but one year I was there I was the chief

16 financial officer.  The first year I was the comptroller.

17 Q.   So do you understand, as you're testifying today, that

18 the government --

19         THE COURT:  One second, Mr. Sheketoff.  I just

20 need to move the mic to make sure we're getting his voice.

21 BY MR. SHEKETOFF:

22 Q.   You understand, as you're testifying today, that the

23 government has agreed with your counsel that this is covered

24 by your proffer?

25 A.   Yes.

6

1 Q.   And you have a proffer agreement with the government;

2 correct?

3 A.   Yes.

4        MS. BARCLAY:  I would just object, Your Honor.

5 It's an immunity agreement.

6        MR. SHEKETOFF:  I'm sorry.  Immunity.

7 A.   Oh, I'm sorry.

8 Q.   And you do have an immunity agreement with the

9 government?

10 A.   Yes.

11 Q.   And you have testified before the grand jury; correct?

12 A.   Correct.

13 Q.   Now, when did you first meet my client?

14 A.   I believe it was October of 2013.

15 Q.   And was that in connection with some business venture

16 of some sort?

17 A.   Some years prior to that I had worked on a sale of Tom

18 Flatly's hotels with an attorney, Myra Silverstein, and

19 Larry had told me back then that -- because I left Tom on my

20 own, and he said, jeez, you should talk to Gary.  And I

21 didn't do it at that time, but some years later -- you know,

22 back in October of '13 he happened to be out front of my

23 house.  I was having some landscaping done.  He was talking

24 to somebody.  I went out and introduced myself, and he said

25 why don't you come down the office, and we'll get together.

7

1  Q.   All right.  And as a result of that meeting and

2  suggestions that had been made to you earlier, did you get

3  involved in some business venture together?

4  A.   Yes.

5  Q.   And what was that venture?

6  A.   Initially I had a consulting agreement with Gary where

7  he was paying my health insurance, and he was going to give

8  me a 5 percent interest in the Saugus -- a property in

9  Saugus, and if I was able to obtain a -- I think it was a --

10  it might have been a liquor license or a restaurant for the

11  location, the interest would have gone to 10 percent, which

12  I was not able to do at that point.

13  Q.   All right.  And was there a subsequent venture after

14  that one?

15  A.   Yep, we had worked on a number of different things.

16  There was --

17      Oh, there was property in the Bahamas, a great deal of

18  it, that we spent a lot of time researching and trying to

19  get to the bottom of, whether or not the fellow who said he

20  owned it owned it, and of what he did own remained.

21      And we looked at the Saugus property, I guess property

22  in Revere and his property in Winthrop.  I helped him with

23  some things at the marina like the parking agreement.

24      And essentially the financial transaction I got into

25  with Gary was to lend him $900,000 as part of the money to

1 buy out a partner, David Rosenberg, in Saugus -- excuse me

2 -- in Peabody out of the building called the Mills Pulaski

3 LLC.  Gary and David both owned 50 percent of it at that

4 time.

5 Q.   And subsequent to that loan did you get repaid on that

6 loan?

7 A.   Yes.

8 Q.   And did you become some sort of owner of that property?

9 A.   Yes.  Yes.

10 Q.   And as a result of these business dealings, by August

11 of 2014 how often were you seeing Mr. DeCicco?

12 A.   You know, three or four times a week probably.

13 Q.   Okay.  For how many hours a day?

14 A.   Two to four, depending.

15 Q.   And would you say you became friends?

16 A.   Yeah.  I mean, we -- we became close business

17 associates.  I --

18       Honestly, I use the term love and friends sparingly,

19 so.  It's usually reserved for my family or people, you

20 know, that I've known since I was a little kid.

21 Q.   Did you learn certain personal things about him?

22 A.   Oh, sure.  We both did.  Yeah, we talked about our kids

23 and a lot of other things, you know.

24 Q.   Did he --

25          MR. SHEKETOFF:  Beg the Court's indulgence.

9

1  Q.   Did you come to learn that he had a girlfriend who was

2  significantly younger than him?

3  A.   Yes.

4  Q.   And what's her name?

5  A.   Kim DeBenedictis.

6  Q.   Have you met her --

7  A.   Oh, sure, yes.

8  Q.   When you started to get to know him in October of 2013,

9  did he already have a relationship with her?

10 A.   She was in the car when I met him, yeah.

11 Q.   And were there conversations about --

12         MR. SHEKETOFF:  We're going to refer to the person

13 that was beaten up by agreement as CW-1 if that's okay with

14 the Court.

15         THE COURT:  That's fine.

16 Q.   Did you learn whether from hearsay or any other source

17 what Kim's relationship was with CW-1?

18 A.   You know, in all frankness, the discussion about CW-1

19 for the longest time was about him not paying a fellow by

20 the name of Peter Varone the money that he was due to

21 complete the construction of the building.

22     At some point late, late, late in my relationship with

23 Gary that may have come up, but not in any great --

24     You know, it wasn't -- it wasn't like we talked about

25 that.  I mean, and all I was told actually was that she

1 worked there.

2 Q.    All right.  And did CW-1 tell you that, or did Gary

3 DeCicco tell you that?

4 A.    I've never met CW-1, so that would have been Gary.

5 Q.    And how would you describe Kim physically?  Is she a

6 beautiful young woman?

7 A.    I'd say she's an attractive young woman.

8 Q.    Would you call her striking.

9           MS. BARCLAY:  Objection.

10           THE COURT:  Grounds?

11           MS. BARCLAY:  Relevance.

12           THE COURT:  He can answer it.

13 A.    Yeah, I'd say she's --

14     She's a good-looking kid.  Don't get me wrong, I mean.

15 Q.    So there was a --

16     Did you know Peter and Fred Varone?

17 A.    Yes.  Peter I had met a few times with Gary, and Fred a

18 few less times than Peter.  I'd say Fred we bumped into

19 maybe three or four times and Peter maybe, you know --

20     Because Peter had a boat down at Gary's marina, so

21 Peter a few more times than that, I guess.

22 Q.    Had you ever been present at a conversation with Peter

23 Varone and Gary DeCicco discussed the debt that CW-1 owed to

24 Mr. Varone?

25           MS. BARCLAY:  I just object to the leading nature

1 of the questions, Your Honor.

2          THE COURT:  I'll allow it.  Were you present for

3 any conversation?

4 A.   There's one conversation that I remember fuzzily, is

5 the best way to put it.  But yes.  The answer is yes.

6      It was at a greasy spoon in Saugus, Mass., called Iron

7 Town.

8      Gary and I walked in.  Peter was sitting there, I

9 think, with his son and maybe a couple of other people.  And

10 there was a discussion at that time, and Peter was

11 complaining about not getting paid, and --

12      I'm just going to tell you the truth.  Gary said why

13 don't you have him beat up, and Peter said, no, no, no.

14 Afterwards Gary said he's too big a pussy to do something

15 like that, so.  That was --

16      And the exact amount of what it was, I never thought it

17 was a huge amount of money, but I never knew how much it

18 was.

19 Q.   During that conversation did you learn from any other

20 source whether -- how this debt was accruing?

21 A.   My understanding was it was a result of moneys that

22 were due for the construction of a building.  I understood

23 that Peter was the general contractor, and that he was just

24 not paying him in full.

25 Q.   Was there any discussion; and if so, what was said

1  about subcontractors?

2  A.    That Peter wasn't able to pay his subs the amount that

3  he owed them in full; and in fact, I remember saying to

4  Peter why don't you just take out a mechanics lien, because

5  in the event that you do, it is the easiest lien to obtain

6  and the hardest one to get rid of.  If he ever -- if CW ever

7  wanted to sell the property or refinance that property,

8  Peter and his subs would get paid in full.  And he sort of

9  just shrugged his shoulders when I mentioned that to him, so

10 he didn't seem to be interested in doing that.

11 Q.    You're here mostly about the flower incident.

12       Do you recall that incident?

13 A.    I do.

14 Q.    When in relation to the flower incident was this

15 conversation at this greasy spoon?

16 A.    Oh, gee whiz.  I'd say probably -- boy, I couldn't

17 really say if it was before or after, to be frank with you.

18 You know, I mean, we were --

19      You know, Gary and I were getting together every, you

20 know, three or four days a week, so it's hard to put a date.

21 I'd be kidding you if I knew exactly when it was.

22 Q.    So were there other discussions that you had --

23      Besides this one at the greasy spoon, were there other

24 discussions that you had with Gary DeCicco about CW-1 prior

25 to the flower incident?

13

A.    There were -- I don't remember any conversations with Peter, *per se*, but I do recall a couple of things.  One is hearing half a conversation where Peter called Gary, and Gary saying, you know -- you know, just relaying to me that Peter's bitching about not getting paid by CW-1.

And another example or two where we went to --

Peter's son had become a partner in a -- a used car business, and Peter's son was continuing to try to do business with CW-1 and sort of complained that he may have been screwed by him.  And Gary would say to him, well, if he stiffed your father, why are you -- why are you talking to him?

Q.    To the best of your memory did Gary ever explain to you or state to you or express his view -- his personal view of CW-1 prior to the --

A.    Yes.  In fact, we -- we -- the route we would take, -- we would meet on Route 107 in Saugus, and we would then drive across Saugus to Route 1.  And I think it's just sheer coincidence, because we would meet in other places to just take one car up to Peabody.  Because I lived in Winthrop; he lived in Nahant.  So it was more out of convenience.

But we would drive by -- excuse me -- CW-1's place, you know, a couple times a week, and he -- he would tell me that he doesn't know what the heck he's doing in the car business.  He's got Ferraris in the window in the middle of

1 the winter, and nobody's ever going to buy them.

