**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
UNITED STATES OF AMERICA,  . CRIMINAL NO. 1:17-cr-10092-NMG
      Plaintiff            .
                           . WORCESTER, MASSACHUSETTS
           v.              . NOVEMBER 3, 2017
                           .
GARY P. DeCICCO,           .
      Defendant            .
. . . . . . . . . . . . .  .
```

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:   UNITED STATES ATTORNEY'S OFFICE
                      BY: Kristina E. Barclay, AUSA
                      One Courthouse Way, Suite 9200
                      Boston, MA 02210
                      617-748-3371
                      kristina.barclay@usdoj.gov

For the Defendant:    Robert L. Sheketoff, Esquire
                      One McKinley Square
                      Boston, MA 02109
                      617-367-3449
                      sheketoffr@aol.com

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1                         **I N D E X**

2    **EXHIBITS  DESCRIPTION**                    **MARKED  IN EVIDENCE**

3    **Government's:**

4    100   Plan 8 x 13                            6         6

5    101   Plan Dated 8/14/13                     6         6

6    102   Plan Dated 11/11/13                    6         6

7    108   Text Messages                          17        17

8    109   Affidavit of Jane Doe 1                19        19

9    110   Complaint: Comm. of Massachusetts

10         vs. Car Center USA                     20        20

11   111   Mass. Attorney General's Office Press  21        21

12         Release

13   112   Lien                                   24        24

14   **Defendant's:**

15   103       Audio Recording                    12        12

16   104       Transcript                         12        12

17   105       Letter dated 5/26/17               13        13

18   106       Letter Dated 6/26/17               13        13

19   107       Letter Dated 7/15/17               13        13

20

21

22

23

24

25

3

1  COURT CALLED INTO SESSION

2  (10:04:54 P.M.)

3        THE CLERK:  Court is now in session.  Please be

4  seated.  The Honorable David H. Hennessy presiding.  Today's

5  November 3, 2017, in the case of the United States vs. Gary

6  DeCicco, Criminal Action Number 17-10092.

7        Could counsel please identify yourself for the

8  record?

9        MS. BARCLAY:  Good morning, Your Honor.  Kristina

10  Barclay for the United States, and I'm joined at counsel

11  table today by Special Agent Matt Elio from the FBI and

12  Special Agent Sandy Lemanski from IRS.

13        MR. SHEKETOFF:  Good morning, Your Honor.  Robert

14  Sheketoff and Carlos Apostle for the defendant, who's also

15  present.

16        THE COURT:  Good morning.

17        MR. APOSTLE:  Good morning.

18        THE COURT:  Okay.  As the parties are aware, on

19  October 13 I granted the defendant's motion to reopen the

20  detention hearing.  I know there was some question about

21  what my intention was thereafter, but I think it puts us

22  back in to the posture of an open detention hearing.  If you

23  have evidence you want to present, you present it.  If you

24  have evidence you want to present, present it.  I'll hear

25  argument.

4

1          The government has the burden to establish by a

2 preponderance of the evidence that the defendant is a flight

3 risk.  I think that question is now reopened.

4          The government has the burden to establish by

5 clear and convincing evidence that the defendant is an

6 unacceptable danger; and again, I think that question is

7 reopened.

8          So with that, Ms. Barclay?

9          MS. BARCLAY:  Your Honor, the government would

10 introduce exhibits that were turned over in discovery.

11 These are architectural plans.  There are three documents.

12          And I don't know whether Your Honor wants to start

13 the detention exhibit at -- I believe we were at 4 after the

14 March hearing.

15          THE COURT:  Okay.

16          MS. BARCLAY:  Or whether you want to restart it

17 for today.

18          THE COURT:  You know?  Just to distinguish them,

19 why don't we start at like 100.  100, 101.  I mean I know

20 it's far from where we were, but I'm anticipating the

21 defendant may want to offer exhibits that were part of his

22 submission in support of the motion to reopen, so I don't

23 want to --

24          I want to try and keep the numbers straight.

25          MS. BARCLAY:  Okay.  May I approach, Your Honor?

1                THE COURT:  Yeah, sure.

2                MS. BARCLAY:  And once those are numbered and

3 passed up, Your Honor, I'll call your attention to a few

4 items --

5                THE COURT:  Okay.

6                MS. BARCLAY:  -- on there.

7                THE COURT:  Okay.  So for the record 100 is the

8 Auto Excellence, the 8 1/2 by 11.

9        GOVERNMENT EXHIBIT NO. 100, MARKED & ADMITTED

10               THE COURT:  101 is larger Auto Excellence.

11               MS. BARCLAY:  You might be able -- for the two

12 larger ones, Your Honor, if you look at the bottom, on the

13 second one there's a date.  I believe it says 8/14/13.  And

14 then on the second one is says 11/11/13.

15               THE COURT:  Okay.  That's fine.  So before I hear

16 you on this, any objection?

17               MR. SHEKETOFF:  No.

18               THE COURT:  Okay.  These are admitted.

19        GOVERNMENT EXHIBIT NO. 101, MARKED & ADMITTED

20        GOVERNMENT EXHIBIT NO. 102, MARKED & ADMITTED

21               MS. BARCLAY:  Your Honor, I would proffer that

22 these documents were produced by DiLullo Associates.  They

23 are the architects who worked on the design for the victim's

24 car dealership.  And these are three sets of plans.

25               The first set of plans is the pricing set, August

6

1  2, 2013.  And if you turn to the third page, you'll see the

2  mezzanine floor, and you'll see there's a label break room

3  and office.  Two different labels there.

4          THE COURT:  Yes.

5          MS. BARCLAY:  If you look at Exhibit 101, that is

6  the set that's dated August 14, 2013, also from DiLullo

7  Associates.  And if you look at the second page or the

8  mezzanine floor there, you'll see there are two labels.  One

9  says "Gary's Office," and one has CW's first name, and it

10 says that it's his office right next to it.

11         THE COURT:  Okay.

12         MS. BARCLAY:  Then Exhibit 102, Your Honor --

13         THE COURT:  Yes.

14         MS. BARCLAY:  -- is dated approximately three

15 months later, November 11, 2013.  And if you look at the

16 second page, again the mezzanine floor.  "Gary's Office" has

17 been changed to "Conference," but CW-1's office remains

18 labeled with his first name.

19         THE COURT:  All right.  And Ms. Barclay, just

20 direct me again 102, where is the date on it that you were

21 referencing?

22         MS. BARCLAY:  If you look at the front page --

23         THE COURT:  Yes.

24         MS. BARCLAY:  -- in the --

25         If you turn it this way, Your Honor, length wise.

1          THE COURT:  Uh-huh.

2          MS. BARCLAY:  And you go to where there are a

3 number of different lines?

4          THE COURT:  Yes.

5          MS. BARCLAY:  You'll see that that one contains a

6 second entry.  The first entry says updated per owner review

7 8/14/13, and the second one says -- I believe it says window

8 something confirmed.

9          THE COURT:  Okay.

10          MS. BARCLAY:  So that's different than the 101.

11          THE COURT:  I see.  So how does this square with

12 DiLullo's testimony that there's never been -- he's never

13 seen plans that either -- I think he used the term either

14 jokingly or seriously indicated that the office was Gary's.

15          MS. BARCLAY:  Well, Your Honor, the affidavit of

16 Mr. Cinotti is misleading; in that, Mr. DiLullo --

17          It was his firm that worked on this project, but

18 it was actually an individual by the name of John Lloyd who

19 prepared these plans.

20          THE COURT:  Okay.  Right.

21          MS. BARCLAY:  And you know, I'm happy to proffer

22 Mr. Lloyd's testimony, but I think it's sufficient to say,

23 Your Honor, that these three plans corroborate CW-1's

24 statements to the agents that Gary's name showed up on an

25 office on the architectural plans, and that he asked -- had

8

1  to ask that it be removed.

2            THE COURT:  Okay.

3            MS. BARCLAY:  That's the second and third of

4  these.

5            You know, Your Honor, it says in the affidavit

6  that Mr. DiLullo spoke to the FBI twice.  What it doesn't

7  say is the second time he spoke to the FBI he actually

8  called them back and said, "I forget.  It was John Lloyd who

9  actually worked on this.  You've got to talk to him."

10           THE COURT:  Okay.

11           MS. BARCLAY:  But there's nothing about Mr. Lloyd

12 in the affidavit which again makes it misleading.  It was

13 not Mr. DiLullo who had these conversations.

