**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 17-CR-10092-NMG |
| | ) | |
| GARY P. DECICCO, | ) | |
| | ) | |
| *Defendant*. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO COMPEL DISCOVERY**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................... 2

I.  BACKGROUND OF THE CASE .................................................................................. 2

ARGUMENT .................................................................................................................... 5

II.  THE GOVERNMENT HAS PROVIDED INADEQUATE RESPONSES TO  THE
DEFENDANT'S REQUESTS FOR INFORMATION MATERIAL TO PREPARING THE
DEFENSE UNDER FED. R. CRIM. P. 16(a)(1)(E)(i) ........................................................ 5

    A.  Applicable Legal Standards ................................................................................. 5

    B.  The Government's Boilerplate Response ................................................................. 7

    C.  Specific Requests for Documents and Objects Material to Preparing the Defense ...... 8

        1.  Requests 3 and 4:  The Construction of Auto Excellence Group ........................... 8

        2.  Requests 5-8:  Documents Pertaining to Mr. DeCicco's Alleged Attempted
Extortion ............................................................................................................... 11

        3.  Request 13:  Alleged Report to the FBI on December 28, 2014 Regarding Threats
to CW-1 ................................................................................................................ 12

        4.  Request 14:  Documents Pertaining to the January 11, 2015 Assault of CW-1 ... 12

        5.  Request 16:  Documents Pertaining to the Recorded Conversation Between CW-3
and CW-4 ............................................................................................................. 13

        6.  Request 18:  Documents Pertaining to CW-1's Communications with Others
Regarding Mr. DeCicco ....................................................................................... 14

        7.  Requests 21 and 22:  Documents and Information Pertaining to the Books and
Records of Auto Excellence Group ...................................................................... 15

        8.  Request 23: Documents and Information Pertaining to CW-1's Employment of
Kimberly DeBenedictis......................................................................................... 16

        9.  Request 25:  Documents and information Pertaining to Interstate Commerce..... 17

III.  THE GOVERNMENT HAS REFUSED TO PRODUCE DOCUMENTS THAT ARE
MATERIAL TO THE DEFENSE AND EXCULPATORY UNDER *BRADY* AND *GIGLIO*
.......................................................................................................................... 17

    A.  Background ........................................................................................................ 17

        1.  ████████████████████████████████

        2.  The Video of Mr. DeCicco's Arrest on CW-1's Mobile Phone .......................... 20

    B.  Specific Requests for Documents and Objects Material to Preparing the Defense and
Exculpatory Under *Brady* and *Giglio* ................................................................. 21

        1.  Request 38: Documents and Information Pertaining to CW-1 ............................. 21

        2.  Requests 11 and 23:  Documents and Information Pertaining to the Failure of Law
Enforcement to Identify Mr. DeCicco ................................................................. 24

3.   Requests 19 and 24: Documents and Information Regarding Mr. DeCicco's
Communications with CW-1 ................................................................................ 25

III.   THE SAUGUS POLICE DEPARTMENT IS A MEMBER OF THE PROSECUTION
TEAM ................................................................................................................................ 26

CONCLUSION .................................................................................................................................. 26

## **INTRODUCTION**

Defendant Gary DeCicco has filed a Motion to compel the government to produce discovery that is material to preparing the defense, and additional discovery that is exculpatory under *Brady* and *Giglio*.  Regarding the withheld discovery under *Brady* and *Giglio*, the defense seeks the Court's intervention because there are grave inconsistencies and troubling anomalies in certain law enforcement documents that undermine the government's case. ███████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████

In addition, the government recently and belatedly produced additional FBI reports prepared shortly after the alleged assault of CW-1 on January 11, 2015, stating that "[i]t is believed the assault was arranged . . . in response to an alleged debt owed by the cooperating witness to the subject."  These newly-produced government documents cast grave doubt on the existence of a federal crime in this case.

Finally, the government has stonewalled the defense in providing vague and evasive responses with respect to fourteen of Mr. DeCicco's requests under Fed. R. Crim. P.

16(a)(1)(E)(i), necessitating this Motion.  As demonstrated below, the defense has made a *prima facie* showing that the requests at issue seek information and documents material to preparing the defense.  The Court should direct the government either to clarify its responses, or produce the requested documents and information.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I.      BACKGROUND OF THE CASE

The Indictment charges Mr. DeCicco with one count of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (2016).  Dkt No. 23.  It alleges that from 2013 through January 11, 2015, Mr. DeCicco unlawfully "attempted to obtain an ownership interest in [CW-1's] automobile dealership from [CW-1] with his consent, induced by wrongful use of actual and threatened force, violence, and fear."  Dkt No. 23.  The Indictment merely tracks the language of 18 U.S.C. § 1951 and contains few facts.  The government, however, initiated this prosecution by filing a Criminal Complaint and supporting affidavit of FBI Special Agent Matthew Elio, which provided details of the alleged facts that form the government's theory of the case.  Dkt. Nos. 3, 3-1.  The government later supplemented these alleged facts by filing the affidavit of IRS Special Agent Sandra Lemanski in support of its motion to detain Mr. DeCicco, as well as an IRS memorandum of its interview of CW-1, which provides a more detailed account of the alleged extortion.  Dkt. No. 35-12; 35-13.

