**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| v. | ) | No. 17-CR-10092-NMG |
| GARY P. DECICCO, | ) | |
| *Defendant*. | ) | |

**REPLY BRIEF IN SUPPORT OF**
**DEFENDANT'S MOTION TO COMPEL DISCOVERY**
**[Leave Granted on May 11, 2018]**

## I. The Defendant Has Complied with Rule 116.3(j) and Shown Good Cause for Subsequent Discovery Requests

At the outset, the government presses the Court to dismiss the motion to compel outright based on a strict technical reading of Local Rule 116.3(j), arguing that the defendant failed to comply with the rule because he failed to provide a "certification" that a subsequent discovery request was for good cause. *See* Gov't Opp. to Def. Mot. to Compel, Dkt. No. 171 (hereinafter "Opp.") at 4. But in the same breath, the government acknowledges that the defendant has, in fact, proffered his reasons—albeit not in the form of a separate certificate—explaining to the Court why his delay was for good cause. Opp. at 4 (citing Def. Mem ISO Mot. to Compel, Dkt. No. 165 (hereinafter "Mem.") at 6, n.2). Indeed, the government points to the precise page of the defendant's brief where those reasons for "other good cause" appear, which the defendant makes explicitly pursuant to L.R. 116.3(j). *See* Mem. at 6, n.2 (citing L.R. 116.3(j)). The Court should reject the government's attempt to wield formality as a way to trump Mr. DeCicco's constitutional rights to present a meaningful defense and "to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the

punishment to be imposed." *California v. Trombetta,* 467 U.S. 479 (1984) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).

What the government apparently disagrees with is the defense's reasons for why good cause exists to serve subsequent discovery requests. *See* Opp. at 5 ("Because the Defendant has failed *to demonstrate good cause* for making the discovery requests . . . the Court should deny the Motion."). The government dismisses the undisputed fact that present defense counsel entered the case in January 2018 and have had to review the discovery before determining the need for further discovery requests. Opp. at 5. Instead, the government scoffs that (1) "present defense counsel have been involved in the defense of this case . . . clearly as early as July 2017," (2) counsel had access to the public docket; and (3) the discovery in this case is neither voluminous nor complicated and only totals "approximately 3,400 pages of information relevant to this case." Opp. at 5. The first assertion is speculative and inaccurate; the second and third, unfair. First, undersigned counsel do not quibble with the dates and numbers that the government has tallied of counsel's visits to the defendant. *See* Opp. at 3. The government cannot, however, conclude from the outside that these visits were devoted to preparing Mr. DeCicco's defense,[1] or—even if they were—a substitute for actually reviewing the case file and the discovery in this case, which undersigned counsel did not have access to until January 2018. Second, the availability of the public docket nevertheless did not allow trial counsel access to the case discovery, the review of which was obviously a perquisite to assessing further discovery requests. Finally, the government's representation that the "relevant" production stood at 3,400 pages is disingenuous. This count—presumably generated through citing the last Bates number

[1] As the government is well aware, Mr. Cipoletta has been Mr. DeCicco's attorney for approximately 15 years, including on a wide variety of matters that have nothing to do with criminal defense.

of the production (excluding Mr. DeCicco's bank records, *see* Opp. at 5, n.1)—ignores files such as USAO_DECICCO_00000500 (2,182 pages), as well as several native spreadsheets that range from hundreds to over 16,000 pages each. The government also omits from its calculation of the production volume almost 4,000 audio files of the defendant's calls from prison—which are not accounted for in units of pages, to be sure, but themselves necessitate well over several hundred hours of review. Unlike defense counsel, the government has had the advantage of reviewing these on a rolling basis, and has threatened to use them against the defendant during trial. *See* Opp. at 11. Thus, the government's argument that no good cause exists because its production is not "voluminous," and that defense counsel somehow should have mastered the record months before they had access to it, should be discarded out of hand.

## II. The Government Is Attempting to Change Its Theory of the Case

The government's insistence that the defendant's motion to compel be dismissed offhand on technical grounds is overshadowed by what appears to be a troubling and fundamental eleventh-hour shift in the government's theory of the case.[2] *See* Opp. at 2. Since the filing of the criminal complaint on March 16, 2017, *see* Dkt. No. 3, the government has pressed its theory that Mr. DeCicco is criminally liable for extortion because—according to CW-1—Mr. DeCicco sought to be a "partner" of CW-1 in CW-1's business, Auto Excellence Group, and resorted to actual and threatened force, violence, or fear to induce CW-1's consent after CW-1's initial rejection. *See* Dkt. No. 3-1. The government now argues that the Indictment "alleges merely that he wanted an interest in the dealership," not an ownership interest, and appears to be shifting its theory of the case away from ownership and toward "a chance to make money if the CW-1

---

[2] The government's disclosure appears to be prompted by the defendant's inadvertent misquoting of the Indictment in his opening brief. *See* Mem. at 2.

made money," or possibly even an interest that "remained hidden" because Mr. DeCicco would not want to be publicly associated with CW-1. Opp. at 10-11.

