# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 17-CR-10092-NMG |
| | ) | |
| GARY P. DECICCO, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## OPPOSITION TO UNITED STATES' MOTION *IN LIMINE* TO PRECLUDE DEFENDANT FROM OFFERING OR ELICITING CERTAIN INFORMATION ABOUT CW-1 (Dkt. No. 261)

Defendant Gary DeCicco respectfully opposes the government's Motion *in Limine* to preclude the defense from offering "evidence consisting of irrelevant and prejudicial information regarding CW-1" (Dkt. No. 261), because the evidence is neither irrelevant nor unfairly prejudicial. The government specifically seeks to exclude (1) negative online reviews about CW-1's business; (2) evidence about CW-1's dispute with Nicholas D'Angelo, a contractor who worked on Auto Excellence Group; and (3) evidence about CW-1's threat to report Ralph Teixeira to law enforcement because of a business dispute over wages. *See* Dkt. No. 261 at 1-2. This is yet another attempt to hamstring the defense from responding to the government's meritless theory that Mr. DeCicco extorted CW-1 because he wanted to partner with CW-1 in his used car dealership. CW-1 is anticipated to testify at trial that Mr. DeCicco wanted to partner with him—the only witness who will so testify. The defense is entitled to show the myriad reasons that Mr. DeCicco would never want to be a partner or co-owner of a business with CW-1. The government's attempt to prevent Mr. DeCicco from defending himself is wrong as the defendant as a constitutional right to present a defense and a right to rebut the government's

case.  *See* [Case Cite].

The evidence at issue will show the deep animus and mistrust between the two men due to CW-1's well-known behavior of smearing others and threatening to report them to law enforcement as an improper means of leverage.  There is compelling evidence that the construction of Auto Excellence Group was a veritable warzone because CW-1 became financial strapped and engaged in sharp conflicts with his contractors, suppliers, and vendors to unfairly extract price reductions from them.  This squarely contradicts CW-1's repeated testimony and statements to law enforcement that Mr. DeCicco—and indeed everyone else in the community— wanted to be CW-1's partner in his dealership because it was the "talk of the town," and because CW-1 had a sterling reputation in the used car business.  The government's motion should be denied.

## RELEVANT FACTS

### I.      The Government's Theory of the Case

Mr. DeCicco and CW-1 have been neighbors in a small, 6-house cul-de-sac since 2001. The Indictment alleges that from 2013 through January 11, 2015, Mr. DeCicco unlawfully "attempted to obtain an interest in [CW-1's] automobile dealership from [CW-1] with his consent, induced by wrongful use of actual and threatened force, violence, and fear" in violation of the Hobbs Act, 18 U.S.C. § 1951.  Dkt No. 23.

Since the filing of the criminal complaint on March 16, 2017, *see* Dkt. No. 3, the government has consistently pressed its theory that Mr. DeCicco is criminally liable for extortion because—according to CW-1—Mr. DeCicco sought to be a "partner" of CW-1 in CW-1's business, Auto Excellence Group, and resorted to actual and threatened force, violence, or fear to induce CW-1's consent after CW-1's initial rejection.  The government has enunciated this theory through affidavits of FBI and IRS Special Agents investigating the case, as well as reports

or memoranda of interview of CW-1, including the following:

- Dated March 16, 2017, SA Elio's affidavit attests that "DeCicco approached CW-1 about **being partners in the automobile dealership**." Dkt. No. 3-1 at ¶ 7. "CW-1 learned that DeCicco was telling people that he was going **to be partners** with CW-1 in the dealership.  According to CW-1, DeCicco told the architect who did the plans for the building that he was going **to be partners** with CW-1 . . . CW-1 made it clear to the architect that he had no intention of **having DeCicco as a partner**." Dkt. No. 3-1 at ¶ 8.  "According to CW-1, DeCicco became very upset that he was not going **to be partners** with CW-1." Dkt. No. 3-1 at ¶ 9.  "When asked by police on August 6, 2014 why DeCicco would be interested in harassing him, CW-1 told the police department that DeCicco wanted **to be a partner** in the business with CW-1 but that CW-1 did not need **a partner**." Dkt. No. 3-1 at ¶ 12.

