**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | No. 17-CR-10092-NMG |
| GARY P. DECICCO, | ) ) ) | |
| *Defendant*. | ) ) | |

**OPPOSITION TO UNITED STATES' MOTION *IN LIMINE*
TO PRECLUDE DEFENDANT FROM OFFERING
OR ELICITING HIS OWN SELF-SERVING STATEMENTS (Dkt. No. 260)**

Defendant Gary DeCicco respectfully opposes the government's Motion *in Limine* to preclude the defense from offering or eliciting Mr. DeCicco's so-called "self-serving statements" (Dkt. No. 260). The government has improperly conflated the concepts of "exculpatory" with "self-serving." It seeks a blanket prohibition on Mr. DeCicco's statements that would assist his defense based on the hearsay rule, even though the statements at issue are not offered for the truth of the matter asserted and are not hearsay. As with the government's other attempts to exclude centrally relevant but unflattering evidence about CW-1 and his business, *see, e.g.*, Dkt. No. 261, this is a not-so-veiled attempt to prevent the defense from rebutting the government's theory of the case, which alleges that DeCicco committed acts to obtain an interest in CW-1's used car dealership. The government's motion should be denied, as it constitutes a brazen effort to deprive Mr. DeCicco of his Sixth Amendment right to present a defense.

**RELEVANT FACTS**

**I.   The Government's Theory of the Case**

The Indictment charges Mr. DeCicco with one count of attempted extortion in violation

of the Hobbs Act, 18 U.S.C. § 1951. Dkt No. 23. It alleges that from 2013 through January 11, 2015, Mr. DeCicco unlawfully "attempted to obtain an interest in [CW-1's] automobile dealership from [CW-1] with his consent, induced by wrongful use of actual and threatened force, violence, and fear." Dkt No. 23. Since the filing of the criminal complaint on March 16, 2017, *see* Dkt. No. 3, the government has consistently pressed its theory that Mr. DeCicco is criminally liable for extortion because—according to CW-1—Mr. DeCicco sought to be a "partner" of CW-1 in CW-1's business, Auto Excellence Group. The government's theory of the case is that Mr. DeCicco delivered flowers, a cross, a note, and pizza to CW-1 on August 4, 2014, and orchestrated CW-1's assault on January 11, 2015, all because Mr. DeCicco was attempting to persuade CW-1 to allow him to become CW-1's partner in Auto Excellence Group.

Specifically, the government has enunciated this theory through affidavits of FBI and IRS Special Agents investigating the case, as well as reports or memoranda of interview of CW-1, including the following:

- Dated March 16, 2017, SA Elio's affidavit attests that "DeCicco approached CW-1 about **being partners in the automobile dealership**." Dkt. No. 3-1 at ¶ 7. "CW-1 learned that DeCicco was telling people that he was going **to be partners** with CW-1 in the dealership. According to CW-1, DeCicco told the architect who did the plans for the building that he was going **to be partners** with CW-1 . . . CW-1 made it clear to the architect that he had no intention of **having DeCicco as a partner**." Dkt. No. 3-1 at ¶ 8. "According to CW-1, DeCicco became very upset that he was not going **to be partners** with CW-1." Dkt. No. 3-1 at ¶ 9. "When asked by police on August 6, 2014 why DeCicco would be interested in harassing him, CW-1 told the police department that DeCicco wanted **to be a partner** in the business with CW-1 but that CW-1 did not need **a partner**." Dkt. No. 3-1 at ¶ 12.

- IRS SA Lemanski's affidavit, submitted in support of the government's motion to detain, contains remarkably similar language. *See, e.g.*, Dkt. No. 70-5 at ¶ 5 ("being partners"); ¶ 6 ("going to be partners"); ¶ 7 (Mr. DeCicco was upset he "was not going to be partners with CW-1").

- During the first detention hearing, IRS SA Lemanski testified that shortly after construction, "[CW-1] was approached by Mr. DeCicco requesting if he could **be partners with him that dealership**." Dkt. No. 18 at 7:3-10. AUSA Barclay encouraged SA Lemanski to go on, asking:

2

> Q: And then did the victim receive other information about Mr. DeCicco asserting **an interest in the ownership**?
>
> A: Yes. Shortly after his conversation with Mr. Deicco about becoming partners, he had started to hear rumors and other people, associates that Mr. DeCicco and both he had, that Mr. DeCicco was saying that he was – had **an ownership interest in that dealership**.

Dkt. No. 18 at 7:15-21.

- SA Lemanski went on to argue that the note that accompanied the flowers was also indicative that CW-1's assault related to a dispute over ownership of the dealership, and that CW-1 has been consistent and would be the only person to say that because "he's the one who was receiving the threats." Dkt. No. 18 at 59:19-60:9. *See also* Dkt. No. 18 at 96:24-97:1 (testifying that CW-1 believed he received flowers and was assaulted because "Mr. DeCicco was getting back at him for not being – **allowing him to be partners in his dealership with him**").

