UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 17-10092-NMG |
| | ) | |
| GARY P. DECICCO, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' OPPOSITION TO
MOTION TO DISMISS INDICTMENT**

The United States, through undersigned counsel, respectfully opposes the Motion of Defendant Gary DeCicco to Dismiss Indictment for Government Misconduct [Docket No. 301] (the Motion). As set forth below, the government had a typographical error in its attachments to subpoenas to phone companies when it sought the cellular telephone records of the victim in this case. That typo, and a mistake in producing text messages between an agent with the Federal Bureau of Investigation (the FBI) and the victim in this case, have now morphed into accusations of material misrepresentations, withholding discoverable information, and spoliation of exculpatory evidence, none of which are grounded in fact, all of which are based on pure speculation, and some of which are based on the word of a convicted fraudster who *admittedly* arranged both the delivery of the threatening flowers to and the beating of the victim in this case. The Motion should be denied because the government has produced all relevant and exculpatory information within its possession, custody and control, and because the government did not destroy or direct the destruction of any evidence in this case.

I.  **Relevant Background**

   A. **The August 4, 2014 Incident.**

On August 4, 2014, the Defendant admittedly sent flowers and a crystal cross to Medi Mirnasiri, the owner of Auto Excellence Group (AEG) with the following message:

> **Congrats Gary – We all know who's place that is.** We hope this cross will help you get rid of that MUSLIM PRICK. From all RT. 1 Autodealers.[1]

(Emphasis added). On the same date, Mirnasiri reported the incident to the Saugus Police Department (the SPD), **not** the FBI. Mirnasiri also reported to the SPD that he received a blocked harassing phone call on that date, and that $75 worth of pizza that he did not order had been delivered to AEG. The Defendant's business associate, Philip Baldi, has admitted that he (with the Defendant's approval) had the pizza delivered to Mirnasiri.

SPD investigated the incident, and received a physical description of the woman who had ordered the flowers. Mirnasiri told SPD that the woman could have been Kimberly DeBenedictis, one of the Defendant's girlfriends. Mirnasiri reported that DeCicco had sold him the land where AEG was located, although the land had actually been titled in the names of Charles Lightbody and Pamela Avedisian. Mirnasiri further stated that DeCicco wanted to be a

---

[1] The note dictated by the Defendant said nothing about his family, girlfriend, or any other of the various purported motives the Defendant has floated in his multiple filings in this case. In fact, the Defendant himself told Mirnasiri in the card delivered with the flowers that the threat related to the ownership of AEG. To allege that the government pursued this case based only on the word of Mirnasiri is patently false and ignores the most critical piece of evidence in the government's case: **the Defendant's own admission**.

partner in his business.[2]

Due to the possible connection of the incident to individuals with known associations with organized crime, SPD Detective Frank Morello got in touch with SPD Detective James Donovan, who was a Task Force Officer (TFO) with the FBI. At some point, the referral made its way to FBI Special Agent Jesse Chizmadia, who was also assigned to the FBI's organized crime squad, presumably because SA Chizmadia had some involvement in the investigation which led to the indictment in *United States v. DeNunzio, et al.*, 14-CR-10284, during which the Defendant's name had also surfaced.[3]

### B. Contact Between The FBI And Mirnasiri Between August And December 2014.

By the end of August 2014, the FBI had the referral from SPD of the delivery of flowers with a threatening note to AEG. Mirnasiri was not then a source for the FBI, he was one of many purported crime victims whose complaints get forwarded to the FBI's attention. Moreover, Mirnasiri had not yet been assaulted. The fact that SA Chizmadia had contacts with

---

[2] The SPD report reflects that the SPD asked Mirnasiri whether he had any prior incidents of harassment that were similar to this one. The report further states "He told us that he had one prior incident that involved a neighbor of his. That neighbor is now identified as Gary DeCicco (\*\*/\*\*/58). He told us that he had contacted the FBI about the matter and it stopped shortly thereafter." The FBI has no record of Mirnasiri contacting the agency about DeCicco. It does have a record that Mirnasiri provided information to the FBI in April 2008 regarding the Nahant Knights of Columbus, which neighbors Mirnasiri's property.