2      And that there was a real estate transaction.  My

3 understanding was that Gary owned the land prior to xxxx

4 buying it, and that there was a -- the state was attempting

5 to take a little shop -- dress shop that's on the corner

6 that xxxx -- or excuse me -- CW -- I apologize -- didn't

7 own, and in exchange for that would have given CW a curb cut

8 on Route 1, which the property didn't enjoy.  Because you'd

9 have to drive around this exit to get into CW's property.

10 So it would have benefited him by having a curb cut and

11 maybe some additional parking on Route 1 -- directly on

12 Route 1.  And he would have had to have surrendered -- the

13 lady would have been paid by the government for the taking,

14 and CW would have had to have surrendered a strip of land to

15 his back parking lot.  Which being in the business and

16 knowing how those things work and knowing the benefit of --

17 the value of a curb cut on Route 1, which is --

18      You know, that curb cut, by the way, was already there.

19 It was part of the lady's property, but they were going to

20 trade it off apparently.  And this is all on just from what

21 I'm being told.

22      And at that point -- Gary had been working on that

23 himself while he owned it.  When CW bought the property, he

24 was, you know, told it's in his best interest to proceed

25 with that.  He went to the state and said you're not going

1 to take this back piece of my land away from me and not pay

2 me for it.

3      And you know, if the State's just doing a pure taking,

4 they have to pay you for it.  But if there's a *quid pro quo*,

5 and they're trading something for it, especially something

6 that benefits you, you'd be -- it would make a lot of sense

7 for you to enter into that with the State.

8      And he blew it up.  So he ends up with the same

9 configuration, the lousy exit, no curb cut on Route 1.

10      And, you know, it is what it is, and that's not --

11      You know, and Gary would say to me he's an idiot for

12 not doing it.

13 Q.   Did you ever hear Gary DeCicco express any interest in

14 becoming CW-1's partner in any way?

15 A.   Not from -- I have recently heard it from other people

16 but never from Gary or Peter or anybody else.

17 Q.   Do you remember the flower incident?

18 A.   Oh, yes.

19 Q.   Who was in the car?

20 A.   Gary, myself and Kim.

21 Q.   And where had you been?

22 A.   We had been, I believe, in Peabody.  We were driving

23 back from Peabody.  We were on Route 107 in Lynn.  Just

24 prior to getting on -- I don't know the name of the

25 intersection, but there's a flower shop.

1       And there was a -- you know, there was a banter going

2  about.  Maybe we should send him some flowers.  Blah, blah,

3  blah, blah.  He's busting Peter's balls.

4       And I can't remember exactly how it ended up being a

5  white cross, but I don't think that's what Kim originally

6  went in there for, is the best way I can put it, but that's

7  how it ended up.  That is the best way to put it.

8  Q.    Okay.  So you were in the car?

9  A.    Yep.

10 Q.    What time of day was this?

11 A.    I'd say -- usually we were coming back --

12      Kim had to pick her kids up by noon or so.  I'd say,

13 you know, one or before.  You know, early afternoon or late

14 morning.  Something like that.

15 Q.    And from your perspective was the stop at the flower

16 shop something that was planned ahead of time?

17 A.    Oh, no.  No.  I don't think so.  I don't think so.

18 Q.    You said you don't remember the exact details, but the

19 cross was not part of the discussion before --

20 A.    I don't --

21 Q.    -- Kim went into the --

22 A.    For some reason I just don't remember -- or how anybody

23 would know to say to go and get a white cross.  You know,

24 that's not like something that would -- it would be a normal

25 thing you'd order, is the best way to put it.

17

1  Q.   Do you have any memory of Kim coming back out to the

2  car after going in to the shop saying something like all

3  they've got is this thing --

4           MS. BARCLAY:  Objection.

5  Q.   -- and it costs a lot more?

6           MS. BARCLAY:  Leading.

7           THE COURT:  Just ask it differently.  When Kim

8  came in to the shop, did she say anything about what she

9  could or could not purchase?

10           THE WITNESS:  Yeah, I believe that did happen.

11           THE COURT:  Would you tell us what she said?

12           THE WITNESS:  I don't exactly remember, but I

13  think that's how the white cross came up to be frank with

14  you.  I don't -- I can't tell you what she said, because I

15  don't recall specifically.

16  BY MR. SHEKETOFF:

17  Q.   So you believe she went in there more than once?

18  A.   Yes.  That's -- it's vague in my memory, but I think

19  that's how it came up, is the best way I can put it.

20  Q.   And do you know how the card got generated?  In other

21  words --

22  A.   I think she brought it back out with her, and I think

23  Gary kind of told her what to put on the card was what

24  happened.

25  Q.   And do you recall what the mood was in the car when

1  this was going on?

2  A.   Yeah.  It was, you know, he's a jerk.  You know, I want

3  to send them --

4       You know, it was more -- it was a prank.  You know,

5  that's --

6  Q.   And based from your perspective it was a prank?

7  A.   Yes.

8  Q.   All right.  Was it the flower shop or some other way

9  that the flowers got delivered?

10  A.   Oh, no.  I think it was the flower shop.

11  Q.   What happened next after you guys drove away from the

12  flower shop?

13  A.   Oh, jeez.  I mean, I imagine we got to where we had all

14  parked, and we all went our separate ways.

15  Q.   Do you know if any phone calls were made to CW-1 about

16  subs or pizza or anything like that?

17  A.   No, not to him.  They were made to one or two different

18  sub shops in and around Saugus to be delivered to him.

19  Because Gary had mentioned to me that he didn't like Italian

20  food, and I sent him some Italian -- I -- I -- I called them

21  and had some Italian food delivered.  Again, as a --

22       You know, I'm thinking it's like sort of you call a

23  taxi to your neighbor's house when you're in high school,

24  and they show up, and they're beeping the horns, and, you

25  know, nobody knows -- nobody comes out, you know.

19

1    Same idea.  Same --

2    You know, if you had a teacher you didn't like, you

3 might send him, you know, a bunch of food or something to

4 pay for.

5 Q.   All right.  So when you called the sub shops, --

6 A.   Yep.

7 Q.   -- was that your initiative based on Gary DeCicco's

8 comment that he didn't like Italian, or did the two of you

9 sort of agree that someone was going to do this?

10 A.   I think one of them I did myself.  I -- I -- I really

11 --

12    You know, and it was as a result of the ongoing sort of

13 he's a jerk.  You know, let's mess with him a little bit is

14 the best way to put it.

15 Q.   At some point after this flower delivery --

16    Do you believe that this was in August of 2014?

17 A.   It's very possible.  I mean, again --

18    But I just don't have a specific recollection.  I can

19 tell you that I remember it not being cold out was the best

20 way I can put it.  You know, I don't think it was at all in

21 the winter or anything like that.  I think it was nice out.

22 Q.   Other than the flower delivery and the one or two phone

23 calls to sub or pizza shops, did you ever have any further

24 contact or connection to CW-1?

25 A.   There was at least --

20

1    When you say to him directly, no.

2    Gary walked me through the building at least one time,

3  and I remember there was a lift for cars to bring it up to

4  the second floor that was being installed at the time.

5         THE COURT:  What building are you talking about?

6  Q.   At CW-1's building?

7  A.   Yes.  I'm sorry.  I apologize.

8         THE COURT:  All right.

9  A.   And I have a natural curiosity about --

10    I've been in the real estate business a long time.  I'm

11 always wondering about how things were being built.  You

12 know, so it's -- you know, it's just something that I --

13    I'll walk through any building that's under

14 construction any day of the week.  Yeah, I might be

15 trespassing, but I'm very curious about how they're doing

16 things.  Because construction is an evolving business.  It's

17 not something that's stagnant.

18 Q.   So no more prank calls from you?

19 A.   There -- not from me.

20    But I do believe there was one other thing.  I think

21 Gary called Davio's and acted as though he were xxxx --

22 excuse me -- CW and said -- made a bunch of disparaging

23 comments about the service, the food, and the this and the

24 that, and that was that.

25 Q.   All right.  When in relation to the flower incident is

1 that?

2 A.   Right around the same time.  All of this happened right

3 around the same time.  There wasn't a --

4     I would say everything we're talking about as far as

5 the food, the flowers, you know, calling Davio's all

6 happened within a week.  Maybe two tops, but more like a

7 week.  Something like that.

8 Q.   The Davio's incident you know about, because you were

9 physically present?

10 A.   Yeah, I was sitting there.

11 Q.   So he made that call in front of you?

12 A.   Yeah.

13 Q.   Now, at some point after the flower incident did Gary

14 DeCicco say something additionally to you about CW-1?

15 A.   The only specific thing that I remember --

16     Now, there may have been other bitching about -- excuse

17 my language -- about Peter not getting paid, and I can't

18 place an exact time with that.

19     -- but was that he said to me something to the effect

20 of xxxx said something bad about me.  That's -- and that was

21 it.  That was really -- that was for all intents and

22 purposes the last thing I heard about it.

23 Q.   To the best of your memory, this was after the flower

24 incident?

25 A.   Oh, definitely.  Definitely.

1  Q.   Do you have an estimate --

2  A.   How long afterwards is a tough question for me to

3  answer.  I thought about that, and I can't --

4       I would say within two months, but how close I don't

5  know exactly.

6  Q.   For any of these -- let me call them prank phone calls,

7  was Kim's father present?

8  A.   No.  No.  He's -- those were all done in the car with

9  me and Gary and --

10      I don't even think --

11      I think the flowers Kim was there for.  The other phone

12  calls I don't think -- she might have been in the car for

13  some, but I remember those being me and Gary together, just

14  the two of us.

15 Q.   Do you remember any conversation about CW-1 occurring

16 in front of Kim's father at the marina?

17 A.   No.  No, I don't.  I really don't, no.

18 Q.   All right.  Was the marina office place different than

19 the marina?