14           THE COURT:  So was Lloyd interviewed?

15           MS. BARCLAY:  Yes, Your Honor.

16           THE COURT:  And what does Lloyd say?

17           MS. BARCLAY:  Lloyd testified, Your Honor, that

18 Mr. DeCicco asked him to put his name on the office.

19           He also testified that Mr. DeCicco was interested

20 in the plans, met with him several times without CW-1

21 present, and he couldn't tell what exactly Mr. DeCicco's

22 interest was in the business, but he certainly had some sort

23 of interest in it.

24           THE COURT:  Okay.  And I know it's in front of me.

25 I can't read it.  What's the date of the plan, Exhibits 101?

9

1                MS. BARCLAY:  101 is August 14, 2013.  So it goes

2 August 2, August 14, and November 11.

3                THE COURT:  Okay.  August 14, two thousand?

4                MS. BARCLAY:  '13.

5                THE COURT:  Okay.  All right.

6                MS. BARCLAY:  Your Honor, in terms of additional

7 evidence, I'd like to have the opportunity to rebut whatever

8 evidence Mr. Sheketoff offers on behalf of Mr. DeCicco.

9                At this point I think that's all the government

10 has, but we would argue, obviously, based on Mr. Baldi's

11 testimony, these exhibits and the failure of the defense to

12 impinge CW-1's credibility, that the weight of the evidence

13 is actually stronger today than it was on March 22, 2017.

14                THE COURT:  Okay.

15                MS. BARCLAY:  So we'd, like I said, reserve the

16 right to present additional rebuttal documents.

17                THE COURT:  All right.  I'm planning to consider,

18 if they're offered, the exhibits that the defendant

19 submitted in support of the motion to reopen, assuming that

20 they're offered.  So just keep that in mind in terms of the

21 scope of your rebuttal.

22                MS. BARCLAY:  Your Honor, I would object to your

23 consideration of any of that information that could have

24 been known on March 22 pursuant to your order.  That would

25 be the affidavit of Noelle Spinoza, information from the

1  Varone's, mutual friends and associates.

2         I believe there's a significant amount of evidence

3  in there that -- or information in there that was either

4  known or could have reasonably been known with due diligence

5  on March 22, so I think unfortunately I'd have to go piece

6  by piece.

7         THE COURT:  Okay.  I think I did clarify that the

8  parties would be limited to information that was not known

9  on March 22 or that could have been known.

10        Mr. Sheketoff?

11        MR. SHEKETOFF:  So I'd move to strike the three

12  exhibits of the --

13        THE COURT:  Yeah, right.

14        MR. SHEKETOFF:  -- the government just offered.

15        THE COURT:  Right.  Why isn't this out of the

16  picture then, the drawings?

17        MR. SHEKETOFF:  So, Your Honor, could I --

18        MS. BARCLAY:  Yeah, Your Honor, I actually don't

19  think the government had the drawings at that point and had

20  not --

21        I don't think we had talked to Mr. Lloyd by then,

22  so this was actually --

23        Because it was a complaint arrest, and this was

24  done rather quickly.

25        MR. SHEKETOFF:  So, Your Honor, the purpose of

1 this hearing is to make a fair determination.

2             THE COURT:  Right.

3             MR. SHEKETOFF:  It's not, it seems to me, to press

4 technicalities.  Maybe they didn't have it, maybe they did,

5 maybe by due diligence they could have had it.  I don't

6 intend to expand the record beyond what's already in front

7 of you except in a minor way.

8             I have the actual tape recording of what CW-1 said

9 in 2010 to the victim in that case and the actual police

10 report.  I don't intend to play it for you, but I intend to

11 make it available so you can listen to it, because --

12             THE COURT:  Is that the --

13             MR. SHEKETOFF:  -- it may change your impression.

14             THE COURT:  I'm sorry.  Is that the exhibit that's

15 the subject of, I think it's Exhibit 12 or 13, that was

16 appended to the motion to reopen?

17             MR. SHEKETOFF:  Yes.

18             THE COURT:  In other words, is --

19             Okay.  I've reviewed it.  I mean, you can offer it

20 and --

21             MR. SHEKETOFF:  Thank you.  It's a little bit

22 easier to read.  It's the full police report and the actual

23 tape recording of what was left on the phone.

24             THE COURT:  Any objection?

25             MS. BARCLAY:  Yeah, I would object, because it's

12

1  not admissible evidence.  There's no evidence that Mr. --

2  that CW-1 lied in connection with this.

3          And he was clearly not the aggressor on January

4  11, 2015, so there's no self-defense issue here.

5          So the fact that he may have left a threat on

6  someone's voicemail and then accepted responsibility for it

7  and took a CWOF on it is not relevant or admissible.

8          THE COURT:  All right.  I'm going to accept it.

9  It's admitted.  So this would be exhibit -- let's call it

10  104 for the -- I'm sorry -- 103 for the police report, 104

11  for the recording.

12      DEFENDANT EXHIBIT NO. 103, MARKED & ADMITTED

13      DEFENDANT EXHIBIT NO. 104, MARKED & ADMITTED

14          MR. SHEKETOFF:  And, Your Honor, I have three

15  discovery letters from the U.S. Attorney's Office to Mr.

16  Sheketoff that I'd like to mark, because they do discuss --

17  the only part that's relevant that I see is they do discuss

18  exculpatory evidence.

19          THE COURT:  Okay.  Ms. Barclay, do you know which

20  documents are being offered?

21          MS. BARCLAY:  Yes, Your Honor.

22          THE COURT:  Okay.

23          MS. BARCLAY:  Again, this is exculpatory evidence.

24  It's not the scope of the evidence that the government has

25  in this case.

1           THE COURT:  Let me see it.

2           MR. SHEKETOFF:  There are three of them.

3           THE COURT:  All right.  I have letters dated May

4  26, June 26 and July 15 all of 2017.  I'll admit them as

5  105, 106 and 107.

6       DEFENDANT EXHIBIT NO. 105, MARKED & ADMITTED

7       DEFENDANT EXHIBIT NO. 106, MARKED & ADMITTED

8       DEFENDANT EXHIBIT NO. 107, MARKED & ADMITTED

9           THE COURT:  Okay.  Mr. Sheketoff, anything else?

10          MR. SHEKETOFF:  No, except I also proffer the

11 exhibit that you mention attached to the motion to reopen.

12          THE COURT:  I think I'm going to go ahead and

13 consider them.  First of all, I've probably read every one

14 of them twice.  And let's be realistic.  To say that I'm

15 going to push them out of my mind or the calculus is going

16 to be a difficult matter.  If there's something in there

17 that's critical; you know, I'll carefully consider it.

18          MR. SHEKETOFF:  As other affidavits, Your Honor,

19 they're just affidavits, and there's been no

20 cross-examination of them, so they are what they are, and

21 you give them as much weight as you deem appropriate in the

22 circumstances.

23          THE COURT:  Is CW-4 who submitted an affidavit, is

24 he Mr. DeCicco's employee?

25          MR. SHEKETOFF:  No.  He's a tenant, Your Honor.

14

1            THE COURT:  Okay.  Why do you say he's an

2  employee?

3            MS. BARCLAY:  He was his employee.  He was an

4  employee at Pulaski and for other projects at that time.

5  That Mr. DeCicco hired him --

6            THE COURT:  Okay.

7            MS. BARCLAY:  -- to -- or used him to facilitate

8  the assault.  I believe he was doing work for him up until

9  the time Mr. DeCicco was arrested, although I could be

10  wrong.

11            THE COURT:  Do you dispute that?

12            MR. SHEKETOFF:  He did some part-time work.

13            THE COURT:  Okay.

14            MS. BARCLAY:  And, Your Honor, if Your Honor is

15  going to consider all of the exhibits including Mr.

16  Cinotti's affidavit, then I also have additional exhibits

17  for rebuttal.

18            THE COURT:  Okay.  Fire away.

19            MS. BARCLAY:  Okay.  I have -- I would proffer

20  with regard to P. J. Varone Junior, he states in Mr.

21  Cinotti's affidavit, although not in his own affidavit, that

22  he -- I believe he says -- it's in document 847, paragraph

23  3.  He added that he worked for his father during the entire

24  project.

25            Your Honor, Mr. Varone Junior testified before the

1 grand jury.  He was asked, "With regard to Auto Excellence

2 group, and your dad was the GC?"

3          He said, "Yeah."

4          I asked, "And did you actually do any construction

5 work on the project?"

6          And he said, "No, but I was there a lot.  I was

7 doing -- into the barber thing."

8          He was a barber at the time, Your Honor.

9          THE COURT:  I'm sorry.  Which paragraph of Cinotti

10 did you want me to look at?  I remember the Varone

11 statement.  This is Peter Junior; right?