Based on the two affidavits, the government alleges, in substance, that in 2013, Mr. DeCicco requested to become CW-1's partner in the operation of the automobile dealership, Auto Excellence Group; CW-1 later rejected Mr. DeCicco's overture; Mr. DeCicco responded by sending CW-1 a delivery of flowers with an accompanying note, a delivery of pizza, and making threatening and harassing calls in August 4-6, 2014; and Mr. DeCicco subsequently arranged for CW-1 to be assaulted on January 11, 2015.  Both affidavits acknowledge that CW-1 was a FBI

2

informant from 2006 to 2011, and was reactivated in July 2015, shortly after the January 11, 2015 alleged assault.  Both agents vouched for CW-1's credibility, attesting in identical language, "I am not aware of any information that would adversely affect the credibility of CW-1's information.  Dkt. No. 3-1 ¶ 5; No. 35-12 ¶ 3.

At trial, the defense will show that Mr. DeCicco *never* requested to be CW-1's business partner.  To the contrary, Mr. DeCicco, a real estate developer, had numerous reasons to avoid any type of business relationship with CW-1, including that CW-1 had cheated customers, cheated contractors with whom Mr. DeCicco regularly did business, and even cheated Mr. DeCicco himself in connection with the sale of a car.  CW-1 further had a reputation for being a dishonest businessman who routinely abused his position as an informant and used it to threaten and extort others to his advantage by reporting them (without basis) to law enforcement.  This directly undercuts the government's theory that Mr. DeCicco wanted to be associated with CW-1 or tainted with CW-1's reputation.

In addition, during the relevant timeframe, there was deep personal animus between CW-1 and Mr. DeCicco arising primarily out of CW-1's jealousy and anger over Mr. DeCicco's romantic relationship with a woman who used to work for CW-1.  CW-1 made derogatory comments about Mr. DeCicco, the woman, and Mr. DeCicco's family, which were relayed back to Mr. DeCicco.  CW-1 and Mr. DeCicco also had an active business dispute pertaining to CW-1's claim that Mr. DeCicco was required to pave the area around Auto Excellence Group under the Purchase & Sale Agreement for the site.  This dispute had nothing to do with the ownership of the dealership.

The defense will vigorously attack CW-1's credibility and bias against Mr. DeCicco, including an instance in which CW-1 made a flagrant misrepresentation to the government,

which then was submitted to this Court as a basis to keep Mr. DeCicco's detained pending trial.

This occurred in connection with CW-1's attempt to justify his threat to "cut" his victim "to

pieces" and cause the victim to lose business with River Works Credit Union.  On January 15,

2010, CW-1 left the following profane and threatening voicemail for the victim:

> Larry, this is [CW-1]. I had people in front of me so I couldn't talk to you but let
> me tell you something asshole. Not only kiss my ass you fucking piece of shit, but
> **you can kiss good-bye to River INAUDIBLE Cre-, Credit Union also, account
> and business as well**. Obviously you don't know INAUDIBLE to me. Next time I
> see you face-to-face mother fucker, you'd better prepare yourself cock sucker
> because **I'm coming after you**, mother fucker piece of shit. You think I'm afraid
> of you, mother fucker. Obviously you don't know me. **I'm gonna cut you to
> pieces**, you cocksucker. If you got balls, tell me where you are and I'll come right
> now and I'm gonna show how deeply **I'm gonna fucking stick my foot up in your
> fucking piece of shit ass**, cocksucker. I've got a score to settle with you, mother
> fucker, now.

Dkt. No. 90-3.  Two days after CW-1 made this extortionate threat, he explained his conduct to

the Kingston Police by stating that he had threatened the victim because the victim had bounced

a check, which caused a problem for CW-1's customers.  As reported by the Kingston Police,

CW-1 said the following: "[CW-1] did in fact leave the message and that he lost his cool and that

it was a stupid thing to do.  [CW-1] advised me that the [victim's] company **had bounced a

check, which caused one of [CW-1's] customers to harass him**."  Dkt. No. 90-3.  Yet, seven

years later, CW-1 fabricated an entirely new explanation for his criminal conduct, telling the

government that he threatened the victim because the victim had called him a "sand n*gger."

Dkt. No. 87.  Thus, when Mr. DeCicco's liberty was at stake and CW-1's credibility was under

challenge, CW-1 did not hesitate lie to the government, which then passed on that lie to this

Court.[1]  Notably, shortly after this January 2010 incident and its aftermath, the FBI deactivated

---

[1] CW-1 did not testify to the Court, but he certainly was aware that the government intended to use his explanation
for this event—casting doubt on his credibility—in a pleading before this Court in connection with Mr. DeCicco's
detention hearing.  Dkt. No. 87.

CW-1 as a confidential source.  Dkt. 3-1 at ¶ 5.

In connection with its trial preparation, the defense served a discovery letter on the government on March 6, 2018.  Ex. 1. The government responded on March 20, 2018, producing some information and documents but declining to produce in response to others.  Ex. 2.  On March 29, 2018, the defense sent the government a letter addressing apparent deficiencies in the government's production and responses.  Ex. 3.  The government responded on April 6, 2018. Ex. 4.  While the parties were able to narrow the discovery dispute over time, the government continues to refuse to disclose (1) information that is material to preparing the defense, and (2) information that is exculpatory under *Brady*/*Giglio*.