This shift sharply contradicts the evidence—*as the government has presented it*—and betrays a fundamental weakness of the government's case and, indeed, the basis of Mr. DeCicco's pretrial detention. *See United States v. Burhoe*, 871 F.3d 1, 31 ("[T]he Government's shifting and imprecise characterization of the alleged property at issue betrays the weakness of its case.") (quoting *Sekhar v. United States*, 570 U.S. 729, 737 (2013)). From FBI Special Agent Matthew Elio's affidavit that formed the basis for the criminal complaint, to IRS Special Agent Sandra Lemanski's affidavit that supported the government's motion to detain Mr. DeCicco, to the government's own briefing and oral arguments during the course of its persistent efforts to detain Mr. DeCicco pretrial, the government has consistently pushed its theory that Mr. DeCicco wanted to be CW-1's "partner" and obtain an "ownership interest" in Auto Excellence Group:

- Dated March 16, 2017, SA Elio's affidavit attests that "DeCicco approached CW-1 about **being partners in the automobile dealership**." Dkt. No. 3-1 at ¶ 7. "CW-1 learned that DeCicco was telling people that he was going **to be partners** with CW-1 in the dealership. According to CW-1, DeCicco told the architect who did the plans for the building that he was going **to be partners** with CW-1 . . . CW-1 made it clear to the architect that he had no intention of **having DeCicco as a partner**." Dkt. No. 3-1 at ¶ 8. "According to CW-1, DeCicco became very upset that he was not going **to be partners** with CW-1." Dkt. No. 3-1 at ¶ 9. "When asked by police on August 6, 2014 why DeCicco would be interested in harassing him, CW-1 told the police department that DeCicco wanted **to be a partner** in the business with CW-1 but that CW-1 did not need **a partner**." Dkt. No. 3-1 at ¶ 12.

- IRS SA Lemanski's affidavit, submitted in support of the government's motion to detain, contains remarkably similar language. *See, e.g.*, Dkt. No. 70-5 at ¶ 5 ("being partners"); ¶ 6 ("going to be partners"); ¶ 7 (Mr. DeCicco was upset he "was not going to be partners with CW-1").

- During the first detention hearing, IRS SA Lemanski testified that shortly after construction, "[CW-1] was approached by Mr. DeCicco requesting if he could **be partners with him that dealership**." Dkt. No. 18 at 7:3-10. AUSA Barclay encouraged SA Lemanski to go on, asking:

Q: And then did the victim receive other information about Mr. DeCicco asserting **an interest in the ownership**?

A: Yes. Shortly after his conversation with Mr. Deicco about becoming partners, he had started to hear rumors and other people, associates that Mr. DeCicco and both he had, that Mr. DeCicco was saying that he was – had **an ownership interest in that dealership**.

Dkt. No. 18 at 7:15-21.

- SA Lemanski went on to argue that the note that accompanied the flowers was also indicative that CW-1's assault related to a dispute over ownership of the dealership, and that CW-1 has been consistent and would be the only person to say that because "he's the one who was receiving the threats." Dkt. No. 18 at 59:19-60:9. *See also* Dkt. No. 18 at 96:24-97:1 (testifying that CW-1 believed he received flowers and was assaulted because "Mr. DeCicco was getting back at him for not being – **allowing him to be partners in his dealership with him**").

- The government has similarly maintained this ownership interest/partner theory of the case while arguing to detain Mr. DeCicco pretrial. In arguing that there is sufficient evidence of attempted extortion, the government stated, "the victim told investigators several times that Mr. DeCicco wanted **a piece of the business**, and that other people had told him that Mr. DeCicco wanted **a piece of the business** . . . Mr. DeCicco said he **owns it** . . . the card mentions the fact that Mr. DeCicco is the **true owner of the dealership** . . . ." Dkt. No. 18 at 113.

- Later, when Mr. DeCicco sought to reopen the detention hearing and argued that there was conflicting evidence on the motive for CW-1's assault, the government insisted that the objective evidence supported the ownership theory:

  > "But the fact that Defendant told CW-4 that CW-1 had harassed a woman in his life is belied by the evidence that Defendant arranged the beating because he wanted an interest in CW-1's business. *See, e.g.*, Docket No. 18, at 7 (Defendant commented to CW-1 **about being partners**) . . . ." Dkt. No. 47 at 11.