- IRS SA Lemanski's affidavit, submitted in support of the government's motion to detain, contains remarkably similar language.  *See, e.g.*, Dkt. No. 70-5 at ¶ 5 ("being partners"); ¶ 6 ("going to be partners"); ¶ 7 (Mr. DeCicco was upset he "was not going to be partners with CW-1").

- During the first detention hearing, IRS SA Lemanski testified that shortly after construction, "[CW-1] was approached by Mr. DeCicco requesting if he could **be partners with him that dealership**." Dkt. No. 18 at 7:3-10.  AUSA Barclay encouraged SA Lemanski to go on, asking:

  > Q:      And then did the victim receive other information about Mr. DeCicco asserting **an interest in the ownership**?
  >
  > A:      Yes.  Shortly after his conversation with Mr. Deicco about becoming partners, he had started to hear rumors and other people, associates that Mr. DeCicco and both he had, that Mr. DeCicco was saying that he was – had **an ownership interest in that dealership**.

  Dkt. No. 18 at 7:15-21.

- SA Lemanski went on to argue that the note that accompanied the flowers was also indicative that CW-1's assault related to a dispute over ownership of the dealership, and that CW-1 has been consistent and would be the only person to say that because "he's the one who was receiving the threats." Dkt. No. 18 at 59:19-60:9.  *See also* Dkt. No. 18 at 96:24-97:1 (testifying that CW-1 believed he received flowers and was assaulted because "Mr. DeCicco was getting back at him for not being – **allowing him to be partners in his dealership with him**").

- The government has similarly maintained this ownership interest/partner theory of the case while arguing to detain Mr. DeCicco pretrial.  In arguing that there is sufficient evidence of attempted extortion, the government stated, "[t]he victim told investigators several times that Mr. DeCicco wanted **a piece of the business**, and that other people had told him that Mr. DeCicco wanted **a piece of the**

**business** . . . Mr. DeCicco said he **owns it** . . . the card mentions the fact that Mr. DeCicco is the **true owner of the dealership** . . . ." Dkt. No. 18 at 113:6-9, 14-15; 17-18.

- Later, when Mr. DeCicco sought to reopen the detention hearing and argued that there was conflicting evidence on the motive for CW-1's assault, the government insisted that the objective evidence supported the ownership theory:

    "But the fact that Defendant told CW-4 that CW-1 had harassed a woman in his life is belied by the evidence that Defendant arranged the beating because he wanted an interest in CW-1's business. *See, e.g.*, Docket No. 18, at 7 (Defendant commented to CW-1 **about being partners**) . . . ."

    Dkt. No. 47 at 11.

(emphasis added).

## II.    CW-1's Statements Injecting His Reputation and Success as the Basis for Mr. DeCicco's Alleged Desire to Obtain a Partnership Stake in Auto Excellence Group

In his statements to the FBI, CW-1 claims that Mr. DeCicco's alleged desire to be his partner and co-owner in Auto Excellence Group was the reason why CW-1 received the delivery of flowers, note, and pizza in August 2014 and was assaulted in January 2015. CW-1 has stated, for example, that he believes he was assaulted because "Gary knows that I'm doing well and he wants a piece of my business." Exhibit A, at 2; that "DeCicco knew of [CW-1]'s good reputation in the luxury automobile business" and "[p]art of the reason why DeCicco wanted to be partners with CHS in the automobile business was based on the fact that DeCicco knew of [CW-1]'s good reputation in the business and that DeCicco knew that [CW-1] was successful in the business." Exhibit B. CW-1 further stated that "it was no secret that CHS has always done well in the luxury car market[.]" *Id*. CW-1 also told federal agents that Mr. DeCicco was "very upset" about not allowing him to be partners with him because it had "everything that DeCicco liked. It was located in a gorgeous building, that was full of exotic cars and the dealership was the talk of the town when it opened." Dkt. No. 35-13 at ¶ 18.