- The government has similarly maintained this ownership interest/partner theory of the case while arguing to detain Mr. DeCicco pretrial. In arguing that there is sufficient evidence of attempted extortion, the government stated, "[t]he victim told investigators several times that Mr. DeCicco wanted **a piece of the business**, and that other people had told him that Mr. DeCicco wanted **a piece of the business** . . . Mr. DeCicco said he **owns it** . . . the card mentions the fact that Mr. DeCicco is the **true owner of the dealership** . . . ." Dkt. No. 18 at 113:6-9, 14-15; 17-18.

- Later, when Mr. DeCicco sought to reopen the detention hearing and argued that there was conflicting evidence on the motive for CW-1's assault, the government insisted that the objective evidence supported the ownership theory:

  > "But the fact that Defendant told CW-4 that CW-1 had harassed a woman in his life is belied by the evidence that Defendant arranged the beating because he wanted an interest in CW-1's business. *See, e.g.*, Docket No. 18, at 7 (Defendant commented to CW-1 **about being partners**) . . . ." Dkt. No. 47 at 11.

(emphasis added).

In addition, the government's recent production of CW-1's statements to the FBI have shown that he has continued to insist that this purported desire of Mr. DeCicco to associate with him, and to partner with him in Auto Excellence Group, was the reason CW-1 was the recipient of allegedly extortionate acts. CW-1 has stated, for example, that he believes he was assaulted

3

because "Gary knows that I'm doing well and he wants a piece of my business." <u>Exhibit A</u> at 2; that "DeCicco knew of [CW-1]'s good reputation in the luxury automobile business" and "part of the reason why DeCicco wanted to be partners with CHS in the automobile business was based on the fact that DeCicco knew of [CW-1]'s good reputation in the business and that DeCicco knew that [CW-1] was successful in the business." <u>Exhibit B</u>.  CW-1 further stated that "it was no secret that CHS has always done well in the luxury car market[.]" <u>Id</u>.  CW-1 also told federal agents that Mr. DeCicco was "very upset" about not allowing him to be partners with him because it had "everything that DeCicco liked.  It was located in a gorgeous building, that was full of exotic cars and the dealership was the talk of the town when it opened."  Dkt. No. 35-13 at ¶ 18.

## II.   The Animus Between Mr. DeCicco and CW-1

There is ample evidence that Mr. DeCicco and CW-1's relationship of over a decade had deteriorated well before the first alleged extortionate act occurred.  CW-1 himself admits that their relationship "went south" by June 2014 at the very latest, due to a contractual dispute over whether Mr. DeCicco was obligated to pave the lot of Auto Excellence Group.[1]  <u>Exhibit C</u> at 2. Another witness stated that the two men were "always jealous of each other" and that [CW-1] would "bad mouth" Mr. DeCicco's decisions.  <u>Exhibit D</u> at 2.

Multiple witnesses will further testify that, before the flower delivery in August 2014, Mr. DeCicco freely doled out insults about CW-1 to family, friends, and business acquaintances alike.  For example, Mr. DeCicco told Phillip Baldi that CW-1 was a "moron," a "dope," and "an idiot" for "trying to sell Maserati's in the middle of winter," that CW-1 would "end up blowing through" his inheritance.  <u>Exhibit E</u>, at ¶¶ 14, 16; <u>Exhibit F</u> at ¶ 7.  He berated Peter Varone, Jr.,

---

[1] According to CW-1, Auto Excellence Group opened its doors in June 2014, presumably after the paving was complete.

4

the son of one of his best friends, for buying a car from CW-1 because he "screwed [Varone]'s dad out of $10,000." Exhibit E, at ¶ 18. He also spoke candidly about his view of CW-1 to his sister, Noelle Spinosa, calling him names such as a "piece of shit," "loser," "prick," "asshole," "son of a bitch," "motherfucker," "scumbag," and "jerk." *See, e.g.*, Dkt. No. 84-6. In or around March 2014, Mr. DeCicco believed that CW-1 was pursuing Ms. Spinosa just to provoke and annoy him, and frankly relayed this belief to her, warning her to stay away from CW-1. *See id.*