[3] Contrary to the repeated accusations in the Memorandum in support of the Motion, the fact that Mirnasiri reached out first by phone to SA Chizmadia on August 27, 2014 does not mean the government has made any sort of misrepresentation about how this case made its way to the FBI. The SPD report states the matter was referred to the FBI, and the government produced an FBI Form 302 of an interview with SPD Detective Morello in which he stated that he brought the matter to the attention of the FBI. Indeed, Mirnasiri could not have called SA Chizmadia's cellular telephone number unless someone from SPD or the FBI provided it to him and thereby invited the call.

Mirnasiri during that time period does not mean that the FBI was conducting a "stealth investigation of [the Defendant] for months." Memo, at 21. Nor does it mean that the government has misrepresented anything to the Court. In fact, SA Chizmadia took the complaint but was busy with other matters, he talked briefly on the phone several times and exchanged text messages with Mirnasiri, who was eager to have his complaint investigated, but the government anticipates that SA Chizmadia will testify that he did not fully debrief Mirnasiri until December 28, 2014.

    **C.  The January 2015 Assault.**

On January 11, 2015, James Lundrigan viciously assaulted Mirasiri, resulting in a broken jaw. It is undisputed that Lundrigan committed the assault on behalf of the Defendant, in exchange for $1,000. The assault was captured on videotape, and the SPD responded to AEG. The next day, the FBI collected evidence from AEG, including the videotape. Ultimately, the fingerprint and DNA evidence collected from AEG did not result in the identification of the assailant.

The FBI eventually identified Lundrigan as the assailant, and he confessed to the assault in November 2015. In January 2017, the FBI learned from David Witham, who had hired Lundrigan, that the assault was arranged through Jeffrey Prime on behalf of Gary DeCicco. On March 16, 2017, Kimberly DeBenedictis admitted that she sent the flowers for the Defendant on August 4, 2014, and that the Defendant had dictated the threatening note.

    **D.    The Government's Efforts to Secure Mirnasiri's Phone Records.**

Having tied the two critical events in this attempted extortion case – the flower delivery and the assault – definitively to the Defendant, investigators in early April 2017 subpoenaed phone records for Mirnasiri in an effort to identify the source of the calls he reported to SPD in

2014. Comcast responded that it had no records for the AEG landline number. *See* Exhibit 1 (USAO_DECICCO_00003418 through USAO_DECICCO_00003419). Unfortunately, investigators made a typographic error on the subpoena attachment for T-Mobile records related to Mirnasiri's cellular telephone, and the company provided records indicating that, during the relevant time period, the number was assigned to a different carrier. That carrier in turn responded that, due to its retention policies, it did not have records dating back to 2014 and 2015 for the phone number. *See* Exhibit 2 (USAO_DECICCO_00002838 through USAO_DECICCO_00002839).[4]

During preparations for trial, Mirnasiri reported that he might still have a cellular telephone that he used during the 2014-2015 time period, which he was not currently using. On April 18, 2018, Mirnasiri provided his phone to the FBI, and the FBI extracted all data on the phone. The phone call logs, SMS and MMS messages extracted did not predate July 2016. However, having the phone in its possession, the government endeavored to review all extracted data, and produced on a rolling basis anything that was potentially relevant or exculpatory.