20 A.   No.  No.

21 Q.   Who's Rick Salvo?

22 A.   Rick is a civil engineer whose office is in Saugus.

23 The name of his firm is engineering alliance.  That's who he

24 is.

25 Q.   Do you know if there was any discussion about whether

1 or not Rick Salvo had been paid?

2 A.   I don't know.  Honestly, the thing I remember the most

3 about Rick Salvo is having paid him to do things and him not

4 producing them on time.  That's -- that's really -- I really

5 --

6      As far as him not getting paid?

7 Q.   Okay.

8 A.   I -- I -- I remember him asking for money on like the

9 Revere project; but, no, not -- not about CW if what's what

10 you're asking.

11 Q.   Yeah.  So you don't recall any conversation concerning

12 CW-1 that concerned -- also concerned Rick Salvo for a steel

13 guy, for an electric guy or anything like that?

14 A.   Yeah.  Steel -- electric -- I wouldn't say steel, but

15 the electric guy --

16      The steel guy may have been the guy putting in that

17 lift, so maybe about that.

18      The electric guy I remember Peter complaining about him

19 not being able to pay.  And I can't remember if Peter said

20 he told the electric guy to go collect on his own.

21 Something to that effect maybe, but.

22 Q.   And we're talking about an electric guy who was a

23 subcontractor on CW-1's building?

24 A.   Correct.

25 Q.   All right.  Now, at some point the government said to

1 you -- and correct me if I'm wrong -- why do you think --

2 what was behind the flower incident, and you gave your

3 opinion; correct?

4 A.   Yes.

5 Q.   And what was your opinion?

6 A.   My opinion of it was that Gary was pissed that Peter

7 didn't get paid, and --

8      I'm sorry.  Did you say about the flower incident?

9 Q.   Yeah.

10 A.   Oh, shit.  The flower incident was, yeah, about that.

11 The same thing.  The same thing.

12          MR. SHEKETOFF:  Nothing further.

13                    CROSS-EXAMINATION

14 BY MS. BARCLAY:

15 Q.   Good afternoon, Mr. Baldi.

16 A.   Good afternoon.

17 Q.   Mr. Baldi, you're a CPA?

18 A.   Yes.

19 Q.   And you work for Coopers and Mybrand (sic) in the 80s;

20 is that right?

21 A.   Yes.

22 Q.   And then you worked for the Flatly Company.  You were

23 the CFO for maybe 17 years?

24 A.   Yep.

25 Q.   And you worked for a few more years after that as the

1 CFO for a company Picernes?

2 A.   Picerne out of Rhode Island.

3 Q.   Picernes.  And that's a family real estate business?

4 A.   Yep, a big apartment company.

5 Q.   And when you left there, you sort of retired?

6 A.   Yeah, I thought I was going to.

7 Q.   But you were sort of going through a mid-life crisis of

8 some sort?

9 A.   Yes, uh-huh.

10 Q.   You needed to get out of the house?

11 A.   Oh, my God.  My wife harassed the crap out of me, so.

12 Q.   So you're outside your house one day in October 2013,

13 and Mr. DeCicco drives up --

14 A.   Yep.

15 Q.   -- with Kim DeBenedictis.

16 A.   Yes.

17 Q.   The pretty girl.

18 A.   Yep.

19 Q.   What kind of car did he have?

20 A.   I think it was a blue Bentley.

21 Q.   Bentley.

22     And you recognized him as someone that -- someone had

23 at some point mentioned you should, you know, possibly get

24 into business with.

25 A.   He was actually talking to the fellow who was doing the

1  landscaping.  And, yeah, I looked out, and I recognized him,

2  and said, yeah, okay.  Yeah, because although he and I had

3  never met before, we -- he, I think, moved to Winthrop when

4  he was 18.  I sort of almost -- I wouldn't say left

5  Winthrop.  Although I lived there, I worked everywhere else

6  but there is the best way I can put it.  So I didn't spend a

7  lot of time in Winthrop.  So I never spent --

8      You know, I never was introduced to him, so.  I knew

9  what he looked like, but I didn't know who he was.  And I

10  went out and introduced myself.

11  Q.   And he said, yeah, stop by my office tomorrow at the

12  marina?

13  A.   Yep.  Or the next day or whatever, yeah.

14  Q.   The next day?

15  A.   Yep.

16  Q.   And he told you over the course of your sort of first

17  couple of meetings with him that he owned land in Winthrop?

18  A.   Yep.

19  Q.   Saugus?

20  A.   Yep.

21  Q.   Revere?

22  A.   Yep.

23  Q.   He also told you he owned Pulaski Mills up in Peabody?

24  A.   He said he owned half of it.

25  Q.   Okay.  At that point he owned half.

1      And that was a mill building with a lot of tenants?

2 A.   Not a lot at the time.

3 Q.   But it had a lot of possibilities for tenants?

4 A.   I believe it did, yes.

5 Q.   And that's because you had worked for the Flatly

6 Company.

7 A.   Right.

8 Q.   That's the type of work you did.

9 A.   Well, we had a large industrial park about a mile and a

10 quarter away in Beverly that during a period of time I was

11 there we started with about a half million square feet and

12 ended up with 2.2 million square feet of mostly industrial,

13 some office --

14 Q.   So this is the type of thing that you --

15 A.   Yeah.

16 Q.   -- piqued your interest?

17 A.   And I thought the location of the building on Pulaski

18 Street was better than Tom's Park, frankly.

19 Q.   And it was your understanding he owned that marina in

20 Winthrop?

21 A.   Yeah.  I -- I -- in fact, I -- the marina I think --

22      I thought his kids may have owned it, frankly.

23 Q.   Okay.  But for all intents and purposes, it was his?

24 A.   Yeah.  Yep.

25 Q.   Okay.  And he told you --

1     This land in the Bahamas, did he say I owned some land

2 in the Bahamas?

3 A.   Not what we were looking at, but some other land --

4 Q.   Other land?

5 A.   -- on another island is the best way to put it.

6 Q.   And he also told you he had two houses in Nahant;

7 right?

8 A.   Yes.

9 Q.   He had one on the water.  A beautiful house you've been

10 to.

11 A.   Yep.  I've been to, yep.

12 Q.   And another inland where an ex-girlfriend lived with

13 one of his daughters?

14 A.   Right.  And I've also been to that.  Just, you know,

15 momentarily is the best way to put it.

16 Q.   And since you met him in October 2013, it was always

17 your understanding he owned both those houses?

18 A.   Yes.

19 Q.   And he had property in Florida he told you?

20 A.   Oh, yeah.  Yep.

21 Q.   And he had a bunch of fancy cars?

22 A.   Oh, yeah.

23 Q.   All right.  Lamborghinies, Porsches, Ferraris?

24 A.   Yep.

25 Q.   He told you he had a boat in Fort Lauderdale that he

1  paid 6 or 8 million dollars for?

2  A.   Yep.

3  Q.   And he told you he had boats in Massachusetts.  You saw

4  some of them.

5  A.   Yep.  I've been on one of them.  You know, more than

6  one.  Maybe two or --

7       You know, one of them in particular which is a

8  catamaran I was on a few times, yeah.

9  Q.   And he said he had another boat in Florida other than

10 the one he paid the 6 or 8 million dollars for?

11 A.   Yep.

12 Q.   And he had a couple of girlfriends; right?

13 A.   Yep.

14 Q.   There was Kim DeBenedictis?

15 A.   Yep.

16 Q.   And then you also met Pam Abdesian (phonetic)?

17 A.   Yep.

18 Q.   And she lived with him in the house on the water in

19 Nahant with a daughter?

20 A.   Yep.

21 Q.   Any other girlfriends did he tell you about?

22 A.   Yeah.  And Lisa who lived in the other home with his

23 other daughter.

24 Q.   Anyone else?

25 A.   No.

1  Q.   And you and DeCicco -- Mr. DeCicco, you're the same

2  age?

3  A.   A week apart.

4  Q.   Right?

5  A.   Yep.

6  Q.   And he's got a lot of stuff.  He's got cars, houses,

7  boats, properties, a couple girlfriends; right?

8  A.   Yep.

9  Q.   Talks tough?

10 A.   Yep.

11 Q.   And very different from the guys you dealt with at

12 Flatly?

13 A.   Oh, yeah.  Yeah.

14 Q.   And you had some money to play around with in your

15 retirement?

16 A.   Yep.

17 Q.   And you wanted to do something with your time?

18 A.   Yeah.  I had to.  Needed to.

19 Q.   So you got talking to him about his properties and how

20 you can help, and this going to be something different for

21 you?

22 A.   Correct.

23 Q.   And one of those properties is Pulaski Mills?

24 A.   Correct.

25 Q.   And he owned half.  The other guy owned half.

1  A.   Yep.

2  Q.   And we'll circle back to this later, but you gave them

3  900,000 --

4  A.   Yep.

5  Q.   -- for that -- as a loan for that property?

6  A.   As a loan to buy out David Rosenberg who owned the

7  other half.

8  Q.   And that was --

9  A.   Part -- partially to buy out David.

10 Q.   And that was May 2014?

11 A.   That sounds about right, yep.

12 Q.   So the flower incident we're talking about is in August

13 of 2014.

14 A.   Okay.

15 Q.   Okay?  So there's three months in there.

16 A.   Yeah.

17 Q.   Does that sounds right?

18 A.   I honestly never -- the only thing I can associate with

19 my investment in Pulaski Street is probably the month prior

20 and the period thereafter spending a lot more time with

21 Gary.

22 Q.   Well, that was my question, actually.

23      So if you put money in in May, --

24 A.   Yep.

25 Q.   -- then you didn't start spending a lot of time with

1 him --

2 A.    Correct.

3 Q.    -- until April --

4 A.    And a little prior to that I wanted to get to show the

5 place a little better, so doing my due diligence.  So yes.