12          MS. BARCLAY:  Right.  That was paragraph 3, Your

13 Honor.

14          THE COURT:  Paragraph 3.  Okay.  I have it.

15          Hang on a second, Mr. Sheketoff.  Okay.

16          MR. SHEKETOFF:  Your Honor, these are grand jury

17 minutes that I don't have.  And normally I would -- when

18 some portion is proffered, I would want to see what's in the

19 rest of it to see if there's some context that changes it in

20 any way, so.  I'd like to see his grand jury testimony, if

21 we're going to proffer portions of it.

22          THE COURT:  What do you say?

23          MS. BARCLAY:  Your Honor, this is a particular

24 statement that's being discredited by a particular statement

25 in the grand jury.  I don't think Mr. Sheketoff is now

16

1 entitled to all of Mr. Varone's testimony in the grand jury.

2 That's essentially asking for early discovery.

3         THE COURT:  All right.  I'm going to deny

4 production of it.  I'm going to consider the statement for

5 what it's worth.  I mean, it seems to me the point of the

6 Cinotti affidavit and Peter Varone Junior's statement is

7 that he was -- whether he was working on the project or

8 cutting hair, he's at the project a lot.  He met with the

9 CW, and CW never said to him that the defendant was

10 pressuring him to be a partner in the dealership.

11         I mean, I don't know that what's being offered,

12 his grand jury testimony changes that, but it's my take on

13 it.

14         I'm not going to order it produced.

15         MS. BARCLAY:  Okay.

16         THE COURT:  Okay.  What else do you have?

17         MS. BARCLAY:  Your Honor, with regard to Mr. T.,

18 this is paragraph 30 of Mr. Cinotti's affidavit.  I would

19 offer a series of text messages between that individual and

20 CW-1.

21         THE COURT:  Is T. the former car salesman?

22         MS. BARCLAY:  He was employed by CW-1 for several

23 months as a salesman earlier in 2017 according to Cinotti's

24 affidavit.

25         THE COURT:  I take it that's a mistake; right?

1          MS. BARCLAY:  The 2017?

2          THE COURT:  Yeah.  I guess not.  I guess it could

3 be --

4          Never mind.  Sorry.

5          MS. BARCLAY:  Okay.  And I'm not sure what exhibit

6 number we're up to.  Is that --

7          THE CLERK:  108.

8          MS. BARCLAY:  108?

9      GOVERNMENT EXHIBIT NO. 108, MARKED & ADMITTED

10          MR. SHEKETOFF:  Can I have a clarification about

11 who's yellow and who's --

12          MS. BARCLAY:  Yes, I will do that right now, Your

13 Honor.  If you look at the yellow, I would proffer that that

14 is a salesman known as Mr. T., and the blue is CW-1.

15          And I would call your attention, Your Honor, I

16 believe the allegation is that CW-1 threatened to report Mr.

17 T. to Homeland Security as an illegal alien.  If you take a

18 look at this string of texts, Your Honor, it's actually Mr.

19 T. asking to be paid.  CW-1 saying, you know, give me -- or,

20 send me your check, and I will take a look at it, and if I

21 owe you money, I will pay you money.  Mr. T. says --

22          THE COURT:  Where are you?

23          MS. BARCLAY:  If you take a look at --

24          Let me see, Your Honor.  It's not numbered.  Three

25 texts down on the fifth page.

1          Mr. T. says, "If you don't pay me, I'm going to go

2 directly to the labor department, and I will shut your shit

3 down."

4          And CW-1 continues to try to work this out, and

5 ultimately after multiple texts back and forth CW-1 talks to

6 the payroll company.

7          If you look to the second to last page, it's not

8 until several texts in to the exchange and after Mr. T. had

9 threatened to call the labor department and shut CW-1 down

10 that CW-1 says, "I'm going to report you to immigration and

11 Social Security Department."

12          So it's in the context of a --

13          THE COURT:  Okay.

14          MS. BARCLAY:  -- extensive business dispute in

15 which threats go back and forth.

16          I would also proffer to Your Honor that CW-1 ran

17 into that individual after the investigator talked to him at

18 Porsche Boston, and Mr. T. told CW-1, "me and the private

19 investigator are going to" -- and I quote -- "fucking take

20 you down."

21          THE COURT:  And when was this?

22          MS. BARCLAY:  What's that, Your Honor?

23          THE COURT:  When?

24          MS. BARCLAY:  Within the last few months.

25          Your Honor, with regards to --

1          THE COURT:  So "me and the investigator,"

2 referring to?

3          MS. BARCLAY:  The private investigator.

4          THE COURT:  Mr. Cinotti?

5          MS. BARCLAY:  Yes.

6          THE COURT:  So what does Mr. T. have to do with

7 Mr. Cinotti?

8          MS. BARCLAY:  Mr. Cinotti interviewed him.

9          THE COURT:  All right.

10          MS. BARCLAY:  Your Honor, with regard to Jane Doe

11 1, I have a sworn affidavit from the woman who's known as

12 Jane Doe 1 in the Cinotti affidavit.

13          THE COURT:  So this is the former girlfriend of

14 CW-1 who started DiVenuti?

15          MS. BARCLAY:  Yes, Your Honor.  Exactly.

16          THE COURT:  All right.  This is Exhibit 109.

17      GOVERNMENT EXHIBIT NO. 109, MARKED & ADMITTED

18          MS. BARCLAY:  And I'll give Your Honor a minute to

19 read it.

20 (Pause in the proceedings.)

21          THE COURT:  All right.  I got it.

22          MS. BARCLAY:  I would also note, Your Honor, that

23 Jane Doe 1 works for the car dealership where Mr. DeCicco's

24 one of his best friends.  He owns the dealership.  And

25 that's where she was interviewed by the private

20

1 investigator.

2            THE COURT:  Mr. Aswad?

3            MS. BARCLAY:  Mr. Aswad, yes.

4            Your Honor, --

5            Should I move on?

6            THE COURT:  Yes.

7            MS. BARCLAY:  Respect to Car Dealer K., I have two

8 exhibits for Your Honor.  This is the individual who stated

9 that CW-1 went on Channel 56 in a special report by Shannon

10 O'Brien.

11            THE COURT:  Right.

12            Is this Mr. -- who is he?  Sorry.  Who's the

13 witness?

14            MS. BARCLAY:  He's referred to in the affidavit as

15 Car Dealer K., but his name is Nader, N-A-D-E-R --

16            THE COURT:  Okay.  I just need to know -- okay.  I

17 got it.

18            MS. BARCLAY:  And his last name is Affoussi,

19 A-F-F-O-U-S-S-I.

20            THE COURT:  Right.

21            MS. BARCLAY:  And Your Honor there are two

22 exhibits with respect to that individual.

23            THE COURT:  110 and 111.

24            MS. BARCLAY:  Your Honor, 110, is that the

25 complaint?  Is that what was labeled as 110?

1      GOVERNMENT EXHIBIT NO. 110, MARKED & ADMITTED

2            THE COURT:  Yes.

3            MS. BARCLAY:  So, Your Honor, I'd just point out

4 that this is a complaint, Commonwealth of Massachusetts vs.

5 Car Center USA.  And if you read down, you also see Mr.

6 Affoussi's name in there individually and as president of

7 Car Center USA.

8            Paragraph 1 it says this is a civil action brought

9 in the public interest by the Attorney General on behalf of

10 the Commonwealth of Massachusetts pursuant to General Laws

11 93A, Section 4, of the Consumer Protection Act.

12            This was filed in Suffolk Superior Court on March

13 3, 2014.  And if you take a look at paragraph 27, it's on

14 page 7 of the complaint, the Office the Attorney General has

15 received approximately 70 written complaints against

16 Defendants, most alleging facts similar to those described

17 above.

18      GOVERNMENT EXHIBIT NO. 111, MARKED & ADMITTED

19            MS. BARCLAY:  And number 111 --

20            THE COURT:  Yes.

21            MS. BARCLAY:  -- is a press release from the

22 Attorney General's Office dated February 18, 2005,

23 describing a contempt judgment filed in Suffolk Superior

24 Court related to this lawsuit, and it details exactly what

25 the defendants were alleged to do.  On the first page of

1 that press release there's four stars, four asterisks there.

2          THE COURT:  All right.

3          MS. BARCLAY:  Your Honor, the government did try

4 to find the tape of this interview with Shannon O'Brien with

5 Channel 56.  It seems that when Channel 56 was bought over

6 by Channel 7, there's nothing left.