## ARGUMENT

## II.     THE GOVERNMENT HAS PROVIDED INADEQUATE RESPONSES TO THE DEFENDANT'S REQUESTS FOR INFORMATION MATERIAL TO PREPARING THE DEFENSE UNDER FED. R. CRIM. P. 16(a)(1)(E)(i)

### A.     Applicable Legal Standards

Fed. R. Crim. P. 16 requires the government to disclose materials, upon the request of the defendant, when "the item is material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E). "Evidence 'material to preparing the defense' includes any evidence that could significantly refute the Government's case in chief[.]"  *See United States v. Zhen Zhou Wu*, 680 F. Supp.2d 287, 290 (D. Mass. 2010) (quoting *United States v. Armstrong*, 517 U.S. 456, 462 (1996)).  The defendant's burden to simply to make a *prima facie* showing as to how the evidence can be used in "uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal."  *United States v. Goris*, 876 F.3d 40, 44-45 (1st Cir. 2017) (citing *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)); *see also* C. Wright, 2 Federal Practice & Procedure § 254, at 66-67 (1982) ("Too much should not be required in showing materiality.").  The scope of discovery available under Rule 16 is broader than that to which a

defendant is entitled to under *Brady v. Maryland*, 373 U.S. 83 (1963). *See, e.g. United States v. Lee*, 573 F.3d 155, 163-64 (3d Cir. 2009) (vacating conviction because government failed to provide material inculpatory evidence that was "the missing link the prosecution's case and was central to the defendant's trial strategy," in violation of Rule 16); *United States v. Muniz-Jaquez*, 718 F. 3d 1180, 1183-84 (9th Cir. 2013) ("Even inculpatory evidence may be relevant" under Rule 16(a)(1)(E)(i) as it may alter defendant's trial strategy or induce a plea agreement); *United States v. Poulin*, 592 F. Supp. 2d 137 (D. Me. 2008).

The discovery obligations under Rule 16 are augmented by this district's Local Rule 116.1, which provides for automatic discovery of Rule 16 materials without need for requests, and Local Rule 116.2, which codifies the government's obligations under *Brady* and its progeny, to produce all exculpatory information. *See also Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (holding that impeachment information constitutes *Brady* material); *United States v. Prochilo*, 629 F.3d 264, 266 (1st Cir. 2011) (citing *Brady*). Under L.R. 116.2, the government is required to produce exculpatory evidence in two phases: the first includes disclosure of evidence that tends to negate the guilt of the defendant of the charges sought, and is contemporaneous with the government's automatic disclosure responsibility under L.R. 116.1(c). The second phase includes most other impeachment evidence, and is due to be produced 21 days before trial. *Compare* L.R. 116(b)(1) and L.R. 116(b)(2); *see also United States v. Ritter*, No. 11-cr-40037-FDS, 2012 WL 1965404, at *1 (D. Mass. May 30, 2012).[2]

---

[2] For the first time on April 6, 2018, the government objected to the defendant's March 6 and 29, 2018 discovery requests as untimely, after the government had already responded and made supplemental productions on March 20, 2018 in response to the defendant's requests. The defense's delay was for good cause because Mr. DeCicco's predecessor counsel filed to withdraw form this case on January 8, 2018 after serving discovery requests on December 31, 2017, and current trial counsel entered their appearances shortly thereafter. The defense's follow-on discovery requests was filed as soon as was practicable, on March 6, 2018, after undersigned counsel was able to review the pleadings and transcripts of prior hearings, conduct a preliminary review of the voluminous production to date, and conduct an investigation of facts of the case in order to provide Mr. DeCicco with an adequate defense as

### B.      The Government's Boilerplate Response

Most of the defendant's requests at issue pertain specifically to evidence described in the affidavits of SA Elio and SA Lemanski filed in support of the charges, as well as the IRS Memorandum of Interview of CW-1.  *See United States v. Libby*, 429 F. Supp. 2d 1, 7 (D.D.C. 2006) ("[A] court must first start with the indictment when determining what is material, as the indictment delineates the evidence to which the defendant's case must respond.").  Rule 116.3 requires the government to provide a written statement for its basis for not providing information requested by the defense. The government, however, responded to fourteen of the defendant's requests for information "material to preparing the defense" by stating:

> The government has no responsive documents in its possession, custody or control which have not already been produced to the defendant and which the government is required to produce under Local Rule 116.1(c)(1)[3] or Local Rule 116.2(b)(1).

Ex. 2.  This boilerplate response lacks clarity and specificity; it also is evasive.  As written, the defense cannot determine whether (1) the government does not have any responsive documents in its possession, custody, or control regarding the particular request; (2) the government has already produced all responsive documents and has no additional responsive documents regarding the particular request; (3) the government possesses the requested documents but is objecting to producing them at this time under Local Rule 116.1(c)(1) and/or Local Rule 116.2(b)(1); or (4) the government possesses additional responsive documents or information

---

contemplated by the Sixth Amendment.  *See* L.R. 116.3(j) (permitting discovery requests served after discovery deadlines to the extent "the delay in making the request was for . . . good cause, which the moving party must describe with particularity."); *cf. United States v. Burns,* No. 2008-10111-RGS, 2008 U.S. Dist. LEXIS 66661, at *3 (D. Mass. Aug. 28, 2008) (finding no good cause to permit untimely discovery).

[3] L.R. 116.1(c)(1) requires the government to produce as part of automatic discovery information and documents discoverable under Fed. R. Crim. 16(a)(1), which includes documents that are material to the defense under Rule 16(a)(1)(E)(i).  To the extent that the government is declining to produce in response to the defense's requests under Rule 16(a)(1)(E)(i) on the basis that it is not required to produce the documents under L.R. 116.1(c)(1), the objection is improper.

that it is declining to produce altogether.

To illustrate but one example, Request 3 seeks information relating to estimates that CW-1 obtained from contractors and suppliers for the construction of Auto Excellence Group under Rule 16(a)(1)(E)(i) and L.R. 116.1(c)(1).  Ex. 1.  To date, the government has not produced a single estimate in response to this request.  But the government's response is ambiguous.  The defense cannot discern (1) whether the government has no such documents in its possession, (2) whether it (erroneously) claims that it has already produced them, (3) whether the government plans to produce them 21 days before trial, or (4) whether the government disagrees with the defense's assertion that they are discoverable.  "Criminal discovery is not a game.  It is integral to the quest for truth and the fair adjudication of guilt or innocence." *Libby*, 429 F. Supp. 2d at 7 (quoting *Taylor v. Illinois*, 484 U.S. 400, 419 (1988) (Brennan J., dissenting)).  If the government does not have any documents in its possession, custody, or control in response to a particular request, it should say so.  In fact, the government did precisely that in response to Requests 10, 27, 28, 31, 34, 35, 36, 39, and 40.[4]

The defense requested that the government clarify its responses to the fourteen requests, but the government has declined to do so, arguing that it is not obligated to inform the defense of what it has and does not have.  *See* Ex. 4.  This has necessitated this Motion as to the following requests.