The Court was persuaded by this ownership interest/partnership theory and the alleged evidence in support of this theory for its decision to order pretrial detention. The Court noted that "there's sufficient evidence there to link the assault to the efforts by the defendant to get some **percentage of ownership, if not complete ownership, of the car dealership**." Dkt. No. 18 at 118:13-17. After hearing additional evidence, the Court returned to the ownership concept, musing "the language of the note fairly squares with the government's theory here, and that was

what was persuasive to the Court at the original detention hearing." Hr'g Tr. of Motion Hearing, 62:13-18 (Oct. 3, 2017). This Court's written decisions specifically refer to the note as "a critical piece of the government's case" in support of the government's theory that "Defendant acted to force CW-1 to accept him as **a partner in the auto dealership**." Dkt. No. 119 at 6, 5. The choice of words in the note, the Court wrote, "focus on **ownership** of CW-1's business and are consistent with the notion that a **battle about ownership** existed." Dkt. No. 132 at 8 (emphasis supplied).

The government's new theory about Mr. DeCicco seeking a "hidden" interest or a cut of the profits instead of taking an ownership stake or serving as a partner of CW-1 is an blatant about-face, and simply does not square with the proffered evidence. Moreover, the government relied on its "ownership interest/partnership" theory to oppose Mr. DeCicco's motion for a bill of particulars, specifically relying on the affidavits of SA Elio and SA Lemanski and representing that "the government has detailed its allegations against Defendant" in them. *See* Dkt. No. 74 at 9. The Court agreed, questioning why defense counsel could not prepare his defense "with this indictment as with two . . . 25-, 30-page affidavits, a two-hour, three-hour detention hearing in March, a two-hour detention hearing today or hearing on matters?" Hr'g Tr. at 77:8-17 (Aug. 31, 2017). Yet the government is now veering away from the evidence and allegations serially set forth in these various affidavits and hearings. As outlined above, virtually every piece of evidence relied on by the government—CW-1's testimony, the architect's plans, and the note—purports to center on Mr. DeCicco allegedly,[3] brazenly, and openly wanting an "ownership interest" or to be "a partner" of CW-1's in Auto Excellence Group. This evidence also makes it

[3] In recounting the evidence as the government has characterized it, Mr. DeCicco in no way concedes that the government's presentation is accurate, and continues to vehemently deny that *any* of the government's theories of Hobbs Act extortion are correct.

even more absurd that Mr. DeCicco's alleged motive to extort CW-1 would have been for a "hidden" interest. Indeed, the government itself presented argument that Mr. DeCicco was allegedly angry at CW-1 (prompting the flowers and the assault) because he had been telling "people"—including the architect and other auto dealers—that he was going to be CW-1's partner, only to be rejected when CW-1 heard about it. *See*, e.g., Dkt. No. 3-1 ¶ 7; Dkt. No. 70-5 ¶ 6; Dkt. No. 18 at 96:24-97:1, *supra*. The U.S. Attorney's Office zeal "to aggressively prosecute extortion in all its forms" does not give it license to continually stretch and distort its Hobbs Act allegations and case theories to encompass conduct that does not belong under the statute. Statement from Acting U.S. Attorney Weinreb Regarding Verdict in *U.S. v. Fidler* (Aug. 15, 2017)[4]; *see Burhoe*, 871 F.3d at 31 (reversing Hobbs Act conviction for insufficiency of evidence); *United States v. Brissette*, No. 16-cr-10137-LTS, 2018 WL 1399293, at *12-13, n. 24 (D. Mass. Mar. 19, 2018) (denying government motion for reconsideration regarding Hobbs Act extortion jury instruction and noting "the shifting sands of the government's legal theory"); *see also Sekhar*, 570 U.S. at 738 (reversing conviction for Hobbs Act extortion where government theory of property obtained ultimately settled on non-transferable rights, which did not constitute "property").

## III. The Government's Continued Resistance to Allow the Defendant to Obtain Discovery Thus Is Improper and Downplays the Irregularities in Its Production

The government should not be permitted to use its brand-new (and still not entirely known) theory to, at the very least, deny Mr. DeCicco the discovery he seeks. The documents that Mr. DeCicco has sought are tied to specific allegations that the government has proffered, such as in SA Elio's and SA Lemanski's affidavits, as these documents are material to preparing

[4] *available at* https://www.justice.gov/usao-ma/pr/statement-acting-us-attorney-william-weinreb-regarding-verdict-us-v-fidler-et-al (last visited May 9, 2018).

the defense and to refuting the government's case in chief. *See United States v. Zhen Zhou Wu*, 680 F.Supp.2d 287, 290 (D. Mass. 2010) (quoting *United States v. Armstrong*, 517 U.S. 456, 462 (1996).