**III.     CW-1's Disputes with Mr. D'Angelo and Other Contractors Regarding Construction of Auto Excellence Group**

There is ample evidence that during the construction of Auto Excellence Group from the fall of 2013 until June 2014 and well after, CW-1 short-paid and battled with various contractors and vendors who provided services to him, including his architect, his site engineer, his general contractor, his subcontractors, and his suppliers, many of whom were Mr. DeCicco's friends and business acquaintances.  Indeed, many of these individuals were referred to CW-1 by Mr. DeCicco, and CW-1 has admitted to seeking Mr. DeCicco's expertise and contacts given Mr. DeCicco's decades of experience developing real estate in the Greater Boston area.  One of these contractors was Nicholas D'Angelo, who built and installed the elevator onsite at Auto Excellence Group. *See* Proposed Exhibits 88, 90, attached as <u>Exhibit C</u>.  By June 2014, CW-1 began short-paying Mr. D'Angelo on his invoices, starting with a payment of only $6,000 on an invoice of over $15,000.  Instead of expressing contrition, CW-1 and his employee embarked on an aggressive, malicious, and prolonged campaign against Mr. D'Angelo and his wife in an attempt to unilaterally extract a discount of several thousand dollars from the amount owed, forcing Mr. D'Angelo to engage an attorney and file suit to recover what he was due.  This story is not unique amongst the contractors for Auto Excellence Group.  Multiple witnesses will testify that CW-1 refused to pay them on time or in full, and that CW-1 was unreasonable, abusive, and vindictive, even at one point threatening his architect's employee with bodily harm.  CW-1 admitted discussing his issues with his contractors with Mr. DeCicco. *See, e.g.*, <u>Exhibit D</u>. ("[CW-1] recalled discussing on the phone with DeCicco an unpaid balance with Rick Salvo") and ("[CW-1]'s phone contact with DeCicco in early 2014 mostly likely was . . . talking about issues he was having with contractors . . . .").  Given that many of these contractors were his friends and contacts with whom he had ongoing business, Mr. DeCicco was well aware of their

predicament; caught in the middle of his friends and business partners on the one hand, and his neighbor on the other, Mr. DeCicco was forced to mediate many of these disputes. *See id.* Even CW-1 admitted that he needed to stay in touch with Mr. DeCicco to deal with Peter Varone as well as the contractors. *See* <u>Exhibit J</u>.

## IV.     CW-1's Dispute With Ralph Teixeira

CW-1 also had issues with his own employees, including threatening them with government enforcement to gain leverage in business disputes or simply out of spite or a desire to induce fear. Mr. DeCicco was well aware of CW-1's abusive behavior with co-workers, as CW-1 worked for several years at a dealership owned by one of Mr. DeCicco's best friends, Richard Aswad.

In January 2017, one of CW-1's car salesmen, Ralph Teixeira, claimed that he was owed approximately one week of back wages, and warned CW-1 that he was prepared to file a complaint concerning his back pay to "the labor department." *See* <u>Exhibit E</u>, at 6. After a series of further communications via text messages, during which CW-1 consistently refused to meet Mr. Teixeira's demands, Mr. Teixeira gave up trying to collect, telling CW-1 to "keep it" because "[y]ou clearly need that more than me" and then asking CW-1 not to ever contact him again. *See Id* at 13. In response, CW-1 promised Mr. Teixeira that he was going to forward his complaint to "the immigration and Social Securities department . . . I think the government should be aware of your behavior." *See Id.* at 1. Later, when asked about Mr. Teixeira by the FBI, CW-1 vindictively volunteered to the agent interviewing him that Mr. Teixeira "wanted [CW-1] to pay him cash which made [CW-1] very uncomfortable[,]" even though he then admitted that he never did so. *See* <u>Exhibit F</u>, at 2.

## V.     CW-1's Status as an FBI Informant

CW-1's behavior is consistent with his tenure as an on-again, off-again FBI source. *See*

Dkt. No. 3-1 at ¶ 5.  CW-1 was known to flaunt his perceived relationship with law enforcement,

a fact well known by Mr. DeCicco.  He boasted about being connected to individuals working

for the FBI, and frequently threatened to report individuals with whom he had business or

romantic disputes to state and federal law enforcement and government agencies.  *See, e.g.*, Dkt.

No. 84-7 ¶¶ 30, 34, 40, 42, 44; Aff. of Silvia Corina Milian, attached as <u>Exhibit G</u>.  Several

witnesses on the defense's witness list can testify as to CW-1's statements to them about his

access to contacts in the FBI, in particular.  Indeed, one of the witnesses in this case noted in a

later interview that CW-1 characterized the FBI as "his friends," something that CW-1 admitted

to saying.  *See* FD-302 Report of Richard Scourtas (May 1, 2018), attached as <u>Exhibit H</u>.