### III. Mr. DeCicco's Statements Surrounding the Alleged Extortionate Acts

The record also reflects what government and defense witnesses alike are prepared to testify about Mr. DeCicco's statements concerning the delivery of the flowers and the assault. With respect to the flower delivery, Mr. Baldi stated that, on August 4, 2014, Mr. DeCicco asked him "what we can do to harass or bug this guy" before sending CW-1 pizza and impersonating him on the phone to CW-1's favorite restaurant as a prank. Exhibit E, at ¶ 20. Mr. Baldi further stated that he believed that the decision to send flowers was spontaneous, and that Mr. DeCicco was "busting [CW-1]'s balls" because of he was upset that CW-1 consistently failed to pay Peter Varone for his work at Auto Excellence Group. Exhibit F, at ¶ 10. Shortly after delivering the flowers, Mr. DeCicco crowed about the prank by telling his family—including his parents and adult sisters—that he sent that "asshole" pizza and "got that asshole real good," Dkt. No. 84-6, at ¶ 13. Mr. Baldi also will testify that Mr. DeCicco told him that CW-1 had been saying negative things about Mr. DeCicco behind his back. No witness, other than CW-1, will testify that Mr. DeCicco sent the flowers, note, and pizza to CW-1 in order to induce him to give up a partnership or ownership stake in Auto Excellence Group.

With respect to the assault, which was arranged by CW-4, CW-4 has stated that CW-1 "had said something bad about DeCicco's daughter or ex-wife," and later testified that Mr. DeCicco had told him that "a neighbor" was "harassing his wife or daughter." Exhibit G, at

5

ll:18-24. Another witness and a friend of CW-1's, Richard Scourtas, also testified that before the assault, Mr. DeCicco told Mr. Scourtas to relay a message to CW-1 for him to "keep his mouth shut . . . stop talking bad about DeCicco." Exhibit H, at 3.

## ARGUMENT

Brandishing Federal Rule of Evidence 801(d)(2)(A), the government impermissibly moves for a blanket prohibition against defense counsel introducing or even commenting on "evidence of statements of the defendant," whether through "opening statement, cross examination of witnesses, examination of witnesses, introduction of exhibits, or closing statement."[2] Dkt. No. 260 at 4. According to the government, this would constitute impermissible hearsay because the defendant is not permitted to use Rule 801(d)(2)(A) to introduce his own statements. As a threshold matter, however, because the introduction of such evidence by the defense would not be made pursuant to Rule 801(d)(2)(A), the government's discussion of this rule—and indeed the entire basis for its motion—is simply inapposite.

In fact, a cursory review of the statements that the government has singled out for complaint reveals that they would not be offered for the truth of the matter asserted, removing the anticipated evidentiary dispute from the hearsay rule entirely. *See* Fed. R. Evid. 801(c). For example, proposed Exhibit 2 is an email between Mr. DeCicco and Andrew Bisignani, wherein Mr. DeCicco counsels Mr. Bisignani not to purchase a vehicle from CW-1. The fact that Mr. DeCicco told someone he "wouldn't buy a Ferrari from [CW-1]… Seriously… [CW-1] isn't the right guy to buy from" is obviously not being offered for the truth that CW-1 is not the "right person to buy from." *See* Proposed Exhibit 2, attached as Exhibit I. Instead, it is offered as

---

[2] The government complains that it does not know the anticipated testimony of "the vast majority" of the defendant's 54 witnesses. But the government has interviewed at least 25 of them—some of them numerous times—and another 9 of them are records custodians.

evidence to show that Mr. DeCicco said those words, from which it could be inferred that Mr. DeCicco neither liked CW-1 nor thought much about his business practices. This statement would tend to prove Mr. DeCicco's animus toward CW-1 regardless of whether CW-1 truly was "the right person" from whom to buy a Ferrari.

For the same reason, an email between Mr. DeCicco and Peter Varone, wherein Mr. DeCicco calls CW-1 "a jerk," is not hearsay. *See* Proposed Exhibit 70, attached as <u>Exhibit J</u>. The statement was made in response to Mr. DeCicco learning about CW-1's threat to inflict bodily harm on an architect with whom Mr. DeCicco conducted business, wherein the architect's employer wrote:

> On two separate occasions earlier today [CW-1] threatened bodily harm to my associate John Lloyd, threatening to assault him in my office and later asking John on the phone to disclose his location so that [CW-1] could go to that location and assault him. These threats followed verbal unfounded accusations of unprofessionalism with regard to his building process.

*See* <u>Exhibit K</u>. Mr. DeCicco's reaction to this incident is clearly not being offered for the truth of the matter asserted that CW-1 was a "jerk," but rather to show animus.[3] *See, e.g.*, *Iorio v. Aramark Servicemaster*, No. Civ. A. 03-40147-FDS, 2005 WL 3728715, at *8 (D. Mass. Sept. 30, 2005) (declarant's statement that plaintiff was a "bitch" is not hearsay because it was not offered for its truth, would be admissible under FRE 803(3) even if it were, and revealed declarant's animus toward plaintiff).

Scratching below the surface, it becomes clear that the government is disguising its request for the Court to preclude the introduction of *exculpatory* evidence under the ill-suited

---

[3] Proposed Exhibits 37 and 97, also singled out by the government, do not contain statements that the government would credibly consider "self-serving"—they concern communications between Mr. DeCicco and Richard Scourtas and GF-1, respectively, both discussing vehicles. Proposed Exhibit 100 has since been withdrawn.