On May 4, 2018, hours after defense counsel notified the government of the typographical error as to Mirnasiri's cellular telephone number, the government issued a trial subpoena to T-Mobile for records relating to the correct telephone number. The government

---

[4] The Bates Numbers on these records indicate that they were produced to the Defendant. The suggestion that the government "resisted production of information as to what efforts were made by law enforcement to identify the alleged callers" is untrue. After the government explained that it had produced all of the subpoena responses it received regarding the phone records, Judge Hennessy repeatedly asked defense counsel at the May 10, 2018 hearing on the Defendant's motion to compel discovery what exactly they wanted the government to produce regarding its "efforts" to obtain phone records, and ultimately stated, "If there are 302s that were prepared regarding the attempts to identify the source of the calls, I want those produced and order those produced. I can't draw the line. I can't actually identify what it is that you're seeking beyond that . . ." *See* Docket No. 271, at 48. No such FBI Form 302s exist.

expedited the request. On May 17, 2018 at 3:05 p.m., the government received records from T-Mobile and by 5 p.m. delivered *all* of those records to defense counsel. *See* Exhibit 3 (Receipt from Speedy Delivery). After sending the records, and around the same time that defense counsel notified the government of the same (at 6:12 p.m. on May 17), investigators realized that T-Mobile had sent incomplete records. At 9:17 a.m. on May 18, the government notified T-Mobile that the response was missing records, and followed up on May 21. *See* Exhibit 4 (May 18-21, 2018 emails between Ibrahim Salah and T-Mobile). On May 22 at 10:03 a.m., T-Mobile provided records for the entire responsive time period, including the records that were missing from the first response, and stated "I APOLOGIZE FOR THE ERROR ON THE RECORDS SENT PRIOR. I HAVE ATTACHED THE TIME FRAME MISSING TO THE END OF THE RECORDS." *See* Exhibit 5 (May 22, 2018 email from T-Mobile). At 10:31 a.m., less than 30 minutes after receipt, the government produced the records to defense counsel. *See* Exhibit 6 (May 22, 2018 email from Ibrahim Salah).[5]

In addition, out of an abundance of caution, the government issued a trial subpoena to Comcast for all records for the landline phone number for AEG, even though Comcast had previously responded that it had no such records. After escalating the matter, Comcast located some records for the time period, but not complete records. *See* Exhibit 7 (May 23, 2018 email from Timothy Derr), and Exhibit 8 (Records from Comcast). The government provided these records to the Defendant promptly upon receipt.

---

[5] The government provided defense counsel with copies of Exhibits 4 and 5 via email before 9:20 a.m. on May 24, 2018. Accordingly, the Defendant had this information when it filed its Motion alleging that the government had deliberately withheld critical records.

**E.     The Production of FBI Text Messages.**

On May 8, 2018, the government voluntarily made a production pursuant to 18 U.S.C. § 3500, which included two spreadsheets of text messages with Mirnasiri, who is on the government's witness list. One spreadsheet reflected communications with SA Chizmadia and the other reflected communications with SA Elio. It was not until the May 23, 2018 Final Pretrial Conference that the government realized that text messages from 2014 between SA Chizmadia and Mirnasiri had not been produced on May 8. Those text messages were provided by the FBI on a different spreadsheet, because SA Chizmadia had switched from a BlackBerry device to an Android device around the end of 2014 or beginning of 2015. Upon realizing its error, the government produced the missing 2014 text messages the morning of May 24, 2018.[6]

Also on May 24, 2018, while reviewing the text messages for SA Chizmadia provided by the FBI, the government realized that the FBI technicians had not provided text messages after 2015 for SA Chizmadia. The government reached out to the FBI technicians, and in the meantime culled and produced the text messages between SA Chizmadia and Mirnasiri that had been captured in the extraction of Mirnasiri's phone, and produced those records (along with recent texts between SA Elio and Mirnasiri), pursuant to the government's agreement to provide early Jencks Act materials to the Defendant.

---

[6] The accusation that the government intentionally withheld information that SA Chizmadia and Mirnasiri had contact before they met on December 28, 2014 is false. The government has never represented to the Court that there was no contact at all before December 28, 2014. Moreover, the government immediately upon receipt produced the phone records that reflected the contact and revealed the inadvertent omission of the 2014 texts.