6 Q.    Okay.  And a couple times a week you meet at an auto

7 body shop in Revere, is it?

8 A.    It's Saugus actually.

9 Q.    Saugus.  Route 107?

10 A.    Yep.

11 Q.    Is that Brother's?

12 A.    Is that in Revere?

13 Q.    Brother's Auto Body?

14 A.    No.  No.  It's, umm --

15 Q.    Is it Kenny Lafauci?

16 A.    No.  It's Armand -- I don't know Armand's last name.

17 It's right at the end of 107 before the bridge goes in to

18 Lynn.

19 Q.    Did Mr. DeCicco did introduce to you Kenny Lafauci,

20 though?

21 A.    Yeah.  And we would occasionally meet at Kenny's,

22 because Gary would buy cars through auction from Kenny.

23 Kenny would repair cars.  Kenny's repaired my own car, and

24 we've repaired --

25     You know, if Gary had something that Armand couldn't

1  handle from a repair stand -- Kenny was a step above Armand

2  in, I think, mechanically as much as anything in trying to

3  figure out how to fix cars.

4  Q.   Did he tell you --

5       Did Mr. DeCicco tell you that Kenny, Mr. Lafauci, let

6  Mr. DeCicco use his dealer license to buy and sell cars?

7  A.   No.  I thought that was --

8       Well, I thought the dealer plate he had came from the

9  Lynnway Dealership.

10 Q.   Is that Mr. Aswad?

11 A.   Yep.

12 Q.   Okay.  Because -- I'm sorry.

13      But Mr. DeCicco did have a dealer plate; right?

14 A.   Yep.

15 Q.   And did he tell you that the dealer plate allowed him

16 to buy and sell cars without them ever showing up under his

17 name, so he could not reveal that he owned those to the IRS?

18 A.   He never said it quite that way, no.  He -- he, uh --

19      No.  I mean, my -- my --

20      No, he never said that.

21 Q.   Okay.

22 A.   He would --

23 Q.   So --

24 A.   I mean, my impression of things is that he liked to

25 play with cars.  He liked to buy cars that --

1     He'd by one of two types of cars.  One was something

2 that was nice he could get at a cheap price, use it for a

3 period of time, and then sell it at the same price or maybe

4 a little less.

5     Or buy a car that was considered to be a junker by an

6 insurance company or something that he had a good feeling

7 about.  He'd buy that, spend some money on it, and then try

8 to sell it for more money.  And --

9 Q.   What about --

10 A.   You know, frankly, I always thought he was a partner of

11 Richy's.  I never thought he was -- I didn't think -- I

12 didn't think that was a tax scheme --

13 Q.   Okay.

14 A.   -- personally.  I just never thought.

15 Q.   So most days you'd leave a car at one of these shops,

16 and Mr. DeCicco would drive you up to Pulaski in one of his

17 cars?

18 A.   Or I would drive up.  It was sort one or the other.  I

19 mean, sometimes he'd drive his daughter's car over, because

20 it needed repair.  And I'd drive up some days.  You know,

21 he'd get whatever.

22     So I mean, it was a truck he got that was supposedly in

23 a flood.  And I saw it on the auction page.  You know, it

24 looked good.  And I just didn't believe it was going to run.

25 And it comes off the back of the truck and started right up,

1  so.

2  Q.   And sometimes Ms. DeBenedictis, the younger of his two

3  girlfriends, she's with you when you drive up there?

4  A.   Oh, yeah.  Many times.  I would say maybe not quite

5  half the time.

6  Q.   And you said that you drove by CW-1's property, --

7  A.   Right.

8  Q.   -- the dealership, a number of times?

9  A.   Yep.

10  Q.   Including when it was being built?

11  A.   Yep.

12  Q.   And he actually brought you in to the dealership --

13  A.   Yes.

14  Q.   -- once when it was being built?

15  A.   Yep.

16  Q.   And you said once, maybe even more than that?

17  A.   It might have been twice.  I really --

18      There's one time I distinctly remember that lift going

19  in.  And that's the thing that I remember the most, because

20  to me, when I looked at it, it looks like a lot of money.

21  That's an expensive thing.

22  Q.   Yeah.  And Mr. DeCicco just walked you right in there?

23  A.   Yeah.

24  Q.   And CW-1 was not there?

25  A.   Correct.

36

1  Q.   Peter Varone was there?

2  A.   Peter I think was there.  Probably --

3       Yeah, I can't remember if he was there.

4  Q.   And he showed you all around the building?

5  A.   Yeah.

6  Q.   He showed you how the lift worked?

7  A.   I don't think it was working yet.

8  Q.   Okay.  But he showed you what it was going to do?

9  A.   Sure.  Yep.

10 Q.   Did he show you his office on the second floor?

11 A.   He showed me upstairs on the second floor.

12 Q.   Okay.

13 A.   I mean, he never --

14 Q.   You said you thought that he --

15          MR. SHEKETOFF:  Wait.  He didn't finish the

16 answer.

17          THE COURT:  Yeah.  Finish --

18 A.   Yeah.  He never called that his office in my presence,

19 so.

20 Q.   Okay.

21 A.   I just want to be clear on that.

22 Q.   You also said, I think, and maybe I didn't hear you

23 correctly, did you also -- is it possible that you also

24 stopped there, and he ran in on other occasions?  Like, you

25 waited in the car?

1  A.    It might have been maybe once.  Maybe once, yeah, we

2  pulled around back, and he ran in.  That's possible.

3  Q.    And you said in response to Mr. Sheketoff's questions

4  that Mr. DeCicco talked about CW-1 and how he was running

5  the business?

6  A.    Yes.

7  Q.    And he said he was an idiot who didn't know how to run

8  a business?

9  A.    Correct.  Didn't know how to run --

10  Q.    A car --

11  A.    -- a used car -- high-end used car dealership.

12  Q.    Right.  He's selling Ferraris in the middle of the

13  winter.

14  A.    In the middle of the winter, yeah.

15  Q.    And there's this issue with the curb cut, because Mr.

16  DeCicco knew that that would be valuable for the property?

17  A.    Yes.  Any person --

18       You know, I would think that --

19       I mean, that's --

20       Boy, you would have paid for that, you know, in the

21  normal course of business not too much, because there wasn't

22  a lot of land there.  But to get it, yeah, you probably

23  would have shelled out a few bucks to get that.

24  Q.    Right.

25  A.    And to be able to get it in a swap essentially for land

38

1  that they needed to make a safer turn off of Route 1; to me,

2  it was a no-brainer when I look at it.

3  Q.    And Mr. DeCicco was frustrated that CW-1 --

4  A.    Yeah.  He's --

5  Q.    -- blew up that deal?

6  A.    You know, who -- who -- what kind of an entity would do

7  that?

8  Q.    And he was also -- you said he was complaining often

9  about CW-1 --

10       Or Mr. Varone was complaining about CW-1 owing him

11 money?

12 A.    Yes.

13 Q.    And Mr. DeCicco was not talking about CW-1 in

14 relationship to women in his life?

15 A.    No.  No.

16 Q.    Turning to August of 2014.

17      Now, at this point you had put $900,000 in to Pulaski

18 Mills; right?

19 A.    Yes.

20 Q.    And you are working to get that under control?

21 A.    Correct.

22 Q.    And you're spending a lot of time with Mr. DeCicco?

23 A.    Yep.

24 Q.    But he's not asking you to do anything illegal or

25 improper at that point?

1 A.   No.

2 Q.   And when you're driving back and forth to Pulaski one

3 day, you're in the car, he pulls over and sends Kim in for

4 the flowers?

5 A.   It was on the way back.

6 Q.   On the way back.   Sorry.

7       And this is same time that he's getting regular calls

8 from Mr. Varone about CW-1 owing him money?

9 A.   Yep.   Yep.

10 Q.   He's talking about him being an idiot --

11 A.   Yes.

12 Q.   -- for this curb cut?

13 A.   Yep.

14 Q.   Not knowing how to run a business.   Those types of

15 things.

16       Nothing about him harassing Ms. DeBenedictis, a sister,

17 a daughter, nothing?

18 A.   No.

19 Q.   With respect to the message on the flowers, you said

20 that Mr. DeCicco dictated it to Ms. DeBenedictis?

21 A.   Yeah.

22 Q.   It's addressed to --

23          MS. BARCLAY:  Your Honor, we can mark this -- I

24 think --

25          It's already Detention Exhibit 1, I believe.

40

1           THE COURT:  Yes.  Well, it's part of the Saugus

2  police report.

3           MS. BARCLAY:  Right.  Right.  But if I could

4  approach, Your Honor?

5           THE COURT:  Sure.

6  Q.   Take a look at the card.

7       So where it's addressed to Dear Gary, was that your

8  idea?

9  A.   No.

10 Q.   Whose idea was that?

11 A.   Gary.

12 Q.   And where it says, "We all know whose place that is.

13 We hope this cross will help you get rid of that Muslim

14 prick," whose idea was that?

15 A.   Gary.

16 Q.   And "from all Route 1 auto dealers," is that you?

17 A.   No.  That's all Gary (inaudible).

18 Q.   And when Mr. DeCicco first said let's send him flowers,

19 did you have any idea he was going to write something like

20 this?

21 A.   No.  I figured it would be Flowery; but, no, I didn't

22 know exactly what he would write, no.

23           THE COURT:  I'm sorry.  I didn't hear what you

24 said.  You thought it would be?