7          So I guess, you know, the government's position is

8 that Shannon O'Brien was working at the time as a consumer

9 advocate for Channel 56.  CW-1 was a former employee of a

10 company that was under investigation.  Suffice it to say

11 it's more likely that he was talking to Ms. O'Brien about

12 these matters as opposed to making allegations that Mr.

13 Affoussi was associated with terrorists and question why a

14 Channel 56 would run that in a consumer protection segment

15 anyway.

16          THE COURT:  So CW-1 admits that he was the person

17 who was interviewed?

18          MS. BARCLAY:  Yes, he does, Your Honor.  He worked

19 for this individual.  He left because of their unfair and

20 deceptive trade practices, and he gave an interview with

21 Shannon O'Brien.

22          THE COURT:  All right.  And does he agree that his

23 voice and his appearance was disguised for the interview?

24          MS. BARCLAY:  Yes.

25          THE COURT:  Okay.  And finally, does he agree that

1 he said that the car dealer K. is the roommate or the nephew

2 of --

3          MS. BARCLAY:  That's a different --

4          THE COURT:  Oh, it is.

5          MS. BARCLAY:  That's Salesman M.

6          THE COURT:  Oh, that's M.  Okay.

7          So the interview with Shannon was not an interview

8 during which he made statements regarding somebody's alleged

9 association with Al-Qaeda.

10          MS. BARCLAY:  There's no evidence of that, Your

11 Honor.  The evidence is that he was giving an interview to

12 Shannon O'Brien about the practices at this business which

13 ultimately the AG's office --

14          THE COURT:  All right.

15          MS. BARCLAY:  -- suited for.

16          THE COURT:  All right.

17          MS. BARCLAY:  With respect to Larry, I believe his

18 last name is Cunningham, that's paragraphs 36 and 37.  I

19 would just note for the Court that Mr. Cunningham and the

20 lieutenant to whom Mr. Cinotti talked have been friends for

21 twenty plus years.  He's the one who filed the complaint.

22          I would also note that Mr. Cunningham admitted to

23 agents that he was one of Mr. Affoussi's biggest customers.

24 So when Mr. Affoussi got shut down, that was a problem for

25 Mr. Cunningham.

24

1          THE COURT:  All right.

2          MS. BARCLAY:  With respect to Salesman M., this is

3  the person whom CW-1 told Saugus P.D. had -- I believe he

4  had stated to CW-1 that he was the roommate of someone who

5  was related to an Al-Qaeda leader or something like that.

6  CW-1 also told the Saugus P.D. --

7          If you look at detention Exhibit 1 from the first

8  detention hearing, the Saugus P.D. report he also told him

9  that this individual Salesman M. did not believe in paying

10 taxes, and we have a notice of federal tax lien that was

11 filed with the Registry of Deeds Southern Middlesex County

12 for that individual requesting that he owes $78,000 in

13 taxes.

14          And finally, Your Honor, we have --

15          THE COURT:  Okay.  So what are we up to?  112.

16     GOVERNMENT EXHIBIT NO. 112, MARKED & ADMITTED

17          MS. BARCLAY:  This is a purchase and sale

18 agreement for the property.  Many of the allegations or the

19 statements made --

20          THE COURT:  Purchase and sale for what property?

21          MS. BARCLAY:  I'm sorry?  This is for the property

22 where the car dealership which Mr. DeCicco sold to Mr. -- to

23 CW-1.

24          THE COURT:  Okay.

25          MS. BARCLAY:  And, Your Honor, a number of people

1 were asked by Mr. Cinotti whether Mr. DeCicco had anything

2 to do with the permitting process, and it's the government's

3 position that these are people who wouldn't necessarily know

4 that anyway, but I call your attention to -- it's the fifth

5 page of that document.  "Paragraph 46" is written in.

6        Actually, there's an addendum to purchase and

7 sale.  I'm sorry, Your Honor.  It's a little confused.

8        THE COURT:  Okay.  But I'm looking at what's

9 handwritten in as "Paragraph 46."

10       MS. BARCLAY:  And it says both parties agree to

11 assist in permits for auto dealer and building.

12       THE COURT:  Okay.  Why does CW-1 say or think that

13 Mr. DeCicco assisted him in getting the permits?

14       MS. BARCLAY:  I believe that there were -- that

15 there --

16       Mr. DeCicco had a relationship with Fred Varone

17 who's the building inspector for Saugus and that he -- I

18 believe that he promised CW-1 that he would help him get the

19 permits.

20       THE COURT:  Okay.  But let me ask a different

21 question.  Did CW-1 ever say to you why he believes --

22 whether it's right or wrong -- that Mr. DeCicco discharged

23 his obligation to help CW-1 get the permits to build?

24       MS. BARCLAY:  CW-1 stated that Mr. DeCicco told

25 him that by hiring Peter Varone who was the brother of Fred

1  Varone, that they would enable him to get the permits, and

2  ultimately he did get the permits.

3          THE COURT:  Okay.

4          MS. BARCLAY:  So it is his belief that he's had

5  relationships, Mr. DeCicco.  Through these relationships Mr.

6  DeCicco was able to get him --

7          THE COURT:  Okay.  And that's Senior; right?

8  Peter Senior?

9          MS. BARCLAY:  Yes.

10         THE COURT:  All right.

11         MS. BARCLAY:  That's all, Your Honor.

12         THE COURT:  Mr. Sheketoff, do you want to respond

13  to any of that?

14         MR. SHEKETOFF:  Well, --

15         THE COURT:  Let me just -- if this is helpful, I

16  understand the CWs credibility is an issue insofar as he

17  makes this statement that Mr. DeCicco wanted in on the car

18  dealership and the CW did not want him there.  I guess I'm

19  looking at other evidence of that.  And of course this is a

20  matter that goes to one factor that I have to consider; and

21  that is, the strength of the evidence.

22         Having said that, I'm not trying to discourage you

23  from pursuing whatever you want.  I'm just --

24         MR. SHEKETOFF:  So I agree that that is the focus

25  of my attention on the weight of the evidence is CW-1's

1 credibility.

2          So just in brief rebuttal, there is an affidavit

3 from the woman that got the restraining order, so she's

4 contradicted Cinotti's affidavit with an affidavit from this

5 woman --

6          THE COURT:  Right.  This is Exhibit 109?

7          MR. SHEKETOFF:  Yes.

8          THE COURT:  Okay.

9          MR. SHEKETOFF:  You there's also an affidavit that

10 is part of the record that shows that she did get a

11 restraining order against him at the Waltham District Court,

12 and she did file an affidavit that she signed at the time

13 that supported that restraining order --

14          THE COURT:  Right.

15          MR. SHEKETOFF:  And that affidavit reads, "I have

16 been receiving threatening text messages from CW-1; wherein,

17 the last text he said I'm going to get you.  I know that

18 when he says things like that, he means that he will hurt

19 me.  During the time I dated him, he almost hit me twice,

20 and I'm afraid he will hurt me.  He has spoken to my sister

21 and friends and has threatened to come and find me."

22          So whatever the finer details of when you're

23 confronted with the FBI, if I remember things the same way

24 you told the investigator or not, that affidavit was long

25 before this litigation.

28

1            THE COURT:  And just so I can put a note here,

2  what exhibit is that of 84?  Do you have it at the top?

3            MR. SHEKETOFF:  It says document 84-9.

4            THE COURT:  Okay.

5            MR. SHEKETOFF:  Signed 8/11/17.

6            THE COURT:  Right.

7            MR. SHEKETOFF:  I'm not as organized as the

8  government.

9            This is one of my -- my wife would say there are

10  many major weaknesses, but this is one of them.

11            THE COURT:  Okay.  I'm sorry --

12            MR. SHEKETOFF:  One that I actually recognize.

13            THE COURT:  My wife says my weakness is I don't

14  listen.

15            Is it 84-9?

16            MR. SHEKETOFF:  Yes, Your Honor.

17            THE COURT:  Thank you.

18            MR. SHEKETOFF:  I'm willing to swap.

19       (Pause in the proceedings.)

20            MR. SHEKETOFF:  Okay.  I think that's really all I

21  want to specifically address.

22            THE COURT:  Okay.  I just have a couple of

23  follow-up questions then.

24            Ms. Barclay, the Elio evidence at page 5, note 2,

25  says, in substance, -- I just have a note here -- that on

1 December 28 CW was receiving threats.

2          MS. BARCLAY:  I'm sorry?

3          THE COURT:  It says, in substance, that the CW

4 received threats.  I actually don't have it in front of me.