### C.    Specific Requests for Documents and Objects Material to Preparing the Defense

### 1.    Requests 3 and 4:  The Construction of Auto Excellence Group

Requests 3 and 4 seek documents and information pertaining to the construction of Auto

---

[4] The Request numbers (e.g. "Request 3") correspond to the numbered requests in the defendant's discovery letter, dated March 6, 2018, attached as Ex. 1.

Excellence Group.  They include specific requests for production of estimates that CW-1 obtained from contractors and suppliers; disputes between CW-1 and contractors; threats made by CW-1 against contractors; disputes between CW-1 and Mr. DeCicco regarding Mr. DeCicco's alleged non-performance under the Purchase & Sale Agreement to pay for the paving of the driveway of Auto Excellence Group; and CW-1's calls with Rick Scourtas regarding derogatory statements CW-1 was making about Mr. DeCicco as a result of the contract dispute.

These requests are material to preparing the defense under Rule 16(a)(1)(E)(i) because responsive documents would significantly refute the government's case-in-chief, which is based on the theory that Mr. DeCicco wished to partner with CW-1 to co-own Auto Excellence Group. The Indictment alleges that the motive of Mr. DeCicco's alleged extortion was to "obtain an interest in [CW-1's] automobile dealership."  Dkt. No. 23.  And SA Elio's affidavit submitted in support of the Criminal Complaint alleges Mr. DeCicco and his associates had threatened CW-1 because CW-1 was refusing "to give part" of his business to Mr. DeCicco.  As noted, the defense intends to prove at trial that Mr. DeCicco had no interest in becoming partners with CW-1, who routinely cheated contractors who worked on the project, several of whom were business acquaintances of Mr. DeCicco.  This directly rebuts the government's theory of Mr. DeCicco's motive and is material to preparing the defense under Rule 16(a)(1)(E)(i).  *See United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010) (constitutional error to exclude "evidence intended to refute the prosecution's theory of motive"); *United States v. Luthra*, No. 15-cr-30032-MGM, 2016 WL 5946864, *10 (D. Mass. Oct. 12, 2016).

 Second, CW-1 provided information to the government that he refused to make payments to Peter Varone and the contractors because of "kickbacks" that "inflated construction fees," and that he was not allowed to "hire or even get estimates from any other contractors."

Dkt. No. 35-13 at ¶¶ 11-12.  Contrary to his statements to law enforcement, responsive documents to these requests will show that CW-1 hired several contractors himself, and had ample opportunity to obtain estimates.  They are therefore material to preparing the defense because they impeach CW-1 and show that he made false statements to law enforcement.  Since the government's extortion theory hinges on the credibility of CW-1— because no other witness will testify that Mr. DeCicco sought to be his partner in Auto Excellence Group—the veracity (or lack thereof) of CW-1's statements to law enforcement are highly material to preparing the defense.  *See* Fed. R. Crim. P. 16(a)(1)(E)(i);. *Goris*, 876 F.3d at 44-45.

Third, CW-1 has admitted that, when construction of the building was almost complete, he had a contractual dispute with Mr. DeCicco over whether Mr. DeCicco was obligated to pave the area around Auto Excellence Group.  Dkt. No. 35-13 ¶¶ 20-21, 24.  CW-1 then told several of DeCicco's business contacts and friends, outside of DeCicco's presence, that DeCicco had breached "his agreement to install the asphalt."  Dkt. No. 35-13 ¶ 21.  He later claims to have reported this contractual dispute to the FBI.  In addition, following the incident involving the flower delivery on August 4, 2014, CW-1 referred to the asphalt incident as a motive for DeCicco to have delivered the flowers and the note to him.  Dkt. No. 35-13 ¶ 24.  Documents responsive to these requests will both rebut the government theory that Mr. DeCicco's motive for the alleged extortionate acts was to obtain an ownership interest in CW-1's business, and attack CW-1's credibility.

Fourth, CW-1 informed law enforcement that Rick Scourtas called him and told him that Mr. DeCicco was upset at him because of CW-1's criticism of him regarding the asphalt dispute, *before* he received the flower delivery.  Dkt. No. 35-13 ¶ 21.  In particular, Mr. DeCicco reportedly told him to "stop talking shit about him."  *Id.*  This both shows an active dispute and

an alternate motive for the delivery of the flowers:  personal animus.  Documents responsive to

these requests will thus rebut the government theory that Mr. DeCicco's motive for the alleged

extortionate acts was to obtain an ownership interest in CW-1's business, as well as attack CW-

1's credibility.  *See Stever*, 603 F.3d at 755 (constitutional error to exclude evidence intended to

refute the prosecution's theory of motive); *Luthra*, 2016 WL 5946864, at *10.  The information

thus is material to preparing the defense.