On May 7 and 8, 2018, the government produced a set of documents pursuant to Fed. R. Crim. P. 26.2, L.R. 116.2, and 18 U.S.C. § 3500, largely comprising prior statements of witnesses and of CW-1. *See* Ex. 1 and 2. The government continues to decline producing additional documents, however, as follows:

**A. Requests 3, 4, 21 and 22: Construction and Books and Records of Auto Excellence Group**

The government rejects Mr. DeCicco's request for the books and records of Auto Excellence Group because its new theory purportedly renders the documents requested irrelevant to the case. Opp. at 10. The government skirts the pile of alleged evidence that it has introduced in this case from Day One that "DeCicco approached CW-1 **about being partners** in the automobile dealership." Dkt. No. 3-1 at ¶ 7 (emphasis added); *see also* Section II, supra. Instead, the government now objects to this request because, "the Defendant did not ask that his name be on the books or records, or offer that he would share in any losses CW-1's business incurred." Opp. at 10. The government is moving the goalposts.

The government further alleges that the information that Mr. DeCicco seeks about Auto Excellence Group's construction would be relevant "only if there is evidence" that the Defendant himself knew about such information before he attempted to extort CW-1 between 2013 and January 2015." Opp. at 7. But even just based on the production from earlier this week, it appears that the government has long had in its own possession this very evidence. For example, CW-1 testified in the grand jury that he confided in Mr. DeCicco about the construction of Auto Excellence Group. CW-1 Grand Jury Tr. at 25:14-21, 26:19-25 (Mar. 30, 2017). CW-1 also

stated that Mr. DeCicco knew that he was "struggling to come up [with the cash], because I didn't finance this." *Id.* at 28:2-10. CW-1 also told the FBI that "part of the reason why DeCicco wanted to be partners with [CW-1] in the automobile business was [because] DeCicco knew of [CW-1's] good reputation in the business and that DeCicco knew that [CW-1] was successful in the business." *See* Ex. 3. CW-1 also stated that it was "**no secret** that [he] had always done well in the luxury car market and that [he] has no floor plan money and all the cars at [Auto Excellence Group] are owned outright." *Id*. This only adds to the evidence already adduced during evidentiary hearings that showed that Mr. DeCicco was aware of CW-1's lack of business acumen. For example, Phillip Baldi has testified that DeCicco talked about how CW-1 was an "idiot" who "didn't know how to run . . . a . . . high-end used car dealership" because he sold Ferraris "in the middle of winter." Hr'g Tr. at 37:3-14 (Oct. 5, 2017); *see also id.* at 13:13-15:12.

**B. Request 13: CW-1's Report to the FBI on December 28, 2014**

The defendant acknowledges the government's clarification about the December 28, 2014 report as a representation that CW-1 did not receive threats from Mr. DeCicco or his alleged "associates" on December 28, 2014, and that the substance of the threats "were those CW-1 had earlier reported to the Saugus Police Department." Opp. at 8. This leaves unanswered, however, why the FBI 302 report reflecting this encounter with CW-1 on December 28, 2014 was not prepared or finalized until March 16, 2017. *See infra*.

**C. Request 14: Documents Pertaining to January 11, 2015 Assault of CW-1**

The government represents that the FBI agent's description of the assault in the February 17, 2015 Form 1057 as being motivated by "a debt owed by [CW-1] to the [Defendant]" was "inartful." Opp. at 9. Be that as it may, this Form 1057 represents SA Chizmadia's memorialization of the events only one week after he interviewed CW-1 on February 11, 2015.

*See* Ex. 4 at 3. The FBI's involvement in an apparent state law assault is only warranted if the intent of the assault was to obtain property from CW-1, thereby converting it into a Hobbs Act extortion. *See Scheidler v. NOW, Inc.*, 547 U.S. 9, 16 (2006) ("We hold that physical violence unrelated to robbery or extortion falls outside the scope of the Hobbs Act."). Thus, the motive or intent of the assault was central to the investigation, and the concept that the intent was to collect or avenge a "debt owed" is materially different than the "ownership interest/partnership" theory that the government has been pressing from the day it sought the criminal complaint. *See* Dkt. No. 3, 3-1. Mr. DeCicco is entitled to, at the very least, information from the FBI agents' notes that reflect and explain this material inconsistency so that it may be prepared to respond to the government's case-in-chief and refute the government's theory of motive.