## ARGUMENT

The government seeks to exclude the evidence that would "prejudice CW-1 in the eyes of

the jury," and "cast CW-1 and his business in a negative light," Dkt. No. 261 at 1-2, as if it were

unaware that it is precisely this "negative light" with which the defendant justifiably viewed

CW-1 and his business that undercuts the government's theory of the case that Mr. DeCicco

sought to be CW-1's business partner.  The evidence thus is squarely relevant to Mr. DeCicco's

defense and he should be permitted to introduce it to rebut the government's theory of the case.

**I.      Evidence of Negative Reviews of CW-1's Businesses is Relevant, Non-Hearsay, and
        Admissible**

The exhibits of negative reviews of CW-1's business are relevant because CW-1 has

alleged that "[p]art of the reason why DeCicco wanted to be partners with [CW-1] in the

automobile business was based on the fact that DeCicco knew of CHS's good reputation in the

business[.]"  The existence of these reviews—whether true or not—rebut CW-1's claims that he

enjoys a "good reputation in the business" and, more importantly, rebut the government's theory

that Mr. DeCicco was drawn to CHS because of this non-existent "good reputation."  The

government's objection based on hearsay thus is misplaced:  the postings are not being offered for the truth of the matter asserted, but rather for the effect that their existence has on CW-1's less-than-sterling reputation, implicating the success of any business run by CW-1.  *See, e.g.*, *Mathew Enter., Inc. v. Chrysler Grp. LLC*, 2016 U.S. Dist. LEXIS 129925, at *8 (N.D. Cal. Sept. 21, 2016) (allowing admission of Yelp reviews and ratings "to show the effect on future customers"); Fed. R. Evid. 801(c)(2).  Moreover, the government's protest that one of the postings reference CW-1's employee of the business rather that CW-1 himself ignores that the government is alleging that Mr. DeCicco wanted to be CW-1's *business* partner; *i.e.*, owning a stake in a business that CW-1 would presumably continue to direct and run.  Fed. R. Evid. 401. The defense will show that Mr. DeCicco did not want to be associated in any way—let alone as a business partner—with CW-1, who was engaged in a highly-competitive market in which he operated under a cloud of negative reviews.

## II.     Evidence of the Dispute with Nicholas D'Angelo Is Relevant and Admissible

The evidence of CW-1's dispute with Nicholas D'Angelo is relevant for several reasons. First, the government claims there is no evidence that Mr. DeCicco knew about the dispute between CW-1 and Mr. D'Angelo, implicitly acknowledging that Mr. DeCicco's knowledge of such a dispute would be relevant because it would dissuade Mr. DeCicco from wanting to partner with him.  *See* Dkt. No. 261 at 2.  But CW-1 himself has admitted that he spoke regularly to Mr. DeCicco during the construction of Auto Excellence Group concerning "issues" he had with contractors, and further has stated that Mr. D'Angelo was referred to him by Mr. DeCicco, as he had prior experience working for Mr. DeCicco.  *See* Exhibit I.  Mr. DeCicco was also in regular contact with Peter Varone, the general contractor, and was aware of the disputes that CW-1 had with contractors.

8

Second, the evidence shows that Mr. D'Angelo was short-paid on his invoices starting as early as June 2014, when CW-1 paid less than half of the May 2014 invoice as it came due. This undercuts the government's assertion that "the Defendant could not have known about the dispute before he sent the flowers on August 4, 2014." Dkt. No. 261 at 2. In any event, the defense is not arguing that this one particular dispute Mr. D'Angelo had with CW-1 was the trigger for Mr. DeCicco's delivery of flowers to CW-1. Rather, Mr. DeCicco intends to show is that the intolerable way that CW-1 treated Mr. D'Angelo and the other contractors who worked on Auto Excellence Group, and the ensuing damage it did to the reputation of the business, makes it exceedingly unlikely that the government's theory—that Mr. DeCicco would have wanted to join forces with CW-1, let alone extort him for it—holds water. Fed. R. Evid. 401, 402.