7

guise of precluding "self-serving" statements under Rule 801(d)(2)(A).[4] This is because the government is cognizant that its decision to press the baseless theory that Mr. DeCicco desired to partner with CW-1 necessitates the defense to counter this theory by showing why Mr. DeCicco would *not* want to partner with CW-1. The gravamen of the government's complaint, therefore, centers on statements that reflect Mr. DeCicco's deep dislike for CW-1. But they are not hearsay. For example, the government has focused its ire on statements Mr. DeCicco made to his sister, Noelle Spinosa, about CW-1, even though it would be strange to characterize her as a co-conspirator of Mr. DeCicco; indeed, the government has not so argued. *See* Fed. R. Evid. 801(d)(2)(A) (deeming **co-conspirator** statements offered for the truth of the matter asserted non-hearsay). Moreover, Mr. DeCicco's griping about CW-1 trying to "get"—*i.e.*, annoy—him by attempting to date Ms. Spinosa cannot credibly be characterized as self-serving; what possible interest does it serve Mr. DeCicco to complain about CW-1's attempt to date his sister, six months before the first alleged extortionate act occurred? Dkt. No. 84-6 at ¶ 12. *See also United States v. Barone*, 114 F.3d 1284, 1301 (1st Cir. 1997) (citation omitted) (finding declarant's statements not self-serving and admissible because they were made to close relatives "in a noncustodial setting rather than to the police" and that he had no reason to lie). Similarly, Mr. DeCicco's exultant statement that he "got that asshole real good" is not offered for its truth, nor is it self-serving. The statements, however, are exculpatory because they rebut the government's theory that Mr. DeCicco wished to become a business partner of CW-1, when it is clear from Mr. DeCicco's pronouncements that he viewed CW-1 with disdain. That the evidence does damage to the government's case, however, is not in and of itself a valid reason for excluding it.

---

[4] By which the government means the introduction of co-conspirator statements by the alleged co-conspirator defendant (instead of the government) for the truth of the matter asserted, which is not at issue here. *See* Fed. R. Evid. 801(d)(2)(A).

The rest of the cases the government relies on are inapposite. In *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996), the excluded statement was the defendant's out-of-court statement to the police explaining how he came into possession of stolen money, offered for the truth of the matter asserted. In *United States v. Palow,* 777 F.2d 52, 56 (1st Cir. 1985), the court admitted testimony under FRE 801(d)(2)(A) of a co-defendant repeating the defendant's statements. *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) also expressly discusses the admissibility of a statement under FRE 801(d)(2). Neither *Palow* nor *McDaniel* are applicable to the statements that the government has complained of in its motion.

Finally, even if the statements were sought to be admitted for the truth of the matter asserted, they would fall under one of several hearsay exceptions, including: (1) Mr. DeCicco's then-existing state of mind; (2) Mr. DeCicco's present sense impression; (3) excited utterance; or even (4) statements against penal interest, given that his apparent admissions would expose him to civil and criminal liability—just not the one that the government has attempted to shoehorn into this case. *See* Fed. R. Evid. 803(3); 803(1); 803(2); 804(b)(3).

The government's motion *in limine* to exclude *all* of Mr. DeCicco's statements merely because they happen to be exculpatory—without properly conducting the hearsay analysis—is impermissibly overbroad. Should the government object to particular statements as hearsay at trial, its objections should be dealt with on a statement-by-statement basis so the Court can assess whether they are truly offered for the truth of the matter asserted and fall within a hearsay exception. The government's motion should be denied.

                Respectfully submitted,

                GARY P. DECICCO

                By his attorneys,

                /s/ Thomas C. Frongillo
                Thomas C. Frongillo (BBO# 180690)
                Caroline K. Simons (BBO# 680827)
                Jessica L. Perry (BBO# 696392)
                FISH & RICHARDSON P.C.
                One Marina Park Drive
                Boston, Massachusetts 02210
                frongillo@fr.com
                simons@fr.com
                jperry@fr.com
                TEL: (617) 542-5070
                FAX: (617) 542-8906

                James J. Cipoletta (BBO# 084260)
                Law Offices of James J. Cipoletta
                Citizens Bank Building
                385 Broadway Suite 307
                Revere, Massachusetts 02151
                jim@cipoletta.com
                Tel: (781) 289-7777
Dated: May 22, 2018       Fax: (781) 289-9468

### CERTIFICATE OF SERVICE

    I hereby certify that a true copy of the above document was filed on May 22, 2018 through the CM/ECF system and will be served electronically to registered CM/ECF participants as identified on the Notice of Electronic Filing.

                /s/ Thomas C. Frongillo
                Thomas C. Frongillo