## II. ARGUMENT

The Defendant contends that the government has engaged in "outrageous government conduct" in four ways: (1) by destroying exculpatory evidence; (2) by making material representations in support of its motion to detain the Defendant; (3) by withholding exculpatory evidence until the eve of trial; and (4) by deliberately failing to investigate facts. *See* Memorandum of Defendant Gary DeCicco in Support of Motion to Dismiss Indictment for Government Misconduct (Docket No. 302-1) (the Memo), at 31. The government, however, has not engaged in outrageous conduct, and the Motion must therefore be denied.

As this Court recognized in *United States v. George,* 839 F.Supp.2d 430, 438 (D. Mass. 2012):

> "In rare and extreme circumstances, a federal court has the authority to dismiss criminal charges as a sanction for government misconduct." *United States v. Guzman,* 282 F.3d 56, 59 (1st Cir. 2002). That power must be used "sparingly," however, and is "reserved for only the most appalling and egregious situations." *Id.* (citing *United States v. Santana,* 6 F.3d 1, 10 (1st Cir. 1993) ("Potential elixirs should not be casually dispensed.")). A defendant invoking an outrageousness defense therefore has a high hurdle to surmount: indeed, although the First Circuit has confirmed the theoretical viability of the defense, it has never dismissed criminal charges on the basis of outrageous government misconduct. *United States v. Luisi,* 482 F.3d 43, 59 (1st Cir. 2007) (citing cases); *Santana,* 6 F.3d at 4 ("The banner of outrageous misconduct is often raised but seldom saluted.").
>
> A defendant claiming government misconduct must demonstrate that the government has engaged in conduct "so appalling and egregious as to violate due process by 'shocking … the universal sense of justice.'" *Luisi,* 482 F.3d at 59 (quoting *United States v. Russell,* 411 U.S. 423, 432, 93 S. Ct. 1637, 36 L.Ed.2d 366 (1973)).

The Defendant has not met and cannot meet this heavy burden. Indeed, despite his best efforts, his attempt to show any intentional misconduct fails.

**A. The Government Did Not "Destroy Exculpatory Evidence."**

The centerpiece of the Defendant's claim that the Court should dismiss the indictment is his contention that the government engaged in "outrageous government conduct" by destroying exculpatory evidence. Memo, at 31-32. Specifically, the Defendant claims that "the government knowingly destroyed the voicemails that [the Defendant] left for Mirnasiri on December 9, October 8, and October 9, 2014." Memo at 32. The Defendant maintains that this purported destruction of evidence warrants dismissal under *United States v. Femia,* 9 F.3d 990, 993 (1st Cir. 1993) because (1) its exculpatory value was evident before it was destroyed, (2) the Defendant cannot obtain comparable evidence by other reasonably available means, and (3) law enforcement acted in "bad faith." Memo, at 32-33. However, the government never had and therefore did not "destroy" these voicemails, and the Defendant has otherwise failed to satisfy the *Femia* formulation.

First, the Defendant, as the person who left the voicemails, has been aware of their purported exculpatory content from the beginning of this case.[7] The only source for the proposition that these voicemails were in any way exculpatory is the Defendant himself. He has not claimed what it is about the October 8 and 9 voicemails that was exculpatory, but as to the December 9 voicemail, he contends that he "told Mirnasiri that he had heard about Mirnasiri's backstabbing and gossip, and strongly and profanely advised Mirnasiri to stop talking about him and his family, or else he would 'beat the sh*t out of' him." Memo, at 27. But this account does not make sense. As the Defendant recognizes, after leaving Mirnasiri a voicemail on

---

[7] The Defendant failed in the extensive litigation over the government's motion for detention to allege that he had left an "exculpatory" voicemail for Mirnasiri. It is only now, confident that no recording of this voicemail exists, that the Defendant has put forth the purported substance of this voicemail.