25           THE WITNESS:  Flowery.

                    *Judy Bond, CERT*
            *Certified Federal Court Transcriber*
                *judy@bondcourtreporting.com*

41

1          THE COURT:  You thought it would be flowery?

2          THE WITNESS:  Yep.

3  Q.   But did you think it would be this vicious?

4          MR. SHEKETOFF:  Well, Judge, I mean -- objection

5  to the characterization.

6          THE COURT:  To the characterization.  Yeah, that's

7  sustained.

8  A.   It's a little --

9  Q.   Mr. Baldi, I think --

10 A.   You know --

11 Q.   I think the judge sustained.  I'm sorry.

12 A.   I'm sorry.

13         THE COURT:  That's right.  Go ahead and ask the

14 next question.

15         MS. BARCLAY:  Next question.

16 Q.   Mr. Baldi, would you ever have been involved in sending

17 the flowers and this message if you knew that it had

18 anything to do with Mr. DeCicco wanting a piece of CW-1's

19 business?

20 A.   Absolutely not, no.

21 Q.   If you could take a look at -- actually, strike that.

22      Is there any water in there?

23 A.   No.  I have a bottle right there.  That's mine.  Thank

24 you very much.  Thank you.

25 Q.   As time went on, Mr. Baldi, eventually Mr. DeCicco

1 stopped talking to you about CW-1; right?

2 A.   Yep.

3 Q.   And in fact, he never told that you CW-1 was assaulted

4 in January 2015; right?

5 A.   No, he did not.

6 Q.   You didn't find that out until after Mr. DeCicco was

7 arrested --

8 A.   That's correct.

9 Q.   -- in March of 2017?

10 A.   Yep.

11 Q.   And he certainly never told you that he hired someone

12 to beat up --

13 A.   No.

14 Q.   -- CW-1?

15      And if he had told you that, you would have pulled your

16 money out of Pulaski; right?

17 A.   If I could have.  I mean, I -- you know, I mean, if --

18      Yeah, I mean, I probably would have been in a pretty

19 good pickle at that point, but.

20 Q.   Okay.  Just on Pulaski, when you first met Mr. DeCicco,

21 he needed to buy out his partner on Pulaski?

22 A.   Yes.

23 Q.   Okay.  And you put $900,000 in in May of 2014?

24 A.   Yep.

25 Q.   And that was -- you thought it was a loan to Mr.

1  DeCicco?

2  A.    Yep.

3  Q.    And you believed at that time that Mr. DeCicco used all

4  of that money to pay Mr. Rosenberg?

5  A.    Yep.  It was the 900 -- there was an additional --

6        The 900 grand gave me an option to buy like 36 percent

7  of the shares -- or convert it in to the shares of Pulaski

8  Street.

9        There was an additional like 400 --

10       There was a personal note that Gary took from

11 Rosenberg.  I think it was 430,000 or 420,000.

12       And the sum of those two are the million three and

13 change was essentially the buy-out price of David's half.

14 Q.    And you thought all your money was going to Rosenberg?

15 A.    Sure.

16 Q.    Because that's what Mr. DeCicco told you?

17 A.    Yep.

18 Q.    And then this summer while going through the

19 transaction records with agents, you realized that 200,000

20 of that was missing?

21 A.    It certainly looks that way.

22 Q.    And have you ever heard of a boat called the *Thunder*

23 *Cat*?

24 A.    Yep.

25 Q.    Did Mr. DeCicco tell that you he used your $200,000 to

44

1  buy that?

2  A.    No.

3  Q.    For Pulaski, there were some mortgages on the property.

4  They totaled 1.5 million?

5  A.    There was a mortgage for 1.5 and -- yes, there was --

6        The other personal note between David and Gary was not

7  secured by the property, to the best of my recollection.

8  Q.    And early 2016 you guys -- you and Mr. DeCicco start

9  talking about refinancing?

10 A.    Yes.

11 Q.    And the two of you applied to three different banks for

12 a refinancing?

13 A.    Initially there were two.

14 Q.    And then there was one final?

15 A.    Yep.  Yep.

16 Q.    Okay.  And first the plan is that you're both going to

17 own it?

18 A.    We're both going to own fifty-fifty.  One of the banks

19 was Leader Bank.  We felt that they may not have been

20 comfortable with Gary as a primary borrower.

21      We had talked about him putting his interest in a trust

22 for the benefit of his children, and because he had enough

23 of a gift tax exemption to be able to do that.  And we

24 thought that would have been okay with them is the best way

25 to put it.

1 Q.   And just to be clear, so the first bank, they turned

2 you down, because Mr. DeCicco had a tax lien, and because

3 his name was in the paper?

4 A.   No, I don't believe -- the first bank was Leader Bank,

5 and I think they turned us down, because they couldn't get

6 comfortable with the trust.

7 Q.   With the trust.

8      And the trust, just to be clear, was Mr. DeCicco was

9 going to own it, but he was just going to put it in the name

10 of his kids in trust?

11 A.   I don't think he would have owned it, but I think he

12 would have probably been the administrator.  He would have

13 been running it for the benefit --

14      His kids weren't old enough to --

15 Q.   Right.

16 A.   -- be the --

17      And I don't know how exactly it was legally structured;

18 but, you know, it was -- but I think it would have actually

19 been owned by his children.

20 Q.   And he --

21      So at some point, though, one of the banks --

22 A.   The next bank was Bank of New England.  Not the old

23 one, but a smaller version of them that -- an entity called

24 Bank of New England.  We applied to them.  They were hot to

25 trot on it.  And about a week later they came back and said

1  they wouldn't do the loan because of Gary's tax liens and

2  some of the press that was out on the Everett.

3  Q.   And you talked to Mr. DeCicco about his tax lien,

4  didn't you?

5  A.   Yes.

6  Q.   And he told you it was $1.1 million --

7  A.   He told me --

8  Q.   -- at one point?

9  A.   -- it was about 1.1, but that he had been on a payment

10  plan, and it was down somewhere in the 250 range.  Somewhere

11  around there.

12  Q.   So based on what he said to you, you believed he had

13  paid $800,000?

14  A.   Yeah.

15  Q.   To the IRS?

16  A.   Yep.

17  Q.   And that he was current in paying?

18  A.   Yep.

19  Q.   And you actually asked him why didn't he just pay it

20  off; right?

21  A.   Simultaneously with any refinancing.

22  Q.   And he said he didn't want to show the IRS that he had

23  any money?

24  A.   That may have been a previous conversation.  The

25  conversation when we were trying to refinance, he just

1 didn't want to do it.  I mean --

2 Q.   And you --

3      This whole time you thought that Mr. DeCicco was a

4 millionaire?

5 A.   Sure.

6 Q.   But at the same time he also bragged to you about

7 getting financial aid from a college for one of his kids;

8 right?

9 A.   He mentioned it, yep.

10 Q.   Did you and Mr. DeCicco have to submit rent rolls to

11 these banks?

12 A.   Yes.

13 Q.   And a rent roll is an accounting of all the leases

14 including the amounts of rent that comes due each month?

15 A.   Correct.

16 Q.   And those rent rolls that were submitted to the bank,

17 those were actually falsified?

18 A.   Yeah, the -- the first set of rent -- the first rent

19 roll that we submitted was to -- I think, in fact, there

20 were --

21      The same rent roll was submitted to Leader Bank and to

22 Bank of New England, and those rent rolls had a combination

23 of some just bogus leases and some inflated leases.

24 Q.   And in fact, Mr. DeCicco also manufactured some fake

25 leases to submit to these banks?

1 A.   It was --

2       I thought we could get the debt without needing to do

3 that, and he said it would be better this way.  That's what

4 he said.

5       And the one lease in particular that I can just tell

6 you, it was one to a moving company, Commonwealth Movers or

7 whatever, which I -- you know, I met that fellow for a total

8 of about 3 seconds, Joe Porter.  He's a real big guy.  He's

9 not somebody I would have chosen to cross in my life.  I

10 would have never entered a $10,000 a month lease on the rent

11 roll assuming that he was going to somehow fall out of

12 heaven and pay for it.  That was -- I had nothing to do with

13 it.

14 Q.   So they were not tenants?

15 A.   He was not a tenant.

16 Q.   But there was a lease for $7,500 that was submitted to

17 the bank for $10,000 --

18 A.   I thought it was 10 grand a month, yeah.

19 Q.   Okay.  And then, in fact, didn't Mr. DeCicco stencil

20 the name --

21 A.   I think he attempted to copy it to the best of his

22 ability.

23 Q.   But didn't he have the name put on the door?

24 A.   Oh, yeah.  Up on the door upstairs, yeah.

25 Q.   At the place they were supposed to be at behind?

1 A.    Yeah.

2 Q.    And it actually, did Mr. DeCicco, didn't he tell you

3 that even though he sold that business to Mr. Porter, he

4 actually still owned a part of it?

5 A.    Yeah.  He told that to many people.

6 Q.    So as time goes on, Mr. DeCicco starts to tell you more

7 about himself as you get to know him?

8 A.    Yep.

9 Q.    And he tells you at some point that he stuck a gun down

10 someone's throat?

11 A.    In his child -- in his high school days or college days

12 maybe, yeah.

13 Q.    And he said that he had someone beaten up to make sure

14 they didn't show up at a court hearing to testify against

15 him?

16 A.    I think it was against his brother.

17 Q.    And he told you he knew members of the Lynn Chapter of

18 the Hell's Angels?

19 A.    Yep.

20 Q.    And he told you those guys were his friends, and if he

21 needed anything, he could call them?

22 A.    Yep.

23 Q.    When you heard that Mr. DeCicco had been arrested, you

24 got nervous; right?

25 A.    Oh, yeah.

1 Q.   Because the allegation here is that he wanted an

2 interest in a piece of property he supposedly sold to

3 someone else?

4 A.   Correct.

5 Q.   And in order to get that interest, he hired someone to

6 beat the guy up?