5 I just put a note down to ask you about it.  I think that's

6 Exhibit 3.  Let me see.

7          In any case, I wanted you to address that.  What

8 threats was he receiving?  Were these by phone?

9          MS. BARCLAY:  I'm not sure -- are you talking

10 about the Elio affidavit or the Saugus police report?

11          THE COURT:  I'm sorry.  I'm talking about the Elio

12 affidavit.

13          I now have it.  No, I don't have it.  I thought it

14 was an exhibit to the motion to reopen.

15          MS. BARCLAY:  I have it right here, Your Honor.

16          THE COURT:  Okay.

17          MS. BARCLAY:  It's Document No. 3-1.  It was

18 attached to the complaint.

19          THE COURT:  Oh, that's what it is.

20          MS. BARCLAY:  You might be looking at Ms.

21 Lemanski's affidavit was a detention exhibit.  That's

22 Exhibit 1.

23          THE COURT:  No.  I think I mean 3-1.  Let me go to

24 it.  Page 5, is there a footnote?

25          MS. BARCLAY:  Yes.

1                THE COURT:  Good.  What does it say?

2                MS. BARCLAY:  "CW also reported to the FBI on

3    December 28, 2014, that he was receiving threats from

4    DeCicco, and his associates related to a CW-1 refusing to

5    give part of his business to DeCicco."

6                THE COURT:  Right.

7                MS. BARCLAY:  This, Your Honor, is after Saugus

8    P.D. turns the case over to the FBI, and then the FBI goes

9    to talk to CW-1.

10               THE COURT:  Right.  Oh, in other words, the

11   threats were not on December 28.  He's simply reporting it

12   on December 28, because that's when's interviewed.

13               MS. BARCLAY:  Yes, Your Honor.  Saugus P.D., the

14   task force officer, he turns it over to the FBI, and they

15   ultimately get to talk to CW-1 on December 28; and therein,

16   --

17               THE COURT:  Okay.

18               MS. BARCLAY:  -- there he recounts that he's

19   received threats that he believes are from DeCicco and his

20   associates.

21               THE COURT:  All right.  Is there anything in

22   particular that's going on with the auto dealership business

23   in December of '14 and the beginning of January of '15 prior

24   to January 11?

25               MS. BARCLAY:  Anything in particular meaning?

1          THE COURT:  So high volume of sales is the --

2          There's some indication the business is doing

3 particularly well, that it's showing a particular line of

4 cars that --

5          MS. BARCLAY:  Well, the business did open in

6 August of 2014.  That's, I believe, when he opened his doors

7 for business.  That's when the flowers were delivered.  And

8 so he's only been in business for a couple of months before

9 the assault.

10          But, Your Honor, if you drive by the dealership,

11 you can see the inventory from outside.  I don't know

12 exactly --

13          THE COURT:  Okay.

14          MS. BARCLAY:  -- what it was at that point and

15 what the sales were, but there are expensive cars on display

16 in huge windows through the building.

17          THE COURT:  All right.  One of the things I'm

18 going toward is this.  The flowers are sent in August.  It

19 sounds like right after the dealership opened.  And the

20 assault is on January 11.

21          My question is what's going on in the interim?

22          MS. BARCLAY:  He's doing business, Your Honor.

23          And he hasn't paid attention to the threat.  He's

24 not talking to Mr. DeCicco.  He's not giving him a piece of

25 the business.  He's operating in full view of the entirety

32

1  of Route 1, and it's open and notorious.

2         And at that point, you know, it's the government's

3  position and the government would argue that this gets under

4  Mr. DeCicco's skin, because he is owed a piece of that

5  dealership, and he's operating in full view of everyone.

6         THE COURT:  CW-2 says that it was about one to two

7  months before the January assault that he was offered -- or

8  told about the assault.  CW-4 says it was shortly before

9  January 11 that Mr. DeCicco contacted him to have the CW

10  beaten up.

11         Do you have a better sense of which of those is a

12  better estimate?

13         MS. BARCLAY:  Your Honor, I don't have a better

14  estimate.  I believe that the phone calls among these

15  individuals that were key to sort of figuring out who was

16  involved in the assault started in -- I believe it was

17  December.  I don't have them in front of me, Your Honor.

18  I'm happy to provide that --

19         THE COURT:  In other words, phone records that

20  show that these parties are in communication.

21         MS. BARCLAY:  Right.  And obviously CW-4 would

22  have been in communication with Mr. DeCicco, because he was

23  his employee.

24         But it's the communication between CW-4 and CW-3

25  and CW-3 and CW-2 that I believe that reflects a gap before

1 they are in contact about this issue.

2          THE COURT:  All right.  Then it would appear that
3 CW-4's estimate that the conversation with Mr. DeCicco to
4 have the CW beaten up was not shortly before 1/11, before
5 January 11.  I mean, I guess it depends on what you mean by
6 shortly before.

7          MS. BARCLAY:  Yeah, I mean, I think it depends
8 what shortly before.  Like I said, Your Honor, I don't want
9 to misstate the phone records.  I'd have to go back and find
10 them.  But I think they start in December.  But we're happy
11 to submit that as a supplemental affidavit or exhibit to the
12 Court.

13          THE COURT:  I could just take a statement, and if
14 there's a challenge to it or if Mr. Sheketoff doesn't have
15 the --

16          If he has the records, just direct him to what it
17 is that you're referring to.  And if he doesn't and you want
18 to share them, and then just give me a statement.

19          MS. BARCLAY:  Okay.

20          THE COURT:  I would like to know that.

21          MS. BARCLAY:  Okay.

22          THE COURT:  All right.  And I'll give you a chance
23 to respond.

24          And I'm going to give both sides a chance to argue
25 now; but Mr. Sheketoff, what I'm struggling with a little

1 bit, -- and this what I was struggling with on the whole

2 decision about whether or not to reopen -- is I think a fair

3 reading of the record is that the --

4          Of course the defendant doesn't dispute that he

5 sent the flowers with that message, nor --

6          I mean, this is not quite as clear, but I don't

7 know that the defendant is disputing that he hired CW-4 and

8 got -- however the others got involved.  We'll just put that

9 aside.  That he hired CW-4 to assault CW-1.  That's my

10 reading of even the defendant's own submissions.

11          And I know that that came before your time on the

12 case, and so I'll just ask you to think about this.  I want

13 to hear from the government first, it's their burden.  But I

14 have to consider the strength of the evidence, and I'm going

15 to.  I have to consider the safety of the community, and I'm

16 going to.  And just putting aside the strength of the

17 evidence for a moment, I have evidence that the defendant

18 hired somebody to give this guy a pretty good beating, and

19 that is -- that's kind of the heart of the concern for

20 safety of the community.  Whether I find that this was about

21 an extortion or about an inappropriate comment to a woman,

22 that's what I have.

23          And so my concern is, you know, how do I protect

24 the community --

25          And it comes in the context of someone, as I said

1 in the original ruling, who has the ability and the

2 financial wherewithal to hire other people to do his dirty

3 work for him.

4          So I'm going to give you a chance to address it,

5 but I wanted to alert you to it, because that's an important

6 concern I have in my ultimate decision.

7          MR. SHEKETOFF:  So while I'm not conceding other

8 elements of the case, I think I made it clear when we were

9 before you in Boston that the thrust of any defense that I

10 would have would be there was no intent to extort.  That's

11 where I would fight the case, Your Honor.

12          THE COURT:  Right.

13          MR. SHEKETOFF:  So I'm not pretending otherwise.

14          And if the government had no evidence of any kind

15 that there was an intent to extort, they wouldn't have

16 gotten an indictment.  I concede that.  But I've been doing

17 this for a long time, and this is an unusual federal case,

18 because --

19          And I was anxious today to hear the government if

20 they were going to proffer to you we actually have someone

21 else that Mr. DeCicco told that he wanted a piece of that

22 business.  You heard Baldi say he had heard rumors about

23 that.  But they didn't proffer that at all.

24          So in the end it comes down to whether or not CW-1

25 is believable on this topic.  There was an interview of him

36

1  on December 28.  The last time we were here the government

2  said, well, it was a short period of time between December

3  28 and January 11.  You know, we really couldn't wire him up

4  or make a phone call.  That's the holiday season.

5          Well, I reject that.  But I also say to you that

6  in the Saugus police discovery -- and I didn't hear any

7  proffer about this -- one of the Saugus police reports say

8  it was turned over to the FBI in October of 2014, not in

9  December.

10         I don't know what they did between October and

11 December.  And this is somebody that they had a previous

12 longstanding relationship with.  It's not like either the

13 FBI or CW-1 was unfamiliar with each other.

14         So, to me, this is an extremely triable case, and

15 I think -- I believe that you see that that is a realistic

16 statement.  It's not, you know, just made up.  I'm not

17 saying the government doesn't have a case; I'm saying I have

18 a chance to win this case.