### 2.   Requests 5-8:  Documents Pertaining to Mr. DeCicco's Alleged Attempted Extortion

Requests 5, 6, 7 and 8 seek materials and information that would tend to show, or

disprove, whether an attempted extortion ever occurred.  The alleged attempted extortion is

based on communications between CW-1 and Mr. DeCicco, including that CW-1 was fearful of

Mr. DeCicco.  Request 5 specifically targets communications between CW-1 and Mr. DeCicco

regarding the allegation that Mr. DeCicco requested to be partners with CW-1 in the Auto

Excellence Group business.  Request 6 similarly asks for information as to whether CW-1 had

rejected Mr. DeCicco's alleged request to become his partner.  Requests 7 and 8 focus on

information and materials tending to show whether Mr. DeCicco had made any demand for

money or property, directly or indirectly, from CW-1, which is an element of the charged crime.

Information and materials responsive to these requests are central to preparing the

defense in several respects.  The information, or lack thereof, directly impacts the weight of the

government's proof against Mr. DeCicco on virtually all elements of the alleged crime, including

that the extortionate acts alleged in this case were committed in order to "obtain property" and

that CW-1 was placed in "fear" as a result of the alleged acts.  18 U.S.C. § 1951.  Information

and documents responsive to these requests are further material to preparing the defense because

they will either corroborate or contradict the statements CW-1 has provided previously to law

enforcement, and provide fertile grounds for cross-examination.  *See Goris*, 876 F.3d at 44-45.

### 3.    Request 13:  Alleged Report to the FBI on December 28, 2014 Regarding Threats to CW-1

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████    Request 13 seeks documents and information regarding this December 28,

2014 report.  Materials and information responsive to this request are material to preparing the

defense because they would directly corroborate or impeach CW-1's report to law enforcement

about alleged threats he received from Mr. DeCicco and/or his associates.  For example, if an

alleged threat was made on December 28, 2014, thereby prompting CW-1's report, there should

exist video surveillance evidence from Auto Excellence Group's surveillance system that would

either corroborate or contradict the report.  *See Poulin*, 592 F. Supp. 2d at 143 ("Rule 16 requires

the disclosure of inculpatory and exculpatory evidence alike").  This evidence would directly

corroborate or rebut the government's case-in-chief and is thus material to preparing the defense.

This evidence further would be relevant to CW-1's credibility, which is central to the

government's proof of the charge against Mr. DeCicco, and therefore is independently material

to preparing the defense.  *See Goris*, 876 F.3d at 44-45.

### 4.    Request 14:  Documents Pertaining to the January 11, 2015 Assault of CW-1

Request 14 pertains to the assault of CW-1 on January 11, 2015, which is described in SA

Elio's affidavit as a key event to prove the alleged crime of attempted extortion.[5]  Request 14

includes requests for information regarding comments made by the assailant that the assault

---

[5] The government has produced some documents and materials responsive to this request.  However, based on its boilerplate response, the defense does not know whether the government has additional documents that it is withholding at this time.

would teach CW-1 to "how to talk to a lady," telephone records of the individuals involved in the assault, communications between these individuals.  Request 14 also includes a request for information pertaining to the following statement in an FBI Form 1057 Report dated February 17, 2015:  "It is believed that the assault was arranged by the same subject of the above captioned investigation **in response to an alleged debt owed by the cooperating witness to the subject.**" Ex. 5, FBI Form 1057 Report, February 17, 2015, USAO_DECICCO_00003075-3078.

Materials and information responsive to this request are material to preparing the defense because they would directly rebut the government's case-in-chief and undermine the government's theory that Mr. DeCicco arranged for the assault of CW-1 in order to coerce him to become partners with him in Auto Excellence Group.  The Form 1057 Report, which was based on an interview of CW-1 by SA Chizmadia, provides a completely different theory for the assault on January 11, 2015 than the charge in the Indictment.  Documents and information regarding this Form 1057 Report, as well as regarding the assailant's statement about "how to talk to a lady," rebut the government's theory of the case and are exculpatory as they directly negate the defendant's guilt as to the crime charged.  The government's production to date on this issue shows that the information is material to preparing the defense.  *See Poulin*, 592 F. Supp. 2d at 143 (noting that the government's production of a recording is dispositive as to the materiality of that conversation under Rule 16).

### 5.   Request 16:  Documents Pertaining to the Recorded Conversation Between CW-3 and CW-4

Request 16 seeks documents regarding this recorded conversation that the government has produced[6] of the recorded conversation between CW-3 and CW-4, wherein the two

---

[6] Again, the government has produced some information responsive to this request.  However, based on its boilerplate response, the defense does not know whether the government has additional documents that it is withholding at this time.

individuals discuss an incident that "they . . . know Gary paid for it to get done . . . ." Dkt. No. 3-1 ¶ 25.  The government alleges this constitutes evidence tending to show that Mr. DeCicco was responsible for CW-1's assault.  *Id.*

Materials and information responsive to this request are material to preparing the defense because they would either corroborate or contradict the government's case-in-chief, because part of the government's theory is that CW-3 and CW-4 acted as intermediaries to assist Mr. DeCicco carry out the assault of CW-1.  This information would factor into the defense's lines of questioning of CW-3 and CW-4 regarding this call and the assault, including opportunities to cross-examine CW-3 and CW-4 as to the purported motive.  *See Luthra*, 2016 WL 5946864, at *10.  Because the government's theory of the case is that Mr. DeCicco arranged for CW-1's assault to obtain an ownership interest in Auto Excellence Group, information relating to this recorded conversation may further corroborate or contradict the government's theory.  This is especially critical because the assailant told CW-1 that the assault "would teach CW-1 'how to talk to a lady,'" which contradicts the government's theory of the case.  Dkt. No. 3-1 ¶ 19.