**D. Request 18: Communications between CW-1 and Others**

The government asserts that Mr. DeCicco's requests for communications between CW-1 and others in this case, including law enforcement and other witnesses, as "early production of materials that are clearly witness statements." Opp. at 9. But Fed. R. Crim. P. 26.2's definition of statements does not encompass, for instance, calls and texts that CW-1 has made with witnesses in this case, which are clearly not "written statement[s] that the witness makes and signs, or otherwise adopts or approves." The government this week has produced some text message logs between SA Elio and SA Chizmadia with CW-1, but of no others. Given that the government presently has access to CW-1's phone and has yet to represent that it has completed review of its contents, Mr. DeCicco hereby renews his request for documents and information responsive to this request.

**E. Request 38(15): The March 2017 FBI Form 302**

The government's explanation of the origins of the March 2017 Form 302 is noticeably silent on the *prima facie* irregularity of a report memorializing the FBI's contacts with CW-1 in

2014 and 2015 not being written up and finalized until March 2017: over 2 years later, on the eve of the filing of the Criminal Complaint, and in violation of FBI procedures and policies. Opp. 12-15. This information is material to preparing the defense and exculpatory under *Brady* because they raise questions about the accuracy of information memorialized apparently 2 years after they occurred, as well as the credibility and integrity of the overall investigation itself. *See Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (finding that evidence allowing the defense to attack the reliability of the investigation was exculpatory).

The government further represents that there is no metadata for the two Form 302s, Opp. at 12, but to the extent there is, the government argues at length that the defendant would not be entitled to it because it constitutes work product. Opp. at 12-15. The government's citation to *Cadden* does not foreclose the defendant's request. Opp. at 13. In *United States v. Cadden*, 2015 WL 13683814 (D. Mass. Jul. 13, 2015), the Court directed the government to produce materially inconsistent drafts of the government's witness interview memoranda, and moreover left the door open to the production of metadata under certain circumstances, if the record warrants it. *See Cadden,* 2015 WL 13683814, at *8 n.6 (noting that metadata is "*almost* always" work product and "the Court declines to order the production of metadata *based on the record before it*") (emphasis added).

Nevertheless, to the extent the defendant is limited to non-work product information, metadata may not necessarily reveal the "mental processes" of the drafter. For instance, metadata sufficient to show (1) the date the 302 was first created; (2) the identity of the drafter; and (3) the dates and times—but not substance—of when the 302 was revised and finalized would not reveal the "mental processes" of the drafter, unlike comments and substantive modifications. *See United States v. Wirth*, 2012 WL 1110540, at *4 (D. Minn. Apr. 3, 2012).

Given the lapse in time between the "dates of entry" field, the "date drafted" fields, and the events memorialized, the defendant is justified in asking when the 302 was actually created and prepared, and whether the "date drafted" field is accurate (and if so, why the report sat open and fluid for 2 years), or whether the "date drafted" field reflects backdating (and if so, why). *See United States v. Virgen-Nunez*, 2009 WL 10678145, *2 (S.D. Iowa June 26, 2009) (granting request for metadata where it would confirm when document was prepared and timing was "material to the defense").

## IV. The Saugus Police Department Is Part of the Prosecution Team

Finally, Mr. DeCicco notes that while the government strenuously argues that the Saugus Police Department is not part of its prosecution team on the one hand, it is simultaneously opposing the defendant's attempt to obtain information from the Saugus PD through Fed. R. Crim. P. 17(c) on the other. The government cannot have it both ways. *See, e.g., United States v. DeBacker*, 493 F. Supp. 1078 (W.D. Mich. 1980) (ordering disclosure of state police reports over Rule 16 objections because investigation was initiated by the state alone).

## CONCLUSION

For these reasons and for the reasons in the memorandum in support of the defendant's motion to compel, Dkt. No. 165, the Court should grant the defendant's motion.

Respectfully submitted,

GARY P. DECICCO

By his attorneys,

/s/ Thomas C. Frongillo
Thomas C. Frongillo (BBO# 180690)
Caroline K. Simons (BBO# 680827)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, Massachusetts 02210
frongillo@fr.com
simons@fr.com
TEL: (617) 542-5070
FAX: (617) 542-8906

James J. Cipoletta (BBO# 084260)
Law Offices of James J. Cipoletta
Citizens Bank Building
385 Broadway Suite 307
Revere, Massachusetts 02151
jim@cipoletta.com
Tel: (781) 289-7777
Fax: (781) 289-9468

Dated: May 11, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was filed on May 11, 2018 through the CM/ECF system and will be served electronically to registered CM/ECF participants as identified on the Notice of Electronic Filing.

/s/ Thomas C. Frongillo
Thomas C. Frongillo