Finally, CW-1's experience with Mr. D'Angelo was not an isolated event, but was rather a pattern of well-known conduct that CW-1 cheated all the contractors. The incident reflects CW-1's abusive character towards those with him he conducts business, as well as his habit or routine practice for shortchanging or cheating his contractors and vendors. Because CW-1's character is central to Mr. DeCicco's defense that he would not have wanted to partner with him, this evidence of CW-1's treatment of Mr. D'Angelo and the ensuing dispute is independently admissible because it is offered to show CW-1's pertinent trait and his routine practice or habit. *See* Fed. R. Evid. 404(2)(B); 405; 406.

### III.   The Evidence of CW-1's Dispute with Ralph Teixeira Is Relevant and Admissible

Similarly, the evidence of CW-1's dispute with Ralph Teixeira is relevant and admissible. Though this incident happened outside the time period of the alleged extortion, CW-1's dispute with Mr. Teixeira is representative of his character and habit that spans the entire relevant time

period and beyond.  Indeed, this incident falls in line with a long series of similar incidents that all originate with CW-1, including his threat to report another employee to immigration authorities, and his threats to contractors who worked on Auto Excellence to report them (or their relatives) to the FBI.  This specific instance of conduct relating to Mr. Teixeira proves CW-1's combative, underhanded, and vindictive character traits, which are pertinent in this case because the government is trying to show that Mr. DeCicco wished to be CW-1's business partner.  *See* Fed. R. Evid. 405(b).  Moreover, this evidence, coupled with other evidence in the record that CW-1 flaunted his government informant status and routinely threatened others with law enforcement as a means for resolving business and personal disputes in his favor, again goes to show how the government's theory is meritless.  This is particularly so given the fact that Mr. DeCicco had been questioned by the FBI during the relevant time period as charged in the indictment, as part of a separate investigation the FBI was conducting into one of Mr. DeCicco's business partners (who was subsequently indicted in October 2014).  CW-1's well-known connection to the FBI and his tendency to wield it to gain the upper hand when disputes arise would have made CW-1 an exceedingly unattractive business partner to Mr. DeCicco.

## IV.      The Evidence is Not Unduly Embarrassing to CW-1

The government seeks to cast all this evidence as an improper maligning of CW-1's character and business.  But while the evidence is admittedly unflattering, it is not unduly embarrassing because it is the government who has affirmatively injected these issues into its theory of the case, and Mr. DeCicco is entitled to counter it.  *See, e.g.*, *United States v. Simonelli*, 237 F.3d 19, 25 (1st Cir. 2001) (finding no unfair prejudice where government was permitted to conduct "not the most attractive examination" of defendant because it was countering a defense theme that defendant himself introduced); *United States v. Tse*, 375 F.3d 148, 163-64 (1st Cir.

2004) (noting that it was error to use same standard of prejudice to weigh impeaching evidence for government witnesses and the accused, the latter of whom enjoys greater protection from prejudice); Fed. R. Evid. 403 (concerning risk of "***unfair*** prejudice"); 611(a) ("***undue*** embarrassment") (emphasis added).  It is the government and CW-1—not Mr. DeCicco—who intend to offer evidence and testimony in support of the false theory that Mr. DeCicco wanted to be CW-1's partner, specifically because of CW-1's reputation in the used car industry and his attractiveness as a partner.  In short, CW-1's character and business reputation are material to Mr. DeCicco's defense only because the government's theory rests on it.  Mr. DeCicco has the right to defend himself.

## CONCLUSION

For these reasons, the government's motion *in limine* should be denied in its entirety.

Respectfully submitted,

GARY P. DECICCO

By his attorneys,

 /s/ Thomas C. Frongillo
Thomas C. Frongillo (BBO# 180690)
Caroline K. Simons (BBO# 680827)
Jessica L. Perry (BBO# 696392)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, Massachusetts 02210
frongillo@fr.com
simons@fr.com
jperry@fr.com
TEL: (617) 542-5070
FAX: (617) 542-8906

James J. Cipoletta (BBO# 084260)
Law Offices of James J. Cipoletta
Citizens Bank Building
385 Broadway Suite 307
Revere, Massachusetts 02151
jim@cipoletta.com
Tel: (781) 289-7777
Dated: May 22, 2018                Fax: (781) 289-9468

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was filed on May 22, 2018 through the CM/ECF system and will be served electronically to registered CM/ECF participants as identified on the Notice of Electronic Filing.

 /s/ Thomas C. Frongillo
Thomas C. Frongillo