December 9, he spoke to Rick Scourtas, a friend of Mirnasiri, and, according to Scourtas, the Defendant wanted Scourtas to deliver a message that Mirnasiri "gotta keep his mouth shut" and stop talking badly about the Defendant. Memo at 13. Mirnasiri has confirmed that he had a conversation with Scourtas in which Scourtas delivered, in substance, a message that the victim was to stop talking and lying about the Defendant and should shut the hell up. Memo at 13. There would have been no need to have Scourtas deliver any message at all if the Defendant had already done it, far more effectively and frighteningly, via voicemail. Indeed, the Defendant is a very intelligent man, and what strains credulity is that he would have left a voicemail message containing an overt threat to assault the victim. What makes far more sense is that the Defendant left a message for Mirnasiri to call him; Mirnasiri called back after speaking to Scourtas and left a message; and the Defendant did not call Mirnasiri again because Scourtas had already spoken to Mirnasiri.

Moreover, the fact that the Defendant may have had more than one reason for having Mirnasiri viciously assaulted is simply not, as the Defendant appears to assume, fatal to the government's case. The government has requested that the Court give the following so-called "mixed-motive" jury instruction:

> The government also need not prove that the defendant's actions were solely motivated by an intent to obtain property from Medi Mirnasiri. People rarely act for a single purpose, and the defendant need not have used, or threatened to use, force, violence or fear, including fear of economic loss or physical harm, solely in an attempt to obtain property from Medi Mirnasiri. If you find beyond a reasonable doubt that the defendant did attempt to obtain property from Medi Mirnasiri, then it makes no difference that the defendant may also have had another motive for the use, or threatened use, of force, violence or fear, including fear of economic loss or physical harm.

United States' Proposed Jury Instructions (Docket No. 235), at 25-26. So even if the Defendant was angry with the victim for some other reason as well, as long as the jury finds that at least one of the reasons for the threat and assault was the Defendant's desire to have a piece of the victim's business, the Defendant has violated the Hobbs Act. *See, e.g., United States v. Donna*, 366 Fed. App'x 441, 449 (2010) (3d Cir. 2010) (upholding dual motive jury instruction in extortion case); *see also United States v. Woodward*, 149 F.3d 46, 70 (1st Cir. 1998) ("A defendant may be prosecuted for deprivation of honest services if he has a dual intent, *i.e.*, if he is found to have intended both an lawful and an unlawful purpose to some degree. If the jury finds that the unlawful purpose was present, it may convict the defendant."); *United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) (jury instruction that government must prove defendant accepted or solicited thing of value "at least in part" for or because of his conduct as public official entirely appropriate in light of defendant's argument that he was motivated by friendship); *United States v. Vest*, 639 F.Supp. 899, 904 (D. Mass. 1986) ("It is characteristic of human experience that individuals usually—perhaps even always—act with mixed motives."); *Anderson v. United States,* 417 U.S. 211, 226 (1974) ("A single conspiracy may have several purposes, but if one of them—whether primary or secondary—be the violation of a federal law, the conspiracy is unlawful under federal law.").

In addition, the Defendant's claim that SA Chizmadia obtained copies of the voicemail messages, Memo at 33, is simply wrong. The government does not now, and never did, have recordings of these three voicemails. The Defendant thus has not "established possession, custody, and control over the voicemails," and the failure to produce them as recorded statements of the Defendant, as *Brady* material, or "even in response to the defense's direct requests," *see*

Memo at 33-34, does not, as the Defendant contends, establish bad faith under the third prong of *Femia*.

Accordingly, the Defendant's claim that the indictment should be dismissed because the government destroyed evidence must be rejected.

### B. The Government Did Not Make Material Misrepresentations In Support of Its Motion To Detain The Defendant.

The government does not believe it has ever represented to the Court that the FBI had **no contact** with Mirnasiri between August and December. Undersigned counsel has repeatedly stated, believing it to be true, that the FBI did not sit down and interview Mirnasiri about the threat until December 28, 2014. *See* Memo, at 20-22. Undersigned counsel was told that the August to December gap between when the SPD referred the matter to the FBI and when SA Chizmadia ultimately interviewed Mirnasiri was essentially a lengthy game of phone tag. While undersigned counsel was not aware of the number of phone contacts between SA Chizmadia and Mirnasiri during the August to December 2014 time period until May 2018, the contacts themselves do not indicate that, in hindsight, there was any inadvertent material misrepresentation to the Court.