7 A.   Correct.  Once I read what he was being charged with,

8 yeah.

9      I mean, you know, I had just bought a building from

10 him.  And you know, yeah, your mind begins to race.  You

11 don't know exactly, you know, what you've bargained for.

12 Q.   And in fact, the last transaction or the last mortgage

13 that you guys do --

14 A.   Yep.

15 Q.   -- is you buy the building from him.

16 A.   Correct.

17 Q.   And you get a $5.5 million mortgage from Eastern Bank?

18 A.   Correct.

19 Q.   But in fact, he gave you some of that money back?

20 A.   Yes.

21 Q.   And you then began paying him half of what you were

22 getting from Pulaski each month?

23 A.   Yep.  And I didn't feel like I was obligated to do

24 that.  I felt like he had been fair to me during the time

25 where I didn't own half of it, and --

1    You know, I didn't think that was going to go on

2 forever, but I thought, you know, we were looking at doing

3 several other real estate transactions, particularly one in

4 Revere that was getting close.  And there was a deal in

5 Winthrop where we had -- I had forwarded money for a deposit

6 which is I think is still hanging out there, but I won't

7 close on.  I'll lose that money.  And it's a combined

8 deposit and something -- payment to acquire of about 37 to

9 38 grand.

10    So we were working together to try to do other deals at

11 that time.

12         MS. BARCLAY:  Nothing further.

13                  REDIRECT EXAMINATION

14 BY MR. SHEKETOFF:

15 Q.   So who owns Pulaski?

16 A.   Me.

17 Q.   And when did you buy it?

18 A.   September of 2016.

19 Q.   And how much did you pay for it?

20 A.   The purchase price is $7.8 million, and there's a $5.5

21 million note on -- secured by the building that I have

22 personally guaranteed to Eastern Bank.

23 Q.   Okay.  So you eventually got the loan from Eastern

24 Bank?

25 A.   Correct.

1  Q.   And who applied for that loan?

2  A.   Me.  Me along with the broker who we had used to apply

3  to Leader and to Bank of New England.

4  Q.   You used the same broker?

5  A.   Yep.

6  Q.   But this time you were the only one?

7  A.   I was the sole borrower.

8  Q.   And as of today, you're the sole owner?

9  A.   Correct.

10 Q.   But you say you paid my client some of the money from

11 the rent for some period of time?

12 A.   Yep.

13 Q.   And what period of time was that?

14 A.   A couple of months.

15 Q.   Two months?

16 A.   I'd say it was right up until he got arrested,

17 actually.

18 Q.   Did he have some secret interest in that building?

19 A.   No.

20 Q.   Was that -- has that building been appraised?

21 A.   It was appraised twice.  It was appraised by Leader

22 Bank for something to the effect of ten point -- I don't

23 know.  Ten point something million.

24      It was then appraised by Eastern Bank, and Eastern Bank

25 did what I had assumed Leader Bank probably would have done

1 which was to say some of the rents were over market, and

2 they would have --

3     I've been through a lot of appraisals.  And they say,

4 okay, if market rent's seven bucks, you're getting ten,

5 we're not going to give you the benefit of the other three.

6 We're going to discount that out of the rental stream.

7     And they came in at $7.8 million; which is, you know,

8 to me, was a more realistic appraisal.

9 Q.   Okay.  So what did you buy the building for?

10 A.   7.8 --

11 Q.   Or Mr. DeCicco?

12 A.   $7.8 million.

13 Q.   But what did you buy it for from him?

14 A.   $7.8 million.

15 Q.   And you gave him his -- when you closed on the loan, --

16 A.   Yep.

17 Q.   -- you gave him the money, and now you own Pulaski?

18 A.   I'm sorry.  Could you -- I --

19 Q.   When you closed on the loan from Eastern Bank, he got

20 the proceeds on that loan?

21 A.   No.  He got the --

22     There were five and a half million dollars coming from

23 Eastern Bank.  There was a million and a half plus some

24 accrued interest to be paid to David Rosenberg.  There was

25 430 grand plus some accrued interest, and some of it was

1  default interest on one of the two loans, because it was due

2  previously.  So that was, say, a couple million dollars

3  together.

4       And I think that other than that, there may be a broker

5  -- some miscellaneous things.

6       So I would say he ended up with -- I think the number

7  was like 3.2.  Something like that.  Somewhere around there.

8  Q.   And that check was written to him or to somebody else?

9  A.   No.  I believe it was written to him.  I'm not really

10 sure -- I believe they were wire transactions, and --

11      I think it actually went -- may have been gone to an

12 intermediary, because he was going to do a tax-free

13 exchange.  So I don't believe it did actually go directly to

14 him.  I'm not sure, though.  I honestly -- I didn't --

15      I wasn't in control of those funds.  The bank was and

16 the bank's lawyer was.

17 Q.   So in the meantime, this was in -- when in relation to

18 the -- his arrest?

19 A.   Oh, boy.  This is in September of 2016, and you can

20 tell me -- I don't know exactly when he was arrested.

21 Q.   Okay.  So he, you believe, made about --

22      Well, what was his profit on the sale of this building

23 to you?

24 A.   Again, I can't really speak to his profit specifically.

25      What I can tell you is that the way I believe he and I

1 talked about it was that he was going to get his million

2 360.  I was going to get returned my 900,000 plus interest.

3 And then over and above that there were a few extra bucks

4 that we were basically keeping track of on a sheet of paper.

5 Q.   And you had other projects planned together?

6 A.   Correct.

7          THE COURT:  Anything else?

8          MS. BARCLAY:  Nothing further, Your Honor, with

9 this witness.

10          THE COURT:  Mr. Baldi, I'm sorry to belabor this,

11 but let me just make I have it.

12          THE WITNESS:  Certainly.

13          THE COURT:  September 2016 you bought out Mr.

14 DeCicco for 7.8 million.

15          THE WITNESS:  Correct.

16          THE COURT:  Your understanding is he netted of

17 that about 3.2 million.

18          THE WITNESS:  I think the amount of money that

19 went to him -- his intermediary to effect the tax-free

20 exchange, I think, was 3.2.  I'm not --

21          THE COURT:  Okay.

22          THE WITNESS:  And I believe what happened was the

23 money went through the exchange, and then I was repaid my

24 loan with interest on the back side of the exchange.  So

25 those checks would have come probably from him.

1           THE COURT:  Okay.  And that's what would have been

2  among the things that reduced his net of 3.2 million from

3  7.8.

4           THE WITNESS:  No.  The 3.2 would have been reduced

5  to --

6           THE COURT:  Outside the 3.2 that your 900 would

7  have come.

8           THE WITNESS:  Yes.

9           THE COURT:  Okay.

10          THE WITNESS:  Yes.

11          THE COURT:  And the 1.5 or so to David Rosenberg

12  would have come out of the 3.2 or the 7?

13          THE WITNESS:  No.  That was already out of the

14  5.5.

15          THE COURT:  Just when -- at least on the one

16  occasion you remember when you went in to CW's dealership --

17          THE WITNESS:  Yes.

18          THE COURT:  -- and the lift was being installed,

19  --

20          THE WITNESS:  Yes.

21          THE COURT:  Was the building -- was the business

22  operating at that time?

23          THE WITNESS:  Oh, no.  No.  I would say --

24          THE COURT:  It was under correction.

25          THE WITNESS:  Correct.  I'd say 85 percent done

1    complete at that point.

2          THE COURT:  Okay.  I may not have heard you

3    correctly.  When you were first discussing Kim DeBenedictis,

4    I thought you mentioned that -- I have the term "worked

5    there."

6          THE WITNESS:  At Pulaski Street, yes.

7          THE COURT:  Oh, she worked at Pulaski.

8          THE WITNESS:  Yes.  She did some secretarial work,

9    and she would place ads like on Craig's List to list space.

10         THE COURT:  Okay.  That's all I have.  Thank you.

11   You can step down.

12         THE WITNESS:  Am I all set?

13         THE COURT:  You're all set.

14         THE WITNESS:  Thank you very much.

15         THE COURT:  Go ahead.

16         MS. BARCLAY:  Your Honor, you had in your order

17   you had said that we could also introduce any rebuttal

18   information or anything else.

19         THE COURT:  Right.  With respect to what Mr. Baldi

20   --

21         MS. BARCLAY:  With respect to --

22         THE COURT:  -- testified to?

23         MS. BARCLAY:  Right.  And I --

24         THE COURT:  Okay.

25         MS. BARCLAY:  -- assumed that was regarding the

1 motive.  And I have the architect's plans, I guess, is I

2 believe that CW-1 told the investigators that -- that at

3 some point "Gary's Office" showed up on the architectural

4 plans --

5          THE COURT:  Right.  And written on there was

6 "Gary's Office."

7          MS. BARCLAY:  Exactly.  So I have three sets of

8 plans.

9          THE COURT:  And it was not Mr. Delilo (phonetic)

10 that writes that; it was Mr. Lloyd.

11          MS. BARCLAY:  It was Mr. Lloyd.  Exactly.

12          So I have three sets of plans.  One is the pricing

13 set where it doesn't have anyone's office.  The second it

14 says "Gary's Office" and CW-1's office, and the third says

15 conference room and CW-1's office.  So it corroborates that.

16          I can also make a proffer as to what Mr. Lloyd

17 would testify to, but -- if Your Honor wants that.

18          THE COURT:  I really wanted to try and keep this

19 focused to the issue of whether I need to open or not.

20          MS. BARCLAY:  That's fine, Your Honor.

21          THE COURT:  Mr. Sheketoff?

22          MR. SHEKETOFF:  In terms of making an argument

23 now, Your Honor?