19         And if you listen to that tape recording where

20 CW-1 leaves a message for a business associate of his, I

21 think you'll get an impression that I hope the jury will

22 get.  Whether I get that into evidence or not at trial about

23 who this guy is and whether or not he's trustworthy.  As

24 trustworthy as the agents suggested in their affidavits, but

25 for the complaint and for the detention hearing, he's not a

1 trustworthy person, and he's cheating everybody out of

2 money.  It's not just the Varones.  There's consistent theme

3 here.

4          In any event, all I'm really trying to say is I

5 have a realistic chance of winning this case on that issue.

6          That doesn't address your other concern which is

7 if my client hired somebody to beat this man up, how can you

8 be certain that he's not going to do something similar if

9 he's released.  And on that topic I would say -- I think I

10 said it at the last one when we were in Boston that he could

11 probably do the same thing from jail if that was his real

12 goal.

13          Second, we have a concept of forfeiture by

14 wrongdoing.

15          Third, there are conditions.  You know, he cannot

16 have a phone.  You know, he can have a sign-in log at the

17 house.  You can fashion conditions that make that much less

18 likely.

19          And most of these witnesses have already testified

20 to the grand jury.

21          I don't know.  You know, I think about this case.

22 I had a murder case in Dedham a few years ago where my

23 client's brother was a central figure for the Commonwealth,

24 and he died of a heart attack in his early 40s, and they had

25 to *nolle pros* the case.  Of course the State Police thought

1 he had been murdered, but it turned out it was natural

2 causes, even though he was in his 40s, and the case

3 dissolved.  I don't --

4          I mean, I'm not going to do this, but I think

5 about these cases.  What would I do to dissolve this case?

6 I don't think there's a way to dissolve this case.  I think

7 there's a way to defend it, which is to say there was no

8 intent to extort, but I don't think there's a way to

9 dissolve it to make it go away by paying somebody or doing

10 anything like that at this point.

11          From my practice in Suffolk Superior Court I find

12 the worse witnesses for the defense are the witnesses that

13 tell the government the story they want to hear and then get

14 influenced by fear to tell a different story, and the jury

15 not only thinks that the first story's the true story, they

16 think that my client is so bad, that he has moved -- you

17 know, moved these people out of fear to try and help him.

18 And those cases always end in disaster for me.  I think

19 that's the worse set of circumstances.

20          So at this point in time we have a trial date in

21 February.  I don't think that there are -- that it's --

22          I don't see the way to use your power and

23 influence to make this case go away, and even if he was so

24 inclined.  The last time he had a federal case and it got

25 probation, he was never violated.  That case was pending for

1 a long time.  So I think there are --

2          If anything happened to CW-1 now, there's no

3 question that he would be the prime suspect.  He'd be locked

4 up again immediately, and I'm going to lose my forfeiture by

5 wrongdoing.

6          I mean, I have a witness that I look forward to

7 cross-examining, because he's their whole case.  And you can

8 see whether every detail of the Cinotti affidavit is correct

9 or not, and he's relying on what people tell him on a

10 specific point in time, and a lot of these people have

11 various influences on them, you know, pushing them in

12 different directions, including their general inclination to

13 be honest.  He's just reporting what he's told.

14          I want that guy on the witness stand.  You know, I

15 have a chance to convince a jury that when you have to

16 believe beyond a reasonable doubt that this guy's telling

17 the truth and that's all you've got when the FBI had an

18 opportunity to record a phone call or put him on a wire,

19 then I wish I was in that position more frequently than I

20 am.  It's usually the skill of the prosecutor to say play

21 the next tape recording.  You know, I say to my client, "How

22 am I going to explain that one?," and it's inexplicable.  So

23 I apologize.

24          THE COURT:  I appreciate that what was referred to

25 the FBI, whether it was October or December, was flowers and

40

1  the note, and we don't have violence at that point.

2          MS. BARCLAY:  Yeah.

3          THE COURT:  I also appreciate the fact that I

4  understand the Saugus police report correctly that CW did

5  not volunteer the defendant as a source of the threat until

6  Saugus shared with the CW a description of the woman who

7  purchased the flowers at the -- and had them sent.  So I got

8  that.  You don't need to address it.

9          MS. BARCLAY:  And only at that point does he say

10 he wanted a piece of my business, and that's what the card

11 says, so it's corroborated by the defendant's own words.

12          And Your Honor, while I appreciate that Mr.

13 Sheketoff has a breadth of experience beyond my own, I do

14 suggest that this case -- this hearing is limited to this

15 case and these facts and not Mr. Sheketoff's opinion about

16 how it compares to other cases he's seen or tried or won or

17 lost.  And so the focus here is on the evidence in this

18 case.

19          And we're really only talking about motive, as

20 Your Honor said, for the purposes of this hearing.  The

21 defendant is not challenging the evidence that he hired

22 someone to viciously assault CW-1.

23          And the evidence of the motive before this Court

24 now is you have CW-1's description of conversations with the

25 defendant and with Peter Varone Senior.  I think,

1 unfortunately, Your Honor, Mr. Varone Senior is unable to

2 communicate because of a fall off of a ladder, but it's not

3 as if CW-1 didn't say that he did talk to someone else about

4 this.

5          You also have his account of seeing plans with

6 "Gary's Office" on them and asking for it to be removed.

7 Those are corroborated by the plans which reflect exactly

8 that, and the information from Mr. Lloyd that Gary DeCicco

9 asked him to put his office on those plans.

10          You have Mr. Baldi's testimony a couple of weeks

11 ago that Mr. DeCicco walked him through the dealership when

12 it was being built when CW-1 wasn't there, almost as if Mr.

13 DeCicco owned the place.

14          You also have Mr. Baldi's testimony that DeCicco

15 made repeated derogatory comments about how CW-1 was

16 operating the business, selling Ferrari's in the winter,

17 things like that, and about CW-1 owing Varone money for

18 construction at the business.

19          You have DeCicco's own words in the card delivered

20 with the flowers.

21          And then, Your Honor, I would point to the

22 affidavit of girlfriend -- I believe it's Girlfriend 1.  I'm

23 not sure.  It's Document No. 84-5, Kimberly DeBenedictis is

24 his name, and as something that was attached to the brief.

25 She's in the car with Mr. Baldi and Mr. DeCicco when they

42

1  ordered the flowers.  Mr. DeCicco dictates the card to her,

2  and all she says about it, "I am the person who purchased

3  the flowers that were delivered to CW-1's car dealership in

4  Saugus.  I do not remember Gary ever saying that he wanted

5  an ownership interest in CW-1's Saugus dealership."

6          She doesn't say it was a joke, it was a practical

7  -- you know it was a prank, anything like that.

8          The defendant has also made no showing that CW-1

9  is not a credible witness.  There's no evidence that he's

10  lied or that he actually has reports anyone to authorities

11  out of some vindictive motive.  At the most, he left a

12  threatening message for a business associate, and then he

13  owned up to it without offering any excuses to the Kingston

14  P.D.  He also tried to warn customers about the business

15  practices of Nader Affoussi who admitted that he defrauded

16  hundreds of customers.

17          And the rest of it, Your Honor, his employees,

18  ex-girlfriends, neighbors; it's either petty irrelevant,

19  unreliable, or it doesn't go to CW-1's credibility at all.

20  The fact that he had two restraining orders taken out

21  against him, he doesn't deny that, Your Honor.  He hasn't

22  denied it to anyone.

23          As this Court has stated on several occasions, the

24  card accompanying the flowers that DeCicco admittedly

25  dictated and had sent to the victim is basically an

43

1  admission he wanted a piece of the business.  He addressed

2  it to Gary and said we all know whose place that is.

3          This wasn't a joke or a prank.  You don't follow

4  up a prank with a vicious beating.

5          And DeCicco all but admits that he ordered and

6  paid for that beating.  You follow up a threat with action,

7  and that's what the card was.  It was a threat.

8          And, Your Honor, I just want to call --

9          I believe in your order reopening the detention

10  hearing you said that Mr. Baldi testified that it was a

11  prank, but I also want to just point out that he said -- he

12  testified several times that DeCicco said let's send some

13  flowers, because CW-1 is busting Peter Varone's balls.  I

14  believe is what he said.  That's on page 16 of the

15  transcript.  And that he believed DeCicco was pissed that

16  Varone didn't get paid, and that's why DeCicco sent the

17  flowers.