6.     **Request 18:  Documents Pertaining to CW-1's Communications with Others Regarding Mr. DeCicco**

Request 18 seeks materials regarding all communications made by CW-1 regarding Mr. DeCicco, including those with law enforcement and government agencies, CW-1's and Mr. DeCicco's mutual acquaintances, and Mr. DeCicco himself, beginning from 2013 (the beginning of the alleged extortion scheme).  Information responsive to this request is material to preparing the defense because CW-1's statements about Mr. DeCicco provide the best evidence of CW-1's contemporaneous state of mind as to Mr. DeCicco during the relevant time frame, including his animus and bias against Mr. DeCicco.  CW-1's statements in this regard would tend to

undermine his credibility, and corroborate the defense's theory that CW-1 is taking revenge on Mr. DeCicco by fabricating a bogus extortion charge.

Moreover, communications—including written communications—between the key government witness and government agents and prosecutors are material to preparing the defense because it provides fertile ground for impeachment of the sole witness who can testify as to Mr. DeCicco's motive behind the alleged extortionate acts.  *See, e.g.*, Order, *United States v. Grace*, No. CR-050-07-M-DWM (D. Mont. Apr. 28, 2009) (finding violation of Rule 16 and government agents show witnesses' animus toward the defendants and the extent of his relationship with the prosecution), attached as Ex. 6; *see also* United States Attorneys' Manual § 9.5002(B)(5) (directing prosecutors to review substantive case-related communications, including emails, memoranda, or notes, between prosecutors and/or agents with victims and/or witnesses for discoverable information).

Additionally, communications between CW-1 and other witnesses in this case are material to preparing the defense because, to date, no witness has proffered testimony that would corroborate CW-1's anticipated testimony that Mr. DeCicco wanted to be his partner in Auto Excellence Group.  Any statements CW-1 made to others about Mr. DeCicco's alleged desire to partner with CW-1 corroborates the government's case and is material to preparing the defense. *See Poulin*, 592 F. Supp. 2d at 143 ("Rule 16 requires the disclosure of inculpatory and exculpatory evidence alike").

### 7.    Requests 21 and 22:  Documents and Information Pertaining to the Books and Records of Auto Excellence Group

Requests 21 and 22 seek documents relating to the books and records of Auto Excellence Group and the automotive businesses that CW-1 owned and/or operated prior to the opening of Auto Excellence Group.  Documents and information responsive to this request are material to

preparing the defense because they would tend to undercut the government's theory of why Mr. DeCicco committed the allegedly extortionate acts. The materials will show that CW-1 was an unsuccessful car salesman with an unsustainable business model. This directly undercuts the government's theory of the case that Mr. DeCicco would wish to take an ownership stake in a failing business.

Documents and information responsive to this request also are material to preparing the defense because they would show that CW-1 was dishonest in his business dealings, including with respect to Mr. DeCicco, further undercutting the government's theory that Mr. DeCicco wished to partner with him. The defense also intends to prove that, before the construction of Auto Excellence Group, CW-1 sold one of Mr. DeCicco's vehicles and cheated him in connection with the sale. Comparison of bank records and records of CW-1's sales—which CW-1 is obligated to maintain under Massachusetts law—would further reveal that it was CW-1's practice to skim cash from the proceeds of Auto Excellence Group and fail to report accurate sales to the government. The defense also intends to show that CW-1 engaged in "off the books" transactions in violation of law. Given that these practices can constitute criminal conduct, this would allow the defense to effectively cross-examine the credibility of the government's key witness, on which the government's theory heavily relies to prove Mr. DeCicco's motive for the alleged extortionate acts.

### 8.   Request 23: Documents and Information Pertaining to CW-1's Employment of Kimberly DeBenedictis

Request 23 seeks documents and information relating to CW-1's employment of Ms. DeBenedictis and any payments made to her. Documents and information responsive to this request are material to preparing the defense because they would tend to support the defense theory that CW-1's animus toward Mr. DeCicco's arose out of Ms. DeBenedictis's romantic

relationship with Mr. DeCicco, which began in the summer of 2013.  The defense intends to show that Ms. DeBenedictis worked for CW-1 at a prior dealership, and was terminated because CW-1 claimed he could not afford to keep her on his payroll. CW-1 then attempted to employ Ms. DeBenedictis to work for him out of his "home office," which she declined.  Ms. DeBendictis's refusal to accept CW-1's offer, and her subsequent romantic relationship with Mr. DeCicco, can be corroborated by materials and information responsive to this request.  *See Goris*, 876 F.3d at 44-45. The documents thus are material to preparing the defense.

9. **Request 25:  Documents and information Pertaining to Interstate Commerce**

Request 25 targets evidence concerning the interstate commerce element of the alleged crime.  The government has the burden to prove beyond a reasonable doubt that Mr. DeCicco "did knowingly and unlawfully attempt to obstruct, delay and affect commerce and the movement of any article and commodity in commerce." 18 U.S.C. § 1951.  To date, the government has produced no evidence to the defense regarding this element of the alleged crime. The existence, or non-existence, of evidence responsive to this request is material to preparing the defense as it is a complete defense if the government fails to prove this element of the alleged crime.

III. **THE GOVERNMENT HAS REFUSED TO PRODUCE DOCUMENTS THAT ARE MATERIAL TO THE DEFENSE AND EXCULPATORY UNDER *BRADY* AND *GIGLIO***

A. **Background**

1. ███████████████████████

████████████████████████████████████████████████████

---

[7] ███████████████████████████████████████████████
███████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████  ███████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████   The FBI's internal policies and procedures governing the preparation of FD-302 reports require that "the preparation of the FD-302 should be effected **within five days following the final interview session**."  FBI Manual of Administrative Operations and Procedures (MAOP), Part 2, Section 10-13.3.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

On March 26, 2018, the government produced both pages of a 2-page report prepared by FBI Special Agent Jesse Chizmadia (the "Second 302 Report"). <u>Ex. 8</u>, FBI 302 Report, March 16, 2017, USAO_DECICCO_00003167-3168. The Second 302 Report was produced, however, within a Bates range that was responsive to a different request that had sought documents about the alleged incidents of August 4-6, 2014, including deliveries of flowers, pizza, and alleged anonymous threatening calls.[8] <u>Ex. 2</u>. In response to the original request seeking drafts and metadata pertaining to the First 302 Report, the government declined to produce, arguing that it "is not required to provide such information under Local Rule 116.1(c)(1) and Local Rule 116.2(b)(1)."