By late August or early September, the FBI knew the gist of Mirnasiri's complaint, having received the police report from SPD. SA Chizmadia likely discussed the complaint briefly during phone calls with Mirnasiri. Mirnasiri told SA Chizmadia that he was still in contact with the Defendant, and SA Chizmadia told Mirnasiri to keep SA Chizmadia posted, especially if Mirnasiri felt further threatened. But there was no active FBI investigation into the attempted extortion before December 28, 2014, Mirnasiri did not record any conversations with the Defendant, and SA Chizmadia neither heard nor arranged for the destruction of any voicemails, let alone exculpatory voicemails. In fact, the FBI did not actively begin to

investigate the flower incident until the Defendant followed up his threat with action, *i.e.*, the vicious beating on January 11, 2015.

The number of contacts between Mirnasiri and SA Chizmadia during the relevant time period – 47 according to the Defendant – is misleading.  Of the 33 phone contacts between SA Chizmadia and Mirnasiro between August and December 2014, 29 were less than 3 minutes long.[8]  In fact, 13 were less than 1 minute in duration and 11 were less than 2 minutes in duration, with the longest call being less than 7 minutes.  SA Chizmadia could hardly have been debriefing Mirnasiri during those calls, and the timing of many of the calls reflects a game of phone tag.  Further, a phone call that is noted as 1 minute on the phone records does not necessarily mean that the phones even connected.  For example, the 1-minute call from Mirnasiri to the Defendant on December 9, 2014 at 1:19 p.m., which was included on the Defendant's chart (Memo, at 12), actually appears to have gone unanswered by the Defendant, because he was on the other line with one of his girlfriends for 14 minutes starting at 1:12 p.m.  *See* Exhibit 9 (highlighted phone records of Defendant and Mirnasiri).

The Defendant will have ample opportunity to cross-examine Mirnasiri at trial about his contacts with the FBI during the August to December 2014 time period.  Further, the Defendant has indicated that he will call SA Chizmadia as a witness, and will likewise have an opportunity to examine SA Chizmadia regarding his phone contacts with Mirnasiri before December 28, 2014.  But the fact of the matter is, undersigned counsel did not knowingly make a representation

---

[8] The phone records used for these calculations are billing records and not actual toll records.  Accordingly, it is the government's understanding that any call that is even one second more than one minute long will register on the billing records as a 2 minute call.

to the Court about the contacts between the FBI and Mirnasiri between August and December 2014.

### C. The Government Did Not Withhold Exculpatory Evidence Until The Even Of Trial Or Deliberately Fail To Investigate Facts.

#### 1. Mirnasiri's Cellular Telephone Records.

As an initial matter, there is absolutely no evidence that the government intentionally failed to secure Mirnasiri's cellular telephone records. The fact that it did not send subpoenas until April 2017 is a red herring; the government focused first on the threatening flowers and the violent assault, and before the grand jury returned its indictment, the government had subpoenaed all relevant phone records. The fact that the government mistakenly hit a dead end with Mirnasiri's cellular telephone phone records does not mean the government intentionally failed to secure those records because it was hiding something – indeed, upon realizing the error, the government immediately secured those records and produced them to the Defendant.

It is important to note that the Defendant's complaint, at least with respect to Mirnasiri's phone records, is actually not one of non-disclosure, but rather one of delayed disclosure. A prerequisite to obtaining relief in cases of delayed or non-disclosure of exculpatory evidence[9] is a clear showing that the Defendant was prejudiced. Further, in cases of delayed disclosure of material information, defense counsel have an obligation to request a continuance in order to mitigate any prejudice. *United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir. 1993), *cert. denied*, 512 U.S. 1223 (1994); *United States v. Osorio*, 929 F.2d 753, 758 (1st Cir. 1991).

The Defendant's motion fails to allege any actual prejudice. In fact, the Defendant describes the prejudice he would have suffered "*were Mirnasiri's phone records never*

---

[9] The government does not agree that the phone records are exculpatory.