24          THE COURT:  Yeah.  I think just making an

25 argument.  I'm not sure that evidence is actually squarely

1  rebuttal, so I'm not going to take it.

2                        ARGUMENT

3           MR. SHEKETOFF:  So here's my position.  That

4  apparently just from reading the transcript, this incident

5  that is the main focus of our attention today -- and we

6  spent a lot of time on the flower issue --

7           THE COURT:  The flower issue.

8           MR. SHEKETOFF:  -- and the flower incident, can be

9  seen in more than one context now.  And whether it's a issue

10  of what the -- one of these CWs who supposedly gets the

11  order from Mr. DeCicco to have the guy beat up who says it

12  was about a woman, but whether it's what this guy says, it's

13  not about the government's theory in either event.

14           And I've tried a lot of cases and lost my share

15  for sure.  But this is a serious weakness in the

16  government's case that they don't have any evidence of their

17  main theory.  Not that he hired someone to beat this person

18  up, but that it had something to do with extorting a piece

19  of business.

20           In many ways the evidence that we heard today

21  about his other wheelings and dealings makes it even less

22  likely that he would want to extort a part of a business

23  that was not being run properly by somebody that he thought

24  was basically an idiot.

25           So I'd ask you to give me a chance to go into

1  everything that was suggested in Mr. Kendall's motion for

2  reopening, because in the end this is not a case about an

3  assault and battery even with a dangerous weapon.  It's a

4  federal Hobbs Act case where they claim that there was a

5  specific purpose for this extortion from CW-1 who would have

6  been cooperating with the FBI for a significant period of

7  time whose own story does not include any specific kind of

8  demand.  That, you know, some general statement was made.

9  You know, we want -- we were going to be partners of some

10  sort, according to him.  It's not corroborated by anybody

11  else.

12        The idea that he would not go to the FBI to get

13  wired up, to have some subsequent conversation about it, is

14  very surprising to me, Your Honor.  I mean, it's not like he

15  had no connection to the FBI.  He had a longstanding

16  connection to the FBI, and he could have easily engaged my

17  client in some additional conversation about this.  Either

18  he got the flowers.  Now he was thinking there's an

19  extortion.  Or when he got the prank calls or when he got

20  anything else in connection with this case.  He could have

21  gone to the FBI then and done something about it.

22        Even after he was allegedly beaten up at my

23  client's suggestion he could have gone to the FBI and wired

24  up and said something along the lines of what do you want?

25  You know, you convince me.  But he never did any of that.

1          So it really comes down to whether -- what was the

2 motive for this incident.  And I think the government is

3 extremely weak on this issue, and I think the weight of the

4 case should make a difference to the Court.

5          I mean, he's been locked up for a significant

6 period of time already, and it's obviously easier to defend

7 a case when the defendant's on the street.

8          And in addition, who is it that he's going to now

9 threaten in this case to manipulate the case in some way?  I

10 don't see who it is.

11          THE COURT:  I'm sorry.  Who's "he?"

12          MR. SHEKETOFF:  Mr. DeCicco.  Who's he going to do

13 something to at some point?

14          They have sworn testimony, as I understand it,

15 from his girlfriend, Kim; from the witness we just heard

16 from, Mr. Baldi; from all the other cooperators.  Who is it

17 that he would target?

18          And there's obviously forfeiture by wrongdoing.

19 So it seems to me, Your Honor, that you should very

20 seriously consider reopening the hearing.

21          THE COURT:  I want to say that I want to make sure

22 that I'm focused on that question, and what I got from Mr.

23 Baldi is we were in the car, this was a prank just like

24 sending the pizzas.

25          I guess the question is does that make a material

1 difference as to the weight of the evidence.  It doesn't

2 make a difference to the nature of it, whether Mr. DeCicco

3 sent CW-2 there to beat him up for one reason or the other.

4          I'm stuck with him hiring somebody, paying him a

5 thousand bucks to go beat up a car dealer for whatever

6 reason.

7          So it doesn't change the nature and circumstances

8 of the offense; it goes to the weight of it.

9          And I appreciate what you're saying, but there are

10 two issues that I have with it.  And I had mentioned these

11 to Mr. Kendall the last time, or at least the first one, and

12 that is the very language in the note.

13          I understand that somebody who may not be clued in

14 to what Mr. DeCicco is or is not thinking may not have the

15 same take on that note, but the language of the note fairly

16 squares with the government's theory here, and that was what

17 was persuasive to the Court at the original detention

18 hearing.

19          I agree with you.  You had the statement of the

20 CW.  But even in that context it's my understanding that the

21 CW didn't go running to the FBI or the police to say

22 DeCicco's trying to get in on my business.  He actually

23 thought somebody else may have been behind it for a while

24 until he got the description of Kim DeBenedictis or was

25 shown the photo array or whatever it was, however she became

1   connected to it.

2          MR. SHEKETOFF:  But, Your Honor, if you're CW-1,

3   and you have this connection to the FBI, and you have Mr.

4   DeCicco say something to you, this really happened, that

5   you're going to be my partner, and he never raises it again,

6   because that's what his testimony is, that he never raises

7   it again; instead, he gets this cross in the mail that

8   suggests that Gary DeCicco wants him out of there, and maybe

9   he's going to take his place.  And he gets the architect's

10  view where, you know, someone that worked for the architect

11  has written this in.  Wouldn't you -- at that point you put

12  two and two together.  I mean, that's their story.  That's

13  what you just said to me.  Now it squares with the

14  government's theory.

15         If you're CW-1, you put two and two together, and

16  you say to yourself this is an attempt, these three things:

17  Him asking; him sending that cross; him, you know, sending

18  the architect with this name on it.  You put these three

19  things together, and you say this guy's trying to extort --

20  extort me.  You go to the FBI, and they wire you up.

21         And why doesn't he put these three things together

22  if they so squarely fit with the government's theory?  This

23  is not some unsophisticated person who's never, you know,

24  gone to the FBI.  This is someone that has total access to

25  the FBI.  If he really believed that, as opposed to

64

1 constructing it afterwards, this is my theory now, it's my

2 theory now, because I can see what the architect did, I can

3 see what's in the note, so these are not jokes anymore,

4 because once I'm beat up, this makes it a federal crime.

5          I mean, in some ways I can concede it's just as

6 serious a crime whether it's a federal crime or it's not a

7 federal crime.  I'm not applauding hiring somebody to beat

8 somebody else up.

9          But it's not a federal crime if he did it because

10 he was angry about what he said about his -- which I haven't

11 been able to prove yet, but I could at a reopened hearing --

12 that he said something about his kids, or he said something

13 about Kim, and that he really had a relationship -- CW-1 --

14 with Kim.  I don't mean a sexual relationship.  But she

15 worked for him for a period of time.  He said things to her.

16          Or it was over the fact that the contractor was

17 not paid, even though the contract was a friend of my client

18 and that --

19          It's not a federal crime if that's what happened.

20 If it was to get the contractor paid or it was a retribution

21 for some crude remark about one of the women in his life,

22 it's just not a federal crime.

23          And that's what they've charged here, and that's

24 why he's being detained, because it's a federal crime.

25          And I see the same thing you do which is that note

1  fits with the government's theory, but the circumstances of

2  the generation of that note don't really make sense, that he

3  would do it with Mr. Baldi and his girlfriend in the car.

4          Mr. Baldi tells you it wasn't the -- the cross was

5  something -- he has a vague memory, but it wasn't the

6  original discussion.  And why doesn't this guy put that two

7  and two together himself when it mattered when he could have

8  proved the case one way or the other if it really fit, as

9  opposed to reconstructing it afterwards, which is my view of

10 what he did, so.

11         And the stuff about the two girlfriends, I don't

12 know what that was doing in this hearing.  He has a daughter

13 that he's fully responsible for with one woman.  He has a

14 second daughter -- these are both teen-agers now, in their

15 late teens -- with a second woman, and he has his

16 girlfriend.  Just because he has what we called back baby

17 mamas doesn't mean that he has not acted as a responsible

18 father, or somehow he's not -- shouldn't be eligible for

19 release because he's a danger.  Which is, you know, what you

20 found, that he was a danger.  Not that he didn't have strong

21 roots in the community.  You rejected that.

22         So I think it is relevant to the weighing idea of,

23 you know, what is the strength of government's case, and do

24 they really have proof beyond a reasonable doubt to be able

25 to convince the jury that this motive was what they allege

1 in the indictment.

2          THE COURT:  Well, it's --

3          MR. SHEKETOFF:  I know that's not your standard.

4          THE COURT:  That's not my standard.

5          MR. SHEKETOFF:  I understand.

6          THE COURT:  Mine is have you come forward with

7 information that's new.  And I'm treating his information as

8 new, and I'll say in that context I did hear testimony that

9 was probably entirely irrelevant.  But Mr. Baldi wasn't

10 here.  He's here, let's hear it all, and I'll make a

11 decision.

12          My question is is it material -- does it have

13 material bearing on the facts as I originally understood

14 them, and that's really what I was trying to get at.

15          MR. SHEKETOFF:  Right.  I understand, and that's

16 how I read your order.

17          THE COURT:  All right.

18          MR. SHEKETOFF:  And I'm just suggesting that it

19 should.

20                         RESPONSE

21          MS. BARCLAY:  Your Honor, first of all, just in

22 terms of CW-1 -- I mean, I think what Mr. Sheketoff said is

23 he should have known immediately that this was a federal

24 extortion and reported it to the FBI.

25          What he did was as soon as he got the flowers, he

1 reported it to the Saugus P.D.  He wasn't working for the

2 FBI at the time.  That's who you report getting a threat

3 from, you report it to -- you call 911, and you report it to

4 the Saugus P.D.  It was the Saugus P.D. that called the FBI

5 when they realized that this could be a federal crime,

6 because Mr. -- because CW-1 once he realized who had ordered

7 the flowers said, oh, yeah, he has wanted a piece of my

8 business.  He wants a piece of my business.  This must be

9 from him.  So they called the FBI.