18          So he's not saying it's just a prank.  He's saying

19  it's about the business or that Mr. DeCicco is telling him

20  it's about the business.

21          And you know, I think that what Mr. Baldi believed

22  or what Mr. DeCicco told Mr. Baldi about the flowers is not

23  really relevant.  It doesn't change the import of Mr.

24  DeCicco's own words in the card.

25          And tellingly, although Mr. Baldi makes the prank

44

1  phone calls that involve pizza, he doesn't make the

2  threatening phone call; the phone call on August 6, 2014,

3  where someone tells CW-1, "You fucking Muslim.  I'm going to

4  kill you."  That came from a blocked number.

5          The government hasn't been able to identify who

6  that came from yet, but Mr. Baldi clearly said that that was

7  not him.

8          THE COURT:  I thought one of the calls came from

9  Baldi's business number.

10         MS. BARCLAY:  The pizza call.

11         THE COURT:  Oh.  Okay.

12         MS. BARCLAY:  And there's one critical fact that

13 supports this analysis of Baldi's testimony that Mr. DeCicco

14 is not bringing him in on everything, especially not the

15 fact that he's trying to extort an ownership interest from

16 CW-1 because he's afraid that Baldi's going to take his

17 million dollars and run; and that is, Mr. DeCicco didn't

18 tell Baldi he was going to hire someone to beat CW-1, and he

19 doesn't tell him that it happened after the fact.  He talks

20 about other things and other violent acts with Mr. Baldi but

21 not that.  And he was not bringing him in to the fold and

22 telling him everything, because he knew it would scare Baldi

23 away, and he'd take his million dollars, and he'd run.

24         Your Honor, this is isn't a trial; this is

25 detention.  An indictment charging DeCicco with extortion

1  has been returned.  A grand jury's found probable cause.

2              And, you know, Baldi and none of the evidence that

3  you've heard here today detracts significantly from the

4  weight of the evidence in this case.  In fact, the case is

5  stronger today for the reasons I said at the beginning of my

6  argument than it was on March 22.  That's the weight of the

7  evidence, Your Honor.

8              Turning to the other factors, the Court heard Mr.

9  Baldi testify to the following information that is new since

10 the March 22, 2017, detention hearing.

11             Mr. DeCicco has millions of dollars in assets that

12 he has hidden in the names of his girlfriends and children.

13             He pocketed $200,000 of the 900,000 that Mr. Baldi

14 gave him to payoff a loan on Pulaski.  He told Mr. Baldi it

15 was going to a certain individual, but only 700 went to that

16 individual.  Mr. Baldi didn't realize that until he was

17 working with investigators looking through the records.

18             Mr. Baldi and Mr. DeCicco forged leases and

19 submitted fake leases and a falsified rent roll to multiple

20 banks and ultimately secured a $5.5 million mortgage on

21 Pulaski Street using those documents.

22             Mr. DeCicco told many people that he still had

23 ownership of a moving company, even though Joe Porter bought

24 the company from DeCicco years earlier.  And that's

25 significant in terms of the weight of the evidence, Your

1 Honor.

2        Mr. DeCicco bragged about committing student loan

3 fraud for one of his daughters.

4        He admitted to Mr. Baldi that he did not want the

5 IRS to know about his assets, because he did not want to pay

6 taxes.

7        Mr. DeCicco bragged about sticking a gun down

8 someone's throat, knowing the Hells Angels who would help

9 him if he needed it and having someone beaten up so they

10 would not show up in court to testify against his brother.

11 And that's page 49 of Mr. Baldi's transcript of that

12 hearing, Your Honor.

13        As Your Honor said at the outset, this is a

14 violent beating.  Mr. DeCicco hired someone to beat CW-1,

15 and there's very little dispute that that happened.  He also

16 has a history of getting others to commit crimes.  Take Mr.

17 Baldi, for example.

18        But there's also the short sale, Your Honor.

19 There's the tax issues that he has and --

20        And, Your Honor, we would suggest that contrary to

21 --

22        While there were no formal filings with regard to

23 him being on pretrial release and on probation, I believe

24 that --

25        I've gotten information from the probation office

1  that they've reviewed the file; and, in fact, he wasn't

2  entirely compliant.  They had difficulty with a number of

3  things with Mr. DeCicco while he was on pretrial release and

4  while he was on probation.  And I'm not sure how we can get

5  that information to Your Honor, but he wasn't entirely

6  compliant with his conditions.

7          It's the government's position that Mr. DeCicco is

8  not just a danger to CW-1, Your Honor; he's a danger to the

9  community.  And that's what Your Honor found in addition to

10 him being a danger to witnesses and the victim in this case,

11 that he's a danger to the community.

12         This is someone who lies whenever it suits him and

13 whenever it will make him money and make his life easier,

14 and he cannot be trusted to obey the conditions of release.

15 No conditions of release will guarantee the security and

16 safety of the community.

17         And, Your Honor, I'd also suggest that he's a

18 flight risk.  We have spent years trying to figure out where

19 all of his assets are.  We're still doing that, Your Honor.

20 It's no secret.  Special Agent Lemanski testified there's an

21 ongoing tax investigation.  Every time we turn around

22 there's another asset in someone else's name or some other

23 business's name.

24         I understand he has significant ties to the

25 community, and I don't dispute that.  But I also suggest,

1 Your Honor, that this defendant is facing a significant

2 sentence in this case.  He's facing other investigations.

3 He has an incentive to flee, and he certainly has the

4 capability to flee and the resources to flee.

5          THE COURT:  What are the advisory guidelines?

6 It's a 20-year max?

7          MS. BARCLAY:  It is, Your Honor.  I don't have my

8 guidelines book with me, Your Honor.  I apologize.  I

9 normally bring that with the file.  Sorry about that.

10          THE COURT:  Anything else?

11          MS. BARCLAY:  Your Honor, I can submit that when

12 we submit the phone records.

13          THE COURT:  Okay.  That's fine.

14          MR. SHEKETOFF:  Whatever my particular win/loss

15 record is, this is a very triable case.

16          And Your Honor, you've been around nowhere near as

17 long as me, because you're much younger, but there are

18 federal cases that are completely untriable.  This is not

19 one of them.

20          And if you listen to that tape recording, the idea

21 that this is a good person who's lived a good life, CW-1 --

22 and is going to make a good impression on the jury seems to

23 me to be farfetched.

24          THE COURT:  You do have the note to contend with.

25 I mean, --

1           MR. SHEKETOFF:  I'm sorry?

2           THE COURT:  You do have the note to contend with.

3  You say what you want.  Maybe it's just an unfortunate

4  choice in words, but it has to do with ownership of the

5  dealership.

6           MR. SHEKETOFF:  So it does.  And that's the joke,

7  and that's why he latches onto that to make it a federal

8  case, because that's what makes it a federal case.  He takes

9  a joke, and he turns it into a federal case.  That's going

10 to be my argument to the jury.

11          Because this is someone that my client never saw

12 eye-to-eye with, thought was --

13          This is in the record that you have before you.

14          -- thought was a fool in terms of a businessman.

15 There's not a shred of evidence that this business made any

16 money whatsoever.  There's not --

17          My client's got millions of dollars of real estate

18 all over the place, and he wants to force his way in to this

19 dealership when he has another dealership that he has this

20 kind of relationship with and has had it for years, and

21 these people don't get along with each other?  What sense

22 does that make?

23          THE COURT:  What sense do any of these cases make?

24 People have millions of dollars, and it doesn't stop them

25 from committing crimes.  We've all seen that.

50

1          MR. SHEKETOFF:  It's not like he had --

2          There's no evidence he had a real financial motive

3  to take a piece of this dealership, --

4          THE COURT:  Okay.

5          MR. SHEKETOFF:  -- because there's no real

6  evidence that this dealership made any money whatsoever.  I

7  mean, he's selling in December and January.  He's got these

8  very fancy cars that no one's going to buy in the winter

9  months in his showroom.  He doesn't know what he's doing.

10          So of course the government has some case.  I'm

11  not suggesting they have no case.  I'm just suggesting that

12  this is an extremely triable case.

13          Okay.  And you've heard it all already, so you

14  know.

15          This is someone who has a relationship with the

16  FBI.  In October the Saugus police tell the FBI that there

17  is a real threat here in our view.  This guy wants in on the

18  business, and he got these flowers and this note.

19          That's in October, and they don't even bother to

20  see him until December, and nothing of significance has

21  happened in between those dates.  He's continuing to live

22  right down the street from my client.