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[8] The Second 302 Report contains no reference to the August 4-6, 2014 incidents, making its production in the midst of documents responsive to a request relating to those incidents puzzling.



Absent metadata and supporting notes, the defense is unable to ascertain when either 302 Report was drafted, revised, altered, and/or entered into the investigative file.[9]

### 2.   The Video of Mr. DeCicco's Arrest on CW-1's Mobile Phone

The defense requested all data and documents on CW-1's mobile phone relating to Mr. DeCicco and his family members, including a video known to be taken by CW-1 on March 17, 2017, documenting Mr. DeCicco's arrest.  On March 20, 2018, the government produced a video file that appears to be a video of Mr. DeCicco's arrest, taken from the vantage point of CW-1's residence.[10]  This appears to confirm that CW-1's mobile phone is within the possession, custody or control of the government.  The government has, to date, not produced any other data from CW-1's phone despite the defense's requests.

---

[9] 

[10] CW-1 and Mr. DeCicco are neighbors who live on the same cul-de-sac in Nahant, MA.

**B.      Specific Requests for Documents and Objects Material to Preparing the Defense and Exculpatory Under *Brady* and *Giglio***

**1.      Request 38: Documents and Information Pertaining to CW-1**

Request 38 seeks documents and information regarding CW-1, the alleged victim and central witness to the government's case-in-chief.  The various subsections of requests are addressed below.

**a)      Requests Pertaining to CW-1's Deactivation as an FBI Confidential Source**

The government has declined to provide information in response to subsections (1), (2), (3), (5), and (8) because it claims it is not required to provide information under L.R. 116.1(c)(1) or L.R. 116.2(b)(1).  It is incorrect.  The materials in response to subsections (1), (2), (3), (5), and (8) are material to preparing the defense because CW-1, the government's key witness, is a confidential source of the FBI.  The deactivation of a confidential source is often due to the FBI's loss of confidence in the credibility of the source or the misconduct of the source.  Notably, CW-1 was deactivated on the heels of his threat to "cut" a victim "to pieces" and to ruin his business through an extortionate threat.

The circumstances surrounding CW-1's deactivation as a source in or around 2011 and his reopening as an FBI source in July 2015—mere months after his assault—are important to the defense's cross-examination and impeachment strategy.  *See Goris*, 876 F.3d at 44-45.  Documents and information responsive to this request can assist the defense to discredit both CW-1 and the government as to their credibility and motive for prosecuting Mr. DeCicco, particularly given the government's own earlier decision to cease using CW-1 as a confidential source.  The information thus is material to preparing the defense and the defense is entitled to it under Rule 16(a)(1)(E)(i) and L.R. 116.1(c)(1).  Moreover, the information is exculpatory because it impeaches CW-1's credibility under *Giglio*.

21

**b)** 

The recent irregularities that have surfaced make this request not only exculpatory under *Brady* and *Giglio*, but also material to the defense under Rule 16.

For example, the metadata of the document will reveal when the author actually prepared the report, and may further shed light on when it was revised.

This information is thus material to the defense under Rule 16(a)(1)(E).  *See also United States v. Virgen-Nunez*, 2009 WL 10678145, *2 (S.D. Iowa June 26, 2009) (ordering production of metadata from computer used to prepare search warrant to

confirm timing of preparation).  ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████.

### c) Request Pertaining CW-1's Inconsistent Statements to Law Enforcement

The defense is also entitled to exculpatory information regarding the conflicting narrative

provided by CW-1 as to the motive behind the alleged extortionate acts and January 11, 2015

assault, as revealed in the FD 1057 Laboratory Reports (which were themselves untimely

produced).  Because the crime of extortion requires proof that the victim reasonably believed that

the defendant (1) had the power to harm the victim; and (2) would exploit that power to the

victim's detriment, the perspective of the victim and "the absence or presence of fear of

economic loss" must be considered as evidence that would tend to directly impact whether Mr.

DeCicco is guilty of the crime of attempted extortion as the government has charged it.  *United

States v. Capo*, 817 F.2d 947, 951-52 (2d Cir. 1987); *see also United States v. Hathaway*, 534

F.2d 386, 395 (1st Cir. 1976) ("The emphasis in extortion is on the coercion by the defendants . .

. and the resulting fear created in the victim's mind.").  The government's production to date—

including the irregularities in the documents that tend to support the government's theory and, by

contrast, the untimely production of documents that tend to exculpate Mr. DeCicco—has created

a *prima facie* issue of whether the government's theory even holds water.  The information also

is independently material to the preparation of the defense because it is impeachment material as

to the credibility of CW-1.  The defense is therefore entitled to this information under Fed. R.

Crim. P. 16(a)(1)(E)(i), L.R. 116.2(b)(1), and *Brady* and *Giglio*.  *See Luthra*, 2016 WL 5946864,

at *10 (holding defendant had right under *Brady* and Rule 16(a)(1)(E) to information that "may

yield evidence that refutes the government's evidence of her motive").