*produced,"* but in fact the government produced Mirnasiri's cellular telephone records as soon as they came into the government's possession. Docket No. 302-1, at 35 (emphasis added). The First Circuit held in *Osorio* that even when the prosecution is tardy in disclosing material exculpatory evidence (which is not the case with respect to Mirnasiri's phone records) the crucial inquiry is whether the delay prevented defense counsel from employing the material to good effect:

> The court must determine first, whether the disclosed evidence was material, and second, whether the defendant was denied the opportunity to use the disclosed evidence effectively.

*Osorio*, 929 F.2d at 758 (citation omitted). *See also Sepulveda*, 15 F.3d at 1178; *United States v. Devin*, 918 F.2d 280, 290 (1st Cir. 1990).

The Defendant had enough time with the phone records to prepare a Power Point presentation for the Final Pretrial Conference on May 23, 2018, using details from those records as its cornerstone. Moreover, the Court delayed the trial for one week, giving the Defendant ample time to review and analyze the records. Based on fact that the government disclosed the records when it received them, dismissal is not warranted.

### 2. SA Chizmadia's 2014 Text Messages.

The Court did not order the government to provide information pursuant to 18 U.S.C. § 3500 (the Jencks Act) before trial in this case. Nevertheless, the government represented to defense counsel in January 2018 that it would produce Jencks Act materials no later than 21 days before trial. On May 8, 2018, the government produced two spreadsheets of text messages

15

between SA Chizmadia and SA Elio with Mirnasiri (as part of its Jencks Act production),[10] inadvertently omitting the third spreadsheet from the production.

When defense counsel raised the issue of missing 2014 texts between Mirnasiri and SA Chizmadia at the Final Pretrial Conference, the government was obviously surprised, and represented that it would look into the issue forthwith. The government produced the missing texts at 9:15 a.m. the next day. Had defense counsel raised the issue with the government on May 18, 2018 (when they were apparently reviewing Mirnasiri's records in preparation for the surprise Power Point presentation regarding the missing texts), the government would have produced the missing texts on May 18.

Again, at least with respect to the text messages, the Defendant's complaint is not one of non-disclosure, but rather one of delayed disclosure, and the Defendant has not demonstrated that he suffered any prejudice as a result of the delayed disclosure. After having the missing text messages for less than 9 hours, the defense was able to analyze them and incorporate them with the phone records into a comprehensive 42-page memorandum in support of the Motion. The Defendant has not and cannot demonstrate prejudice, especially given the one-week delay to the start of trial.

### D.   Various Criticisms Of The Government's Investigation.

The Defendant makes multiple and repeated allegations about the "unjustifiably reckless and flawed investigation" into the Defendant's attempted extortion of Mirnasiri. These allegations are based on pure conjecture and supposition, and not grounded in the actual facts of this case or the investigation. What is noticeably downplayed in the Defendant's lengthy filing is

---

[10] It is the government's position that these text messages are in no way exculpatory.

any mention of the key piece of evidence in this case, **the Defendant's own confession, contained in the card delivered with the flowers, that the dispute with Mirnasiri was related to ownership of AEG.** While certainly the Defendant has a right to present testimony regarding his allegations that the government's investigation was flawed, none of his remaining criticisms rises to the level of intentional government misconduct, and none of them merits dismissal of the indictment.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

By:    */s/Kristina E. Barclay*
        KRISTINA E. BARCLAY
        ROBERT E. RICHARDSON
        Assistant U.S. Attorneys
        U.S. Attorney's Office
        John J. Moakley U.S. Courthouse
        1 Courthouse Way, Suite 9200
        Boston, MA 02210
        (617) 748-3100

Date:  May 25, 2018

### Certificate of Service

    I hereby certify that this document was filed through the ECF system, and therefore it was sent electronically to the registered participants as identified on the Notice of Electronic Filing.

        */s/Kristina E. Barclay*
        KRISTINA E. BARCLAY
        Assistant U.S. Attorney

Date:  May 25, 2018