10          And then the FBI goes and talks to Mr. -- to CW-1

11 in December of 2014 before he's beaten, and he tells them

12 that Mr. DeCicco wanted a piece of his business.  The fact

13 that they didn't wire him up between the end -- I think it

14 was December 28 and the day he gets beaten on January 11

15 that should be somehow held against the government's case is

16 --

17          You know, I suggest, Your Honor, that that does

18 not mean that the government can not prove the motive in

19 this case or that CW-1 is somehow not credible.  And whether

20 --

21          The suggestion that we should send a guy who had

22 his jaw wired shut for 40 days or 60 days or however it was,

23 have him wear a wire and go talk to the guy who hired

24 someone to beat him up again is, I think, a little bit

25 preposterous, given the circumstances.

1              With respect to Mr. Baldi's testimony

2    specifically, Your Honor, which I think is what you're

3    asking for here today, is how that materially impacts the

4    government's evidence --

5              And again, it's the weight of the evidence, which

6    is one of the four factors to be considered in a detention

7    analysis, and it's one element of the case.

8              And it's the government's position that his

9    testimony doesn't support the defendant's arguments about

10   motive here.  The defendant argued in several different

11   briefs that this was over a woman and other personal

12   matters, and nothing Mr. Baldi said here today supports that

13   theory.

14             In fact, his testimony as to the evidence that Mr.

15   DeCicco's motivation for the card and assault on CW-1 was

16   the business.  First Mr. DeCicco brought Baldi in to the

17   dealership when it's under construction.  CW-1's not there.

18   He shows him around as if he owns the place.

19             Second, Baldi testified that DeCicco's constantly

20   talking about CW-1, how he doesn't know how to run a

21   business, how he screwed up the curb cut, he could have made

22   a lot more money, and then he owes Varone money for

23   construction at the business.

24             He didn't say anything to Baldi about CW-1's

25   treatment of women in his life or any other personal matters

1 between the two.  It was all about the business.

2          And whether you call it -- or Mr. Baldi calls it a

3 prank or not, Baldi actually thought DeCicco sent CW-1 the

4 threatening message because he owed Varone money, and that's

5 still about the business, Your Honor.  It's still extortion.

6          And in fact, it could also be a violation of 18

7 USC 894, extortion and collection of a debt.

8          But that aside, his testimony, Your Honor, I think

9 as you pointed out, is just based on his perception of why

10 Mr. DeCicco sent the flowers.  What he thought the flowers

11 were about is not relevant or necessarily admissible at

12 trial.

13          And Mr. DeCicco had good reason to hide his real

14 intent in sending the flowers from Mr. Baldi.  He's coming

15 off a long career as a CPA, a CFO for Flatly.  He's got

16 $900,000 in with DeCicco, and DeCicco's hoping to get more

17 money from this guy.  He's hoping to put him to work,

18 because he's good businessman.

19          And you know, sure, Baldi's impressed with

20 DeCicco's personality, his lifestyle.  It's so different

21 from his own.

22          But Mr. DeCicco knew that it would raise a huge

23 red flag for Baldi if he told him why he really sent the

24 flowers, to extort an interest in the dealership.  And Baldi

25 would have taken his million back if he could have, if

1  that's what he thought it was all about.

2          And I would say, Your Honor, it's very telling

3  that he didn't tell Mr. Baldi that he had CW-1 beaten up,

4  that's despite the fact that they're together for several

5  days a week at the time.  Because it's one thing to talk a

6  big game about having people beaten up, and it's an entirely

7  different thing to admit to an investor that you're

8  interested in continuing doing business with that -- who's

9  giving you an appearance of legitimacy, that this is how you

10  do business.

11          MR. SHEKETOFF:  Can I --

12          MS. BARCLAY:  And especially since, Your Honor, it

13  appears that Mr. DeCicco intended to do the same thing with

14  Pulaski.  He would, quote/unquote, sell it to Baldi but

15  retain an interest, a hidden interest in it, so that he

16  could hide his interest from the IRS and from banks.

17          It's the government's position that Baldi's

18  testimony here today does not support the defendant's

19  argument that the card and assault had something to do with

20  a woman, and they never said anything like that to Baldi,

21  and this wasn't a joke.  Baldi thought -- he said it was a

22  prank, but he thought it was over a business debt.  And you

23  don't follow up a joke with a vicious beating, Your Honor.

24          And Mr. DeCicco all but admits that he ordered and

25  paid for the beating in January 2015.  You follow up a

1 threat with action, and that's exactly what the card was

2 here.  It was a threat.  And nothing Mr. Baldi said here

3 today changes what Mr. DeCicco's words in that card meant.

4         MR. SHEKETOFF:  Can I have a very brief rebuttal,

5 Your Honor?

6         THE COURT:  You can.  It's your motion.

7         MR. SHEKETOFF:  Thank you.  Thank you for your

8 patience.

9                     FURTHER ARGUMENT

10         MR. SHEKETOFF:  While the building was under

11 construction when Mr. Baldi says my client brought him

12 there, the government is fully aware from CW-1 that my

13 client was obligated to do all the permitting, to do all

14 that stuff to make sure -- that was part of the deal.

15         So to suggest that there's some nefarious purpose

16 for him being around the building during that period of time

17 is completely inappropriate, Your Honor, in my view.

18         THE COURT:  Well, it's ambiguous.

19         MS. BARCLAY:  It's actually -- Your Honor, I

20 believe in their briefs they said they had nothing to do

21 with the permitting.

22         THE COURT:  I thought Mr. DeCicco got the

23 permitting for it.

24         MS. BARCLAY:  That's what CW-1 said.  But in the

25 memo of law in support of the motion to reopen the detention

1 hearing, that numerous people said that Mr. DeCicco had

2 nothing to do with the permitting.

3          MR. SHEKETOFF:  That's the government's theory

4 now.  I don't -- I couldn't --

5          MS. BARCLAY:  It's actually in --

6          THE COURT:  I think they meant in Mr. DeCicco's

7 filing.  Is that what you mean?

8          MS. BARCLAY:  Yes.  In Mr. DeCicco's filing he has

9 a private investigator who, I believe, says has interviewed

10 people who said that Mr. DeCicco had nothing to do with the

11 permitting.

12          THE COURT:  Okay.

13          MS. BARCLAY:  And I have to go back through it,

14 but I believe that was the --

15          MR. SHEKETOFF:  All right.  Well, the witness --

16          MS. BARCLAY:  -- to counter CW-1 saying that he

17 did.

18          MR. SHEKETOFF:  All right.  The witness they're

19 relying on says that he did have to do the permitting, and

20 now they say don't believe their witness on that ground,

21 just believe him on other grounds.  So he had a reason to be

22 around that building, number one.

23          Number two, Mr. Baldi told you that he owns that

24 building now, and that my client made $2 million off of it,

25 something along those lines --

1          THE COURT:  Are we talking about Pulaski now?

2          MR. SHEKETOFF:  Yeah, Pulaski.  That he owns it.

3          And she's saying, well, that he said there was

4   some hidden interest.  He said there wasn't some hidden

5   interest.

6          Number three, I think my sister said, well, if you

7   believe Mr. Baldi, well, he committed another crime, not the

8   crime we've charged in this indictment, but maybe an

9   extortion collection of debt.  That's not --

10          THE COURT:  I agree.

11          MR. SHEKETOFF:  I mean, if the jury believed Mr.

12  Baldi, there would be an acquittal, you know, on what he's

13  charged with now.  If the jury comes to the conclusion that

14  he had the guy beat up because the contractors that his

15  friend who got ripped off by CW-1 was not -- was ripped off,

16  then he gets acquitted of the charge that he's facing now.

17          THE COURT:  Right.  I'm considering the strength

18  of the evidence as to the charge in the indictment and not

19  does it make out some other charge.

20          Do the Saugus Police --

21          Tell me if this is in the record.  I'm thinking of

22  the Exhibit 1, the police report.

23          Do they at some point interview Kim DeBenedictis,

24  or do they just go with the photo array that's shown to the

25  woman who works at the flower shop in Lynn?

```
1            MS. BARCLAY:  They don't.  They turn it over to

2  the FBI, Your Honor.

3            THE COURT:  Okay.  So Kim DeBenedictis is not

4  interviewed.

5            MS. BARCLAY:  Not by Saugus P.D.

6            THE COURT:  Is she interviewed by the FBI when it

7  goes from Saugus P.D. to the FBI?

8            MS. BARCLAY:  No.  There was no time in there,

9  Your Honor, before he got assaulted.

10            THE COURT:  All right.

11            MS. BARCLAY:  I think he was interviewed December

12  28.  The assault was January 11.  So it was over the

13  holidays.

14            THE COURT:  All right.  So what I want to do then

15  is on --

16            I'll take under advisement the motion then to

17  reopen.  I'll get you a decision as quickly as I can on it.

18            MR. SHEKETOFF:  Thank you, Judge.

19            THE COURT:  All right.  We're in recess.

20            MS. BARCLAY:  Thank you, Your Honor.

21            THE COURT:  Thank you.

22       (Court adjourned at 3:57:54 p.m.)

23

24

25
```

75

CERTIFICATION

1

2    I, Judy Bond, a court approved transcriber, certify

3 that the foregoing is a correct transcript from the official

4 electronic sound recording of the proceedings in the

5 above-entitled matter.

6

7

8 _____   October 17, 2017
  Judy Bond

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Judy Bond, CERT*
*Certified Federal Court Transcriber*
*judy@bondcourtreporting.com*