23          It's strange credulity that no one could think to

24  put a wire on this guy and say after the car -- after the

25  case had been turned over to the FBI, Gary, let me tell you,

1 let me meet with you, I'm willing to do this now, I see the

2 light.  He could have made a simple phone call.  He didn't

3 have to be in his presence.

4          And the other thing that gets me is that he's such

5 a threat to this guy, and he's beaten on January 11 of 2014.

6 When is Mr. DeCicco arrested?  Two plus years later.

7 They're neighbors.  They allow them to be in the same

8 neighborhood together.  Literally the backyard of CW-1 looks

9 into the pool area of Mr. DeCicco, and they allow that to go

10 on for two years and two months.

11          So I don't see where he's a danger to --

12          Where is any other violence on his record?  You

13 know, he had somebody beaten up because they were making

14 comments about his girlfriend and perhaps his daughter.

15 We'll see where the evidence goes.

16          And we have someone that has problems with women

17 and has problems with expressing himself about what he's

18 going to do to people.  And that's CW-1, not just my client.

19          He's got extremely strong roots in this community.

20 He doesn't have three passports like Paul Manafort.

21          And there are conditions --

22          And I don't think he's facing anywhere near the

23 time that Paul Manafort's facing.

24          There are conditions of release.  We have a trial

25 date in February.  Everybody in this room knows that when

1  your client can walk in and out of the courtroom, can meet

2  with you on a regular basis, you have a much better chance

3  of prevailing at trial.  It's a tremendous advantage or

4  disadvantage depending on what happens.

5          Both of his daughters are here today and other

6  family members.

7          You can put him on a bracelet, put him on a

8  curfew.  You can take away his cell phone.  You can do a

9  number of things, Your Honor, that guarantee that he's not

10 going anywhere.

11         In fact, the first time you found that he was

12 unlikely to go anywhere, and the representations about all

13 the money he has and the tax fraud count that was going to

14 be forthcoming were all made the first time around too.

15         So I know he doesn't have the money that Paul

16 Manafort has.

17         And so I'd ask you to release him on whatever

18 conditions you consider to be appropriate, Your Honor.

19         THE COURT:  Ms. Barclay, I'll give you a chance to

20 respond, but suppose I set a very high cash -- a very high

21 cash performance bond.  So you violate the conditions of

22 your pretrial release; you lose the money.  Defendant can't

23 go back to the neighborhood at least until after the trial,

24 and if it's he doable -- I have no idea -- his phone gets

25 monitored so you know who he's in touch with.

1          MS. BARCLAY:  Your Honor, this is the defendant

2    who can find a way.  He can find a way to accumulate

3    millions of dollars in assets and not pay a $350,000 tax

4    lien.  He can find a way to hold a marina in his long-term

5    girlfriend's name, and then presumably -- and then buy it

6    from her -- this is evidence from the first hearing -- for

7    $3.2 million so that he can wash the cash he gets from the

8    fraudulent loan from Pulaski and essentially use the 1031

9    exchange so that he doesn't have to pay any taxes on that.

10         THE COURT:  But consistent with that -- I

11   understand that -- you can make the argument that someone

12   who loves money that much, is not going to engage in conduct

13   that's going to result in a loss of a very significant

14   amount of cash.

15         MS. BARCLAY:  Mr. DeCicco figures out a way to get

16   around every restriction that the law puts in place on him,

17   whether it's using a three-way call from prison to get his

18   one girlfriend back on the phone bill through the other

19   girlfriend, whether it's using one girlfriend to pay the

20   rent of another girlfriend by telling her it's a mortgage

21   payment, using an employee to help him move money back and

22   forth through girlfriends, whether it's having prison

23   meetings --

24         We have videos of him and a girlfriend talking

25   through the glass so that it's not recorded.

1          So Your Honor, this is someone who knows and has

2  gamed every restriction and law that has gotten in the way

3  of him succeeding, whether it's financially, criminally or

4  judicially.

5          It's the government's position that there is no

6  set of conditions, Your Honor, that is going to

7          THE COURT:  No, I understand that.

8          MS. BARCLAY:  -- to keep the community safe from

9  Mr. DeCicco.

10          And the fact that he, you know, will have access

11  to potential witnesses --

12          I mean, the government knows who its witnesses

13  are, but that doesn't mean that Mr. DeCicco once he's out

14  can't round up his own slew of witnesses and tell them what

15  to say; which again, is something that we wouldn't put past

16  him at this point.

17          THE COURT:  But that's something he could do from

18  jail.  I mean, in theory.

19          MS. BARCLAY:  The government -- maybe he knows

20  that the government's listening to his calls, Your Honor,

21  so.  I mean, perhaps he can do it through --

22          He has an attorney friend who is on his call list.

23  Perhaps he's already doing it.  I know that he does use that

24  attorney to sort of run around and to pay people to do

25  things for him.

1          He has found a way, Your Honor, to continue his

2  sort of criminal scheme, so to speak -- not the extortion

3  necessarily -- while he's in prison.  He continues to

4  dispose of assets and to transfer money and to generate

5  income through, you know, his girlfriends and those who are

6  loyal to him, including attorneys.

7          Your Honor, with respect to what Mr. Sheketoff

8  said, just a couple of quick points.  The government didn't

9  choose CW-1 as its victim.  Mr. DeCicco did.  Okay?  And

10  there's no evidence that CW-1 knew that by saying this had

11  something to do with the ownership of the business that he

12  understood that would make it a federal case.  He tells it

13  to the Saugus P.D., and there's also no evidence that the

14  Saugus P.D. turned it over to the FBI, because they

15  recognized it was a criminal case.

16          In reality, Your Honor, and I think if this comes

17  out at trial, if this is an issue at trial, they recognized

18  Mr. DeCicco's name as having been associated with organized

19  crime, and they turned it over to the OC squad at the FBI.

20  It had nothing to do necessarily with the fact that this was

21  now a federal case; it had everything to do with Mr.

22  DeCicco's name and the knowledge of law enforcement

23  regarding his potential associations.

24          The point about the wire, Your Honor, we've been

25  over this a number of times before.  Between the time when

1 the FBI interviews CW-1 and the time when he's beaten, it's

2 13 days, and that includes New Year's and Christmas

3 vacation.  They simply didn't have a chance to pursue this

4 investigation before Mr. DeCicco took matters again into his

5 own hands.

6          And the suggestion that they would wire him up

7 after he is viciously beaten and had his jaw wired shut for

8 40 days is preposterous at this point.  The FBI is not going

9 to put someone into a situation like that which would be a

10 significant danger to his safety.

11          With respect to the fact that they live near each

12 other, this investigation was entirely covert.  The fact

13 that Mr. DeCicco was the subject of the investigation did

14 not become known to Mr. DeCicco.  The earliest it could have

15 become known to him is when his girlfriend testified in the

16 grand jury, and I believe that was the day before he was

17 arrested on the complaint.

18          So in the meantime, no one is approaching anyone.

19 In fact, we did not -- the FBI did not approach CW-4 until

20 after Mr. DeCicco was in custody.  So they had spoken to

21 CW-1 who -- CW-2 who was in jail, CW-3, and they did not

22 speak to CW-4 because he lived at Mr. DeCicco's residence or

23 his second residence and he worked for Mr. DeCicco, and that

24 was too close and too dangerous for them to talk to him

25 before Mr. DeCicco was in custody.

57

1          So it is not as if they just, you know, did

2 nothing here, Your Honor.  There were precautions in place.

3          Your Honor, it's the government's position that --

4 the weight of the evidence and all of the other factors, the

5 risk of flight, the nature and seriousness of the offense,

6 the danger posed by Mr. DeCicco to the community and to

7 potential witnesses in this case is too significant for him

8 to be released under any conditions.

9          THE COURT:  All right.  Thanks everyone.  I'm

10 going to take it under advisement.  I'll get a decision to

11 you as soon as I can.

12          MS. BARCLAY:  Thank you, Your Honor.

13          THE COURT:  We're in recess.

14          MR. SHEKETOFF:  Thank you, Your Honor.

15      (Court adjourned at 11:30:37 a.m.)

16

17

18

19

20

21

22

23

24

25

58

CERTIFICATION

1

2      I, Judy Bond, a court approved transcriber, certify

3  that the foregoing is a correct transcript from the official

4  electronic sound recording of the proceedings in the

5  above-entitled matter.

6

7

8  _____  January 16, 2018
   Judy Bond
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Judy Bond, CERT*
*Certified Federal Court Transcriber*
*judy@bondcourtreporting.com*