**2.    Requests 11 and 23:  Documents and Information Pertaining to the Failure of Law Enforcement to Identify Mr. DeCicco**

Requests 11 and 23 seek documents and information relating to the events of August 4-6, 2014, including the government and the Saugus Police Department's efforts to identify the perpetrators of the alleged harassing calls occurring on August 4 and 6, 2014.  The government objects to this request to the extent it calls for documents that are protected by the investigative privilege.  But the failure of law enforcement to adequately investigate these incidents, and their failure to identify Mr. DeCicco as an alleged perpetrator of this alleged conduct, are exculpatory. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (finding that evidence allowing the defense to attack the reliability of the investigation was exculpatory) (citing *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possibly *Brady* violation," and *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial because withheld *Brady* evidence would have potentially allowed defense to discredit police methods employed)).

After investigating these alleged August 2014 harassing calls, the Saugus Police Department apparently identified one or more other individuals as the alleged perpetrators, which undermines the government's theory that these threatening acts could be attributable to Mr. DeCicco.  Moreover, the defense is entitled to cross-examine law enforcement agents as to its methods in assembling the case against Mr. DeCicco, including its failure to request and examine the phone records of CW-1, the victim, despite making the decision to examine others' phone records in parallel circumstances.  *See Lindsey*, 769 F.2d at 1042.  This information should be produced to the defense under Fed. R. Crim. 16(a)(1)(E) because they are material to

preparing the defense, and are exculpatory under *Brady* and *Giglio* and L.R. 116.2(b)(1) and (b)(2).

### 3.      Requests 19 and 24: Documents and Information Regarding Mr. DeCicco's Communications with CW-1

Requests 19 and 24 seek all documents and information within the government's possession pertaining to communications between Mr. DeCicco and CW-1, including any electronic interceptions,[11] because they are material to preparing the defense in several ways. First, the communication patterns between the two individuals before and during the timeframe when the alleged "extortion" was occurring demonstrate the absence of fear on CW-1's part, which is an element of the crime of Hobbs Act extortion.  Second, comparing the timing of their communications would show that CW-1 failed to report any alleged calls between Mr. DeCicco and CW-1 to law enforcement, further evidencing his lack of fear of Mr. DeCicco, as well as raising questions about CW-1's credibility (especially in light of the conflicting statements that the production to date reveals).

The government's possession or previous access to CW-1's mobile phone, as evidenced by its production of what appears to be a video file from that phone, also gives rise to a reasonable inference that the government has access to additional records of communication and data relating to Mr. DeCicco (and his family) stored on the device.  Over the course of the parties' meet and confer communications, the government has represented that it is currently reviewing CW-1's phone, but has not acknowledged that the information is material to preparing the defense under Rule 16.  The defense is entitled to this information under Fed. R. Crim. P. 16(a)(1)(E), L.R. 116.2(b)(1) and 116.2(b)(2), and *Brady* and *Giglio*.

---

[11] The government has also produced three audio files that are Title III intercepts of Mr. DeCicco during the timeframe of the alleged crime.

### III.   THE SAUGUS POLICE DEPARTMENT IS A MEMBER OF THE PROSECUTION TEAM

The government's position that the Saugus Police Department is not a member of the prosecution team does not address the defense's arguments and has no merit.[12]  The United States Attorneys' Manual states that "members of the prosecution team include federal, state, and local law enforcement officers and other government official participating in the investigation and prosecution of the criminal case against the defendant."  United States Attorneys' Manual §§ 9-5.001B(2) and 9-5.002 (citing *Kyles*, 514 U.S. at 437).  As the Saugus Police Department documents produced to date have shown, its officers investigated the August 2014 and January 2015 incidents at issue in this case, were aware of the parallel federal investigation against Mr. DeCicco, and coordinated with FBI agents who investigated this case, including SA Chizmadia, by at least Late August or early September 2014.  Saugus Police Officer James Donovan is an FBI Task Force member and provided information to SA Chizmadia regarding the case.  Under the Department of Justice's own standards, the Saugus Police Department should be considered part of the federal prosecution team for purposes of both Fed. R. Crim. 16 and *Brady* and *Giglio*. *See also United States v. Pedersen*, No. 3:12-cr-00431-HA, 2014 WL 3871197, at *1 (D. Or. Aug. 4, 2014) (concluding that the Oregon State Police were members of the federal "prosecution team").

### CONCLUSION

For these reasons, the Court should grant the defendant's Motion to Compel in its entirety.

---

[12] While the government has represented that it has provided the defense with copies of all documents provided to the government by Saugus Police Detective Frank J. Morello without waiving its objection regarding the definition of the prosecution team, the defense seeks the Court's guidance on this issue as it impacts the government's obligation to produce documents from other members of the Saugus Police Department, as well as its continuing obligation to produce under Fed. R. Crim. P. 16(c) and L.R. 116.7.

Respectfully submitted,

GARY P. DECICCO

By his attorneys,

 /s/ Thomas C. Frongillo
Thomas C. Frongillo (BBO# 180690)
Caroline K. Simons (BBO# 680827)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, Massachusetts 02210
frongillo@fr.com
simons@fr.com
TEL: (617) 542-5070
FAX: (617) 542-8906

James J. Cipoletta (BBO# 084260)
Law Offices of James J. Cipoletta
Citizens Bank Building
385 Broadway Suite 307
Revere, Massachusetts 02151
jim@cipoletta.com
Tel: (781) 289-7777
Dated: April 18, 2018                   Fax: (781) 289-9468

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was filed on April 18, 2018
through the CM/ECF system and will be served electronically to registered CM/ECF participants
as identified on the Notice of Electronic Filing.

 /s/ Thomas C. Frongillo
Thomas C. Frongillo