# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                            )
UNITED STATES OF AMERICA,                   )
                                            )
            v.                              )          No. 17-CR-10092-NMG
                                            )
GARY P. DECICCO,                            )
                                            )
            *Defendant.*                     )
_____)

### (CORRECTED) MEMORANDUM OF DEFENDANT
### GARY DECICCO IN SUPPORT OF
### MOTION TO DISMISS INDICTMENT FOR GOVERNMENT MISCONDUCT
### [Leave granted on May 29, 2018]

### INTRODUCTION

On the eve of trial, the government has belatedly produced evidence to the defense

conclusively demonstrating that in the fall of 2014, the FBI, in conjunction with a former

informant, Medi Mirnasiri, conducted a stealth investigation of Mr. DeCicco for months.  The

agent had Mr. DeCicco in his sights since 2011; Mirnasiri, a jealous and vindictive neighbor,

sought revenge because he believed Mr. DeCicco had sent him a disparaging, anonymous note

along with flowers and cross when he opened his new business.  In truth, there was bad blood

between the two men that had been festering for months due to personal issues between them

ranging from Mirnasiri's cheating of numerous contractors, many of whom were Mr. DeCicco's

friends, to vulgar and vile comments Mirnasiri had made about Mr. DeCicco and his family.  The

FBI, on the other hand, viewed Mr. DeCicco as a significant target due to his prior ownership

interest in the Everett casino land that was the subject of subsequent federal charges, and his

relationship with others who were under investigation.  It was a perfect marriage; they used each

other for their own separate objectives.

1

As a result of this questionable alliance, the FBI ran a furtive and undocumented investigation in an unsuccessful attempt to set up Mr. DeCicco. No standard reports were prepared. Key evidence was not preserved. And exculpatory evidence disappeared. Consequently, the United States Attorney's Office evidently failed to understand or appreciate what was afoot, which was clearly evident at the May 23, 2018 pretrial conference when the prosecutor was forced to confess that she was unaware of the multitude of communications between the FBI and Mirnasiri. But the consequences were severe. The government, which moved to detain Mr. DeCicco, made numerous misrepresentations to the Court to support its "strength of the evidence argument." The Court relied on the veracity of the government's representations and ordered Mr. DeCicco detained pending trial. Nonetheless, Mr. DeCicco has remained behind bars for over 14 months, on a case involving, at most, a state crime of assault and battery that has no place in federal court. As the new evidence has been produced, it's now clear that Mirnasiri contrived this incredible and preposterous story that that Mr. DeCicco was attempting to extort him—a known FBI informant—to become his business partner in a used car dealership.

Moreover, due to the manner by which the government has inappropriately handled discovery, it is continuing to produce further exculpatory evidence even today, all to Mr. DeCicco's detriment.[1] The loss of evidence and the misrepresentations made to the Court have already caused Mr. DeCicco to serve a significant term of imprisonment—time in his life that can never be restored.

---

[1] The defense has not had a reasonable opportunity to properly review and analyze the government's last-minute disclosures, and reserves the right to raise additional arguments concerning them should the Court allow, or should the Court order a hearing on this motion. The defense has exercised its best efforts to acknowledge the government's May 24, 2018 productions in this brief.

In this case, the government has lost sight of the fact that, "[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also Ferrara v. United States*, 372 F. Supp. 2d 108, 132 (D. Mass. 2005). This is not how the United States should be conducting its solemn duty of ensuring its citizens a fair trial and the opportunity to raise a defense against charges brought against them. As demonstrated below, there is a compelling basis for dismissal based on governmental misconduct.

## **RELEVANT BACKGROUND**

### I.     **Overview of the Government's Theory of the Case**

The Indictment alleges that Mr. DeCicco attempted to extort Mirnasiri from 2013 to January 11, 2015. Dkt. No. 23. The government's theory is that Mr. DeCicco desired an interest in Mirnasiri's soon to be formed used car dealership, Auto Excellence Group ("AEG"), and asked Mirnasiri for a partnership stake in AEG at the beginning of its construction, which was the fall of 2013. Dkt. No. 3-1. The government alleges that when Mirnasiri did not acquiesce to DeCicco's request, he opened AEG alone in June 2014. It next maintains that Mr. DeCicco sent Mirnasiri a delivery of flowers, a glass cross, a note, and pizza on August 4, 2014. In addition, the government asserts that, shortly after the delivery of flowers, Mirnasiri received two threatening phone calls on August 4 and August 6, 2014, respectively. The calls purportedly included a death threat referencing his Muslim religion and a warning that he was going to "get burned on the cross." *See* Ex. 1. The next alleged extortionate act was the assault of Mirnasiri at AEG on January 11, 2015, during which the assailant, James Lundrigan, told Mirnasiri that this would teach him "how talk to a lady." Dkt. No. 3-1. The government alleges that Mr. DeCicco

arranged the assault through Jeffrey Prime, who contacted David Witham, who, in turn, enlisted Lundrigan to commit the assault.  Evidently, the government asserts the purpose of an anonymous assault delivering a message about Mirnasiri's treatment of women was intended to force Mirnasiri to make Mr. DeCicco his business partner.  *See id.*

## II.     The Government's Longstanding Interest in, and Scrutiny of, into Mr. DeCicco

As the government acknowledged during the pre-trial conference, during the timeframe immediately preceding the investigation in this case, the government has had Mr. DeCicco under intense scrutiny.  Importantly, the two key FBI agents who played prominent roles in this case had Mr. DeCicco under active investigation at the outset of the timeframe of the alleged attempted extortion.  FBI Special Agent Jesse Chizmadia—the handler of Mirnasiri as a confidential human source—had been investigating Mr. DeCicco since July of 2011 on an unknown matter, according to a report he authored in this case.  *See* Ex. 2.  FBI Special Agent Matthew Elio—the case agent in this case—was actively investigating Mr. DeCicco in the summer of 2013.  Specifically, in July of 2013, the FBI intercepted telephone calls between Mr. DeCicco and Charles Lightbody during a wiretap conducted on Mr. Lightbody's phone in the investigation surrounding the sale of land in Everett as a site for a proposed casino.  On August 12, 2014, Agent Elio interrogated Mr. DeCicco at length about his real estate dealings with Mr. Lightbody.[2]  Mr. Lightbody also was involved in sale of land in Saugus to Mirnasiri, which became the location of AEG.  In addition, as represented by the government, the IRS developed an interest in Mr. DeCicco due to the content of the intercepted calls in the summer of 2013.[3]

---

[2] The government later brought criminal charges against Mr. Lightbody and two others in *United States v. DeNunzio et al.*, Crim. No. 14-10284-NMG (D. Mass.), resulting in the acquittal of all defendants on all counts in a case tried before this Court.

[3] During the investigation in this case, the government simultaneously conducted another investigation of Mr. DeCicco, and has pursued additional charges against him on allegations of mortgage fraud and unlawful monetary transactions.  *See United States v. DeCicco et al.*, Crim. No. 18-cr-10013-RGS (D. Mass.).

III.     **Miransiri's Status as an FBI Confidential Human Source**

Mirnasiri was well-known to the FBI before the investigation in this case.  In 2006, shortly after Mirnasiri purchased the Saugus land from a limited liability company in which Mr. Lightbody and Mr. DeCicco were involved, he became an FBI informant.  The FBI deactivated him 2011, shortly after Mirnasiri was charged in state court with threatening bodily harm stemming from a voicemail he had left for a business associate in which threatened to hunt down the victim to settle a score; "cut" the victim "to pieces"; stick his foot up the victim's posterior; and terminate the victim's business dealings with a financial institution.  The FBI reactivated Mirnasiri shortly after the assault, on January 11, 2015.  In discussions with others, Mirnasiri routinely referred to the FBI as "his friends."  *See* Ex. 3.  Today, he remains an FBI informant. Dkt. No. 3-1 ¶ 5.

IV.     **The Investigation of the Flower Incident on August 4-6, 2014**

On August 4, 2014, Mirnasiri was sent a delivery of flowers, a glass cross, a note, and $75 worth of pizza that he did not order.  *See* Dkt. No. 3-1 ¶ 10.  The note contained a handwritten message that read: "Congrats Gary – We all know who's place that is.  We hope this cross will help you get rid of that MUSLIM PRICK.  From all RT. 1 Autodealers."  *Id.*

   A.     **Mirnasiri's Reports to the Saugus Police Department**

      1.     **Events on August 4, 2014**

Mirnasiri reported this delivery to the Saugus Police Department the same day.  Saugus Detectives Frank Morello and Stacey Forni responded to the call and interviewed Mirnasiri at AEG on August 4, 2014.[4]  *See* Ex. 1.  According to the Saugus Police, during the interview,

---

[4] During the interview, Mirnasiri demonstrated overt hostility towards women, which Agent Elio described as follows: "When Forni arrived at the scene it became very clear to her that Mirnasiri wanted nothing to do with her because she was female.  Mirnasiri would not event talk to Forni and he barely acknowledged her presence.  Forni did not hear any of Detective Morello's interview of Mirnasiri as she was spending time playing with Mirnasiri's

Mirnasiri claimed, "[s]hortly after receiving the flowers delivery, [he] took a call from a blocked number.  The male caller said, 'fucking Muslim, I'm going to fucking kill you.'  *Id.*  When Det. Morello asked Mirnasiri if he had ever experienced any prior incidents of similar harassment, Mirnasiri told Det. Morello that he had one prior incident involving DeCicco, and that he had contacted the FBI about the matter "and it stopped shortly after."[5]  *Id.*

## 2.     The Alleged Blocked Call

Mirnasiri did not identify whether he received the blocked call on his business line or his cell phone.  On January 17, 2017, over two and one-half years after the incident, he told the FBI and IRS that he received the call on his business line.  *See* Dkt. No. 35-13 at ¶ 23.  The defense specifically requested production of Auto Excellence Group's telephone records for the period of 2013-2015, as well as telephone records showing that Mirnasiri or Auto Excellence Group received the call and efforts by law enforcement to identify the alleged anonymous caller and the telephone number from which the alleged call was made.  *See* Dkt. No. 35-13 at ¶ 19.  Aside from the recently produced telephone records of Mirnasiri's cell phone, the government has produced no evidence in response to these requests.  Analysis of Mirnasiri's cell phone records show that he did not receive any blocked calls on August 4, 2014.  A copy of Mirnasiri's cell phone records on August 4, 2014 is attached as Ex. 7.[6]  The government opposed providing the defense with evidence of its efforts to identify the alleged caller and efforts to determine whether, in fact, any such call was even made.

---

dog." Ex. 6.  Mirnasiri's display of his low regard for woman as to Det. Forni provides context for the disparaging comments he made to Det. Morello on August 6 about Mr. DeCicco's girlfriend, Kim DeBenedictis, as well as the mother of one of Mr. DeCicco's daughters, Pamela Avedisian.

[5] The defense has not seen any evidence regarding this purported earlier report to the FBI.

[6] On other dates, blocked calls appear on Mirnasiri's cell phone records, including June 5, 2014 at 12:24 p.m., June 5, 2014 at 10:33 p.m., and on June 7, 2014 at 2:51 p.m *See* Ex. 9.

It is notable, however, that Mirnasiri has given widely conflicting versions of the alleged call.  He told the Saugus Police that the caller said:  "Fucking Muslim, I'm going to fucking kill you."  Yet when he testified under oath before the grand jury, he claimed the caller said:  "You see that cross.  We're going to burn you on it, you fucking Muslim."  *See* Ex 8 at 40:11-12.

### 3. <u>Mr. DeCicco's Prior Alleged Harassment of Mirnasiri</u>

To date, the government has produced no evidence supporting Mirnasiri's statement that he previously reported Mr. DeCicco to the FBI for a similar harassment incident.  The defense expressly requested the government to produce "[a]ll documents and objects regarding CW-1's statement to the Saugus Police that CW-1 had a prior similar harassment incident involving a neighbor, as described in the Paragraph 2 of Det. Morello's Narrative."  *See* <u>Ex. 5</u> at 11. The absence of evidence in the FBI's files indicate this was an utter fabrication.  Moreover, when the FBI and IRS specifically questioned Mirnasiri about this point, he explained that he was referring to a contract dispute he had with Mr. DeCicco concerning Mr. DeCicco's refusal to pay to pave the parking lot at AEG, which does not remotely concern a harassment incident similar to the flower, cross, and note. *See* Dkt. No. 35-13 ¶ 24

### 4. <u>Events on August 6, 2014</u>

On August 6, 2014, at 1:00 p.m., Mirnasiri called Saugus Police again to report new alleged incidents, and Det. Morello returned to AEG to interview him.  *See* <u>Ex. 1</u>.  Mirnasiri claimed he had received more threatening and harassing messages, comprising (1) at 12:01 p.m., a phone call to the business for payment of the pizzas, (2) at approximately 1:00 p.m., a phone call to his cell phone telling him that the cross was for him and that he was "going to get burned on the cross", and (3) a negative cars.com online review from the week prior.  *Id.*  Mirnasiri provided Det. Morello with a printed copy of the review.  *Id.*  Det. Morello then informed

Mirnasiri that the purchaser of the flowers delivered on August 4 was described as a "slim blond female." *Id.* Mirnasiri identified her as Kim DeBenedictis, and noted that she was dating DeCicco at the time. *Id.* When asked why DeCicco would be interested in harassing him, Mirnasiri's included in his answer that DeCicco "wanted to be a partner" in AEG. *Id.*

### 5. The Second Alleged Blocked Call

Mirnasiri called the Saugus Police at 1:00 p.m., which is when he claimed he had received a second threatening call. Analysis of Mirnasiri's cell phone records show that he received no blocked calls on his cell phone on August 6, 2014. *See* Ex. 10. Moreover, only call that received in the vicinity of 1:00 p.m was 11:51 a.m. The defense has identified the caller as a person named Sylvia Whitman. It obviously was not at 1:00 p.m. and was not a blocked call.

Once again, Mirnasiri has given sharply divergent accounts as to the content of the alleged call. He told the Saugus Police that the caller said, "The cross was for him and he was going to get burned on the cross." Saugus Rep ¶ 5. Before the grand jury, Mirnasiri claimed the call said, "Fucking Muslim. I'm going to fucking kill you." Ex. 8 at 40:13-15.

### B.    The Initial Investigation and the Transfer of the Case to the FBI

The Saugus Police then commenced their investigation of this incident. Dets. Forni and Morello interviewed the florist and visited the pizza shop that delivered the pizzas. *See* Ex. 1. Det. Forni checked the phone records of the pizza shop and traced the call placing the relevant order to an active landline. *Id.* Det. Morello also sought surveillance video footage from a bank near to the florist where the flowers were purchased. *Id.*

On September 2, 2014, Det. Morello recorded in his report that "the case will be forwarded to the FBI by Det. Donovan for further investigation." *Id.* On September 24, 2014, after Det. Morello interviewed Mirnasiri yet again regarding more alleged incidents with a

different suspect, he wrote, "Due to the fact that there is another agency currently investigating this and related matters I will be waiting to speak with Agent Jesse Chizmadia so that my investigation does not interfere with or reveal the presence of his investigation." *Id.* On October 16, 2014, Det. Morello confirmed "at this time Agent Chizmadia from the FBI Boston Field Office is handling this case. All information from SPD records have been turned over to SA Chizmadia." *Id.*

At the pre-trial conference, the government provided a vague explanation for the existence of numerous communications between the FBI and Mirnasiri between August 4, 2014 (the flower incident) and January 11, 2015 (the assault), suggesting that the FBI was not even sure whether it would investigate the case. Yet there was no such uncertainty about the issue with the Saugus Police. By early September 2014, the Saugus Police clearly knew the FBI was investigating the matter, and Agent Chizmadia was leading the federal probe.

### C.      The Purported Failure to Request Mirnasiri's Telephone Records

Based on the Saugus Police report, there is no indication the Saugus Police physically reviewed Mirnasiri's cell phone to confirm that he had received a blocked call on August 6, 2014, or even requested the Essex County District Attorney's Office to issue a subpoena for Mirnasiri's and Auto Excellence Group's telephone records. Despite the central role of the alleged telephone threats, the government resisted production of information as to what efforts were made by law enforcement to identify the alleged callers, including any assessment that Mirnasiri had just fabricated a story about them.

## V.      Mirnasiri's Frequent Contact with Agent Chizmadia from August 2014 through December 2014

During hearings before Magistrate Judge Hennessy as to the detention of Mr. DeCicco pending trial, the government represented to the Court that the FBI did not commence its

investigation of this matter until Agent Chizmadia met with Mirnasiri on December 28, 2014.

*See* Ex. 15 at 30:13-15.  In addition, in support of its position that Mr. DeCicco must be

imprisoned pending trial, the government vigorously argued against the defense's contention that

Mirnasiri ginned up a phony extortion crime against Mr. DeCicco, as he was known to

manipulate law enforcement for his own means.  In that regard, the government made the

following representation:

> There is no evidence that CW-1 [Mirnasiri] knew this information would render the
> case a federal Hobbs Act extortion case, and in fact it was the Saugus Police who
> referred the case to the FBI, not CW-1.  See Docket No. 84-2, at 4.  ***The FBI
> subsequently reached out to CW-1 about the incident, not the other way around.***
> The actual facts of this case do not support Defendant's baseless and repeated
> allegation that CW-1 is 'vindictive,' or that he reported this incident to the FBI in
> order to punish Defendant (emphasis in original).  *See* Docket No. 87 at 16.

Based on the recently produced telephone records, it is now evident that Mirnasiri initiated the

contact with the FBI—not the other way around—and the government's representation to the

Court in support of Mr. DeCicco's incarceration was false.

As early as August 27, 2014, ***several days before*** the Saugus Police referred—but not yet

transferred—the case to the FBI, Mirnasiri called Agent Chizmadia.[7]  *See* Ex. 22.  Mirnasiri

called at 10:13 a.m. (2 min),[8] at 2:40 p.m. (2 min), and then the next day, August 28, 2014, at

---

[7] The significance of the calls described in Sections IV and V was unknown to the defense until Tuesday, May 22, 2018, when the defense was able to identify Agent Chizmadia's number on the late produced December 2014 telephone records of Mirnasiri's cell phone.  The government did not produce any of Mirnasiri's cell phone records until May 17, 2018, almost 4 years after the government commenced its investigation in this case.  The telephone records for the time-period of December 9, 2014 and January 8, 2015 were not produced to the defense until May 22, 2018, only after the defense was forced to persist making production requests despite the obvious relevance of the records to the case.  *See* Exs. 11 and 12.

[8] The defense notes the following from its analysis of telephone records to date.  Whether two individuals actually connected and spoke on a call, particularly calls of short (~1-2 min) duration, can only be definitively determined from comparing the records of both caller and recipient.  For example, a call that goes to the recipient's voicemail can register as a call on the caller's statement, but it may not appear on the recipient's corresponding statement.  However, if the recipient then checks his or her voicemail, that voicemail retrieval can appear on the statement.  Generally speaking, short calls are more likely than long calls to be voice messages, given that most voice mailboxes are set up to accept voice messages for a limited amount of time before cutting the speaker off.

3:27 p.m. (2 min).  After the case was referred to the FBI on September 2, 2014, Mirnasiri tried

to reach Agent Chizmadia again on September 3, at 3:27 p.m. (1 min).  On September 5, 2014,

Agent Chizmadia finally called Mirnasiri back.

At that time, Mr. DeCicco was squarely on the FBI's radar screen.  Agent Chizmadia had

an open investigation regarding Mr. DeCicco that began in 2011, and Agent Elio had him under

investigation in the casino case and other matters.  As noted, Agent Elio had interrogated Mr.

DeCicco the prior summer, and the FBI had intercepted his calls with Mr. Lightbody on a

wiretap.  Unquestionably, Mirnasiri's calls to Agent Chizmadia were a bonanza for the FBI, as it

presented yet one more angle from which the FBI could pursue possible criminal charges against

Mr. DeCicco.  Contrary to the scenario painted by the government at the pre-trial conference,

this breakthrough was significant to the FBI and the U.S. Attorney's Office.

From August 27, 2014 until January 11, 2015, when Mirnasiri was assaulted, Mirnasiri

and Agent Chizmadia spoke approximately 1-2 days per week on an irregular basis.  However,

there were certain bursts of frequent calling in that time period.  For example, after Mr. DeCicco

appeared to leave a voicemail for Mirnasiri on September 17, 2014, Mirnasiri called Mr.

DeCicco back and had a 13-minute conversation in the afternoon.  *Id.*  The next morning, on

September 18, Mirnasiri called Agent Chizmadia for 4 minutes, and called again on September

19 for just 1 minute.  In another example, on September 30, 2014, Mirnasiri and Agent

Chizmadia exchanged a pair of calls and 3 text messages.  There also is evidence they met that

night.  That night, at 6:19 p.m., Mirnasiri sent a text message to Agent Chizmadia stating, "I'm

here please come."  Ex. 13.  Moments later, Agent Chizmadia replied, "On way." *Id*.

The week of October 5, 2014 showed even more significant activity, which correlated

precisely with telephone calls between Mr. DeCicco and Mirnasiri on October 8 and 9:

| 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|
| 5:48 pm – MM to FBI, 3 min | | 6:26 pm – MM to FBI, 2 min | 9:51 am – FBI to MM, 1 min<br>11:16 am – MM to GD, 1 min*<br>1:59 pm – GD to MM, 2 min*<br>2:01 pm – CW-1 Checks VM*<br>2:22 pm – MM to GD 1 min<br>2:23 pm – GD to MM, 6 min<br>2:29 pm – MM to FBI, 2 min<br>2:54 pm – FBI to MM, 3 min | 11:38 am – MM to FBI, 3 min<br>1:10 pm – FBI to MM, Text<br>1:11 pm – MM to FBI Text<br>1:11 pm – FBI to MM, Text<br>1:12 pm – MM to FBI, Text<br>1:19 pm – MM to GD, 1 min<br>1:19 pm – MM to FBI, 2 min | 9:53 am – FBI to MM, 1 min |

Notably, on October 8, Mirnasiri reached out to Mr. DeCicco *after* Agent Chizmadia called Mirnasiri.  Mirnasiri and Mr. DeCicco played phone tag, but they then appeared to talk for 6 minutes at 2:23 p.m.  Mirnasiri then *immediately* called Agent Chizmadia back, and they spoke twice within 30 minutes.  The next day, October 9, Mirnasiri again reached out to Mr. DeCicco after a flurry of text messages and a brief call with Agent Chizmadia.  And again, *immediately* after Mirnasiri's outreach to Mr. DeCicco, Mirnasiri called Agent Chizmadia.  In November 2014, Mirnasiri and Agent Chizmadia communicated 8 times.

## VI.    Agent Chizmadia's Supervision of Mirnasiri's Contact with the Defendant on December 9, 2014

By December 2014, Mirnasiri had been under the close supervision of the FBI for three and a half months.  They had communicated by phone and text over forty times in that time-period, and had at least one in-person meeting.

The events that occurred on December 9 are pivotal in this case.  DeCicco became incensed by comments he heard that Mirnasiri had made about him and his family.  At 11:48 a.m., he called Rick Scourtas, a close friend of Mirnasiri, but was unable to reach him and left a voicemail.  He then immediately called Mirnasiri at 11:49 a.m., and left a voicemail for him.  At that time, Mirnasiri was on a 4-minute call (apparently with Fred Varone).  At 12:03 p.m., Mirnasiri checked his voicemail.

Later that afternoon, Mr. DeCicco finally connected with Mr. Scourtas.  In a recent interview with the FBI, Mr. Scourtas confirmed having a call with Mr. DeCicco in which he was quite angry with Mirnasiri.  Mr. DeCicco insisted that Mr. Scourtas call Mirnasiri and deliver a

message that his buddy "gotta keep his mouth shut," and was to stop talking badly about Mr. DeCicco. Ex. 3 at 3. Mr. DeCicco did not tell Mr. Scourtas why he was angry with Mirnasiri, but wanted Mirnasiri to know that he was sending the message to him through Mr. Scourtas. Mr. Scourtas agreed to make the call to Mirnasiri.

Mr. Scourtas later spoke with Mirnasiri. Telephone records show that on December 9, at 4:09 p.m., there was an 11-minute call between Mirnasiri and Mr. Scourtas. Mr. Scourtas conveyed Mr. DeCicco's message to Mirnasiri, who responded by telling him that he (Mirnasiri) would do whatever he wanted to do. Ex. 3 at 3. Mirnasiri has confirmed the substance of Mr. Scourtas' call to him. In the grand jury, Mirnasiri testified that Mr. Scourtas called him to deliver a personal message from DeCicco. Ex. 8 at 47:5-6. Mr. Scourtas said that Mr. DeCicco was very angry and very upset. Ex. 8 at 47:10. While Mirnasiri did not recall Mr. Scourtas' exact words, in substance, Mr. Scourtas delivered the message that (1) Mirnasiri was to keep quiet and stop talking about him; (2) he was to stop lying about Mr. DeCicco; (3) Mirnasiri was to shut the hell up; and (4) Mirnasiri was talking too much, and he'd better stop talking about Mr. DeCicco. Ex. 8 at 47:6-12. On another occasion, Mirnasiri described the message as to shut the hell up, to not call or contact Mr. DeCicco, and to stop talking shit about him. Dkt. No. 35-13 ¶ 21. Mirnasiri has informed the FBI that the call was approximately one month before his assault. Ex. 14 at 1.

The recently produced telephone records show that immediately after Mirnasiri's call with Mr. Scourtas ended, he exchanged three text messages with Agent Chizmadia, at 4:21 p.m., 4:36 p.m., and 4:57 p.m. In the midst of those text messages, there was a 7-minute call between Mr. DeCicco and Mr. Scourtas, which began at 4:29 p.m. According to Mr. Scourtas, Mr.

DeCicco called him back to learn whether he had spoken with Mirnasiri.  Mr. Scourtas confirmed that they had spoken, but did not tell Mr. DeCicco what Mirnasiri had said.

From 6 p.m. to approximately 7:15 p.m., a critical series of calls occurred ending with what clearly appears to be Mirnasiri's attempt to record a call with DeCicco under the direction of Agent Chizmadia.   First, at 6:00 p.m., Mr. Scourtas had another call with Mirnasiri lasting 12 minutes.  Shortly thereafter, at 6:25 p.m., Mirnasiri called Agent Chizmadia and they spoke for 6 minutes.  Mr. Scourtas then called Mr. DeCicco at 6:41 p.m., and they had an 11-minute call.  At 6:59 p.m., Mirnasiri called Mr. Scourtas and they spoke for 15-minutes.  Once Mirnasiri finished speaking with Mr. Scourtas, he immediately called Agent Chizmadia for another 2-minute call.  Following his call with Agent Chizmadia, Mirnasiri then called Mr. DeCicco, and left a 3-minute voicemail.  Mirnasiri testified about the voicemail in the grand jury.  He claims he said, "Gary, I did not make these comments." Ex. 8 at 48:3-4.  According to Mirnasiri, he knew DeCicco had a bad temper, and he did not want to be on his bad side.  *Id.* at 48:3-4.  Mirnasiri then sent a text message to Agent Chizmadia, stating:  "He didn't answer and it went to voice mail.  I did leave him a message."  Agent Chizmadia replied, "Ok, let me know if he calls back, I will touch base in the morning."   The next day, Agent Chizmadia called Mirnasiri, and they spoke for 5 minutes.

Contrary to normal FBI operating procedure, Agent Chizmadia did not prepare a report of the critical events that occurred on December 9, even though he clearly was integrally involved in advising Mirnasiri and monitoring the activity.  The critical voice mail that DeCicco left for Mirnasiri was not preserved—at least it has never been produced.  The important voicemail that Mirnasiri left for DeCicco evidently was not recorded, despite the fact that Agent Chizmadia spoke with Mirnasiri immediately before he placed the call.  But even if it was recorded, it has

never been produced.  Apparently, none of the calls between Mirnasiri and Mr. Scourtas were recorded, despite his key role as an intermediary between Mirnasiri and Mr. DeCicco in what obviously was an intense personal dispute having nothing to do with AEG or the alleged "partnership" story.  Agent Chizmadia did not even prepare a contemporaneous FBI Form 302 reports of any events in December.  For that matter, based on the government's production to date, Agent Chizmadia failed to prepare reports of any of his interactions with Mirnasiri dating back to August 27, 2014.  It appears as though the FBI was running a stealth investigation with a former informant seeking to obtain evidence against a significant target without creating a paper trail.

The first documented contact between Mirnasiri and Agent Chizmadia was on December 28, 2014, when Agent Chizmadia interviewed him.  But even so, Agent Chizmadia did not generate a contemporaneous report of that interview.  Rather, it appears that he first drafted the scant report, which provides virtually no details, on October 9, 2015, about 10 months later.  And it is now clear that while the government has consistently maintained that this was the first time the FBI "talk[ed] to" Mirnasiri regarding this case, that statement is patently false.  *See* <u>Ex. 15</u> at 30:13-20, *see also* Section IX, *infra*.

**VII.    The FBI's Continued Investigation After Assault**

On January 11, 2015, Lundrigan assaulted Mirnasiri at AEG.  The Saugus Police responded to the scene.  The FBI went to AEG the following day to conduct a forensic analysis of the scene, collecting specimens of physical evidence.  *See* <u>Ex. 16</u>.

**A.    The Continued, Purported, and Now Selective Failure to Request Mirnasiri's Phone Records**

As the investigation proceeded, the U.S. Attorney's Office and the FBI sought and obtained telephone records of virtually all of the key witnesses but one—Mirnasiri.  Law

enforcement obtained telephone records of Mr. DeCicco, the Atlantis Marina (Mr. DeCicco's work phone), Kim DeBenedictis, Lundrigan, Witham, Prime, and likely others. *See* Ex. 17. The inclusion of Ms. DeBenedictis's records is particularly notable, given her involvement solely in the flower delivery incident, but not the assault.

### B.      The February 11, 2015 Interview of Mirnasiri by FBI Agent Chizmadia

On February 11, 2015, one month after the assault, Agent Chizmadia interviewed Mirnasiri. *See* Ex. 16. The only apparent official record of this interview is what appears to be a composite FD-302 Report ("302 Report") that was prepared on October 9, 2015 but not finalized until March 16, 2017, the same day the government filed for its Criminal Complaint (The "Second 302 Report"). *See also* Section VIII.A, *infra*. The entry for February 11, 2015 read in its entirety:

> February 11, 2015 – Mirnasiri reported being assaulted by an Unidentified White Male (UWM1) on January 11, 2015 in his place of business, AUTO EXCELLENCE GROUP. As a result Mirnasiri's jaw was broken and wired shut. Mirnasiri provided the writer with video footage of the assault that was captured by Mirnasiri's security cameras at Auto Excellence Group.

This information was described as provided during one of "four (4) separate occasions as it related to potential threats received by Mirnasari [sic] from GARY DECICCO as well as an assault on Mirnasari [sic] allegedly orchestrated by DECICCO." Ex. 16. The issue with this Second 302 Report is discussed in more detail in Section VII.A, *infra*.

### C.      The FD-1057 Laboratory Forms Reflecting Inconsistent and Exculpatory Explanation for the Assault

On February 16, 2015, less than a week after he had interviewed Mirnasiri, Agent Chizmadia prepared a Form FD-1057 Laboratory report. Ex. 2. This report contained highly exculpatory evidence under *Brady*, but was not produced to the defense until February 12, 2018. Significantly, the report contains a statement from Mirnasiri that completely contradicts and

undermines the government's theory of the case:  that Mr. DeCicco attempted to extort Mirnasiri

because he wanted to be Mirnasiri's partner and a co-owner of AEG.  The report stated that

Mirnasiri attributed the assault to an outstanding debt he owed to Mr. DeCicco:

> It is believed that the assault was arranged by the same subject of the above-captioned investigation **in response to an alleged debt owed by the cooperating witness to the subject** (emphasis supplied).

The subject referenced in the report is DeCicco.  *Id.* at 2.  Agent Chizmadia made no reference—

*none*—to an attempted extortion over an ownership interest in AEG being the reason for the

assault.  Moreover, on November 10, 2015, Agent Chizmadia prepared another FD-1057, again

repeating that the assault was believed to be "in response to an alleged debt owed by the

cooperating witness to the subject." Ex. 18.  Both reports indicate the "full investigation" was

initiated on July 6, 2011.

### D.     The Interview of Mirnasiri by the FBI and the IRS on January 17, 2017

On January 17, 2017, Agent Elio and IRS Special Agent Sandra Lemanski interviewed

Mirnasiri about the alleged extortion.  *See* Dkt. No. 35-13.  The purpose of the interview was to

ask Mirnasiri "about information that he provided to the Saugus Police Department on August 4,

2014 relating to a flower delivery."  Dkt. No. 35-13 at ¶ 2.  The agents inquired about the

"incident with DeCicco that [Mirnasiri] was referring to in the police report"—referencing

Mirnasiri's answer to Det. Morello question on August 4, 2014 about "prior incidents of similar

harassment."  Mirnasiri answered that it concerned "their disagreement over DeCicco not paying

for the paving of the dealership." *Id.* at ¶ 23; *see also* Ex. 1.  The agents did not appear to ask

Mirnasiri how that dispute constituted Mr. DeCicco's "harassment" of him given that he was

describing a contractual dispute in which *he* was asking Mr. DeCicco for money.  Nor did they

appear to ask what Mirnasiri meant when he stated that he "contacted the FBI" about the dispute,

or what he meant when he said "it stopped shortly after." Ex. 1.

**VIII.   The Criminal Complaint and the Government's Affidavits in Support of the Pleadings and in Support of Pretrial Detention**

The FBI reactivated Mirnasiri as a source in July 2015.  The government ultimately decided to charge Mr. DeCicco by way of a Criminal Complaint filed on March 16, 2017.  *See* Dkt. No. 3.  The Complaint was supported by Agent Elio's affidavit.  *See* Dkt. No. 3-1.

**A.   The Government's Preparation of Misleading FBI FD-302 Reports to Support the Criminal Complaint**

Agent Elio's affidavit, dated March 16, 2017, was apparently prepared in reliance of a 302 Report that was prepared by Agent Chizmadia, referenced here as the Second 302 Report. As described earlier, the Second 302 Report purported to include four occasions on which Mirnasiri provided information to Agent Chizmadia about the purported threats from Mr. DeCicco as well as "an assault on Mirnasiri allegedly orchestrated by DECICCO."  *See* <u>Ex. 16</u>. The earliest contact described between Mirnasiri and Agent Chizmadia was on December 28, 2014, when Agent Chizmadia wrote that Mirnasiri described threats he had earlier reported to Saugus Police Department that he believed were from Mr. DeCicco related to CW-1's refusal "to give part" of his business to Mr. DeCicco.  The Second 302 Report went on to document the collection of evidence on January 13, 2015, the interview with Agent Chizmadia on February 11, 2015, and the identification of James Lundigran as the assailant via photo array on October 2, 2015.  The Second 302 Report did not reference any of the other 46 points of contact between Mirnasiri and Agent Chizmadia prior to December 28, 2014.

As noted, the "Date of Entry" of the Second 302 Report is March 16, 2017, the same day the government filed the Criminal Complaint.  *See* Dkt. No. 3.  The "Date of Investigation" and "Date Drafted," however, are October 2 and 9, ***2015***, respectively—almost 18 months before the "Date of Entry."  The FBI's internal policies and procedures governing the preparation of FD-302 reports require that "the preparation of the FD-302 should be effected ***within five days***

*following the final interview session*." Ex. 19, FBI Manual of Administrative Operations and

Procedures (MAOP), Part 2, Section 10-13.3 (emphasis supplied).

Before receiving the Second 302 Report in discovery, the defense was first provided with

another version of this 302 Report, dated one day earlier on March 15, 2017 (the "First 302

Report"). Ex. 20. The First 302 Report differs from the Second 302 Report in a few notable

respects, including recounting that Mirnasiri "provided information on *three* separate occasions"

(instead of four). The First 302 Report also did not contain the entry concerning the January 13,

2015 visit to AEG to collect evidence, which appeared to have been inserted sometime between

March 15 and March 16, 2017, over two years later. Critically, the key phrase in the preamble in

the Second 302 Report describing "an assault on Mirnasiri *allegedly orchestrated by*

*DECICCO*," is missing on the March 15 version. The "Date Drafted" on the First 302 Report

was not altered, however, remaining at October 9, 2015. Absent metadata and supporting notes,

the defense is unable to ascertain when either 302 Report was drafted, revised, altered, and/or

entered into the investigative file.[9]

### B.   The Government's Preparation of Affidavits In Support of the Criminal Complaint and Motion for Detention

On March 16, 2017, the same day the Second 302 Report was being revised and

finalized, Agent Elio used it to prepare his affidavit to support the Criminal Complaint, which

was filed later that day. *Compare* Ex. 16 *with* Dkt. No. 3-1 at ¶ 13, n.2. Much of the affidavit is

based on information provided by Mirnasiri to the Saugus Police and to the FBI, particularly

Agent Chizmadia and Agent Elio. To bolster his affidavit, Agent Elio stated that Mirnasiri "has

---

[9] The government represented to the defense the First 302 Report was a "draft" of the Second 302 Report. The government did not offer an explanation why a "draft" would have been revised on March 16, 2017, over 18 months after the report was first drafted on October 9, 2015. The government has also represented that there is no metadata available.

no criminal history and I am not aware of any information that would adversely affect the credibility of CW-1's information." Dkt. No. 3-1 at ¶ 5. Agent Elio also relied heavily on his analysis of telephone records, "wherever possible," to corroborate the information provided by cooperating witnesses Lundrigan and Witham, and Agent Elio used these records to prove the connections between Lundrigan, the assailant, and Witham, Prime, and Mr. DeCicco around the time of the assault. *See, e.g.*, Dkt. No. 3-1 ¶¶ 17, 20, 23.

## IX.  The Government's Representations About Its Investigation During the Detention Proceedings

The government moved to detain Mr. DeCicco pretrial. Dkt. No. 18. The detention hearing was later reopened after a hearing on the defendant's motion to reopen detention hearing. *See* Dkt. Nos. 34, 83, 119. During these hearings, the government made a series of representations that have since been shown to be inaccurate in light of recent productions of evidence.

### A.  The Government's Representation that the FBI First Talked to Mirnasiri on December 28, 2014

Consistent with the timeline inferred from the Second 302 Report, the government has repeatedly represented throughout multiple hearings that the first contact between the FBI and Mirnasiri with respect to the investigation in this case was on December 28, 2014. This representation was deliberately made to support the government's argument that the strength of its extortion case should not be discounted because it did not have time to deploy its customary investigative techniques of interviews, consensually recorded calls, body wires, or Title III wiretaps, in the period between Mirnasiri's interview with Agent Chizmadia on December 28, 2014, and Mirnasiri's assault on January 11, 2015. For example, on October 5, 2017, the government argued that "the FBI goes and talks to [Mirnasiri] in December of 2014 before he's beaten . . . the fact that they didn't wire him up between the end – I think it was December 28

and the day he gets beaten on January 11" should not have been held against the government's

case.  Ex. 21 at 67:9-15.  The government also had the following colloquy with the Court:

| | |
|---|---|
| THE COURT: | **Right.  I'm considering the strength of the evidence as to the charge in the indictment and not does it make out some other charge.** |
| | . . . |
| | Tell me if this is in the record.  I'm thinking of the Exhibit 1, the police report.  Do they at some point interview Kim DeBenedictis, or do they just go with the photo array that's shown to the woman who works at the flower shop in Lynn? |
| GOVT: | They don't.  They turn it over to the FBI, Your Honor. |
| THE COURT: | Okay.  So Kim DeBenedictis is not interviewed. |
| GOVT: | Not by Saugus P.D. |
| THE COURT: | Is she interviewed by the FBI when it goes from Saugus P.D. to the FBI? |
| GOVT: | **No.  There was no time in there, Your Honor, before he got assaulted.** |
| THE COURT: | All right. |
| GOVT: | **I think he was interviewed December 28.  The assault was January 11.  So it was over the holidays.** |
| THE COURT: | All right. |

Ex. 21 at 73:17-74:15 (emphasis added).

On November 3, 2017, the government pressed this point multiple times, stating that,

> **Between the time when the FBI interviews CW-1 and the time when he's beaten, it's 13 days**, and that includes New Year's and Christmas vacation.  They simply didn't have a chance to pursue this investigation before Mr. DeCicco took matters again into his own hands.

Ex. 15 at 55:24-56:5 (Nov. 3, 2017); and:

| | |
|---|---|
| THE COURT: | Oh, in other words, the threats were not on December 28.  He's simply reporting it on December 28, because that's when's interviewed. |

| GOVT: | Yes, Your Honor.  Saugus P.D., the task force officer, he turns it over to the FBI, and **they ultimately get to talk to CW-1 on December 28**; and therein, |
| THE COURT: | Okay. |
| GOVT: | -- there he recounts that he's received threats that he believes are from Mr. DeCicco and his associates. |

Ex. 15 at 30:10-20 (emphasis added).

As Mirnasiri's phone records now show, he was in contact with Agent Chizmadia concerning this case as early as August 27, 2014, and certainly no later than October 8 and 9, 2014, when his records show him calling Agent Chizmadia immediately after finishing a call with DeCicco.

### B.   The Government's Representation that Mirnasiri and Mr. DeCicco Did Not Talk between August 4, 2014 and January 11, 2015

In addition to representing that the FBI did not talk to Mirnasiri before December 28, 2014, the government also represented that Mirnasiri and Mr. DeCicco did not talk to each other between the flower incident and the assault.  This representation was in support of the government's theory that the only interactions that Mirnasiri had with Mr. DeCicco during that time related to the supposed ownership dispute of AEG, providing the straight-line inference as to the intent behind the January 11 assault.  In truth, Mirnasiri and Mr. DeCicco spoke regularly between August 4, 2014 and January 2015:  constructively and antagonistically at various times, given their complex, neighborly relationship and rivalry.  Indeed, after sending the flowers, Mr. DeCicco called Mirnasiri the very next day, explaining that he was behind it and was entirely unapologetic about it.[10]  Yet the government represented, in response to a direct question about the interactions between Mr. DeCicco and Mirnasiri between the delivery of flowers and the assault, that they had no contact:

---

[10] Mirnasiri did not mention to the Saugus Police that he had talked with Mr. DeCicco to the Saugus Police the day before when he was being interviewed on August 6; he did, however, then report that Mr. DeCicco purportedly wanted to be partners with him in AEG.  It was later that month that Mirnasiri repeatedly attempted to contact Agent Chizmadia.

THE COURT:   All right.  One of the things I'm going toward is this.  **The flowers are sent in August.  It sounds like right after the dealership opened.  And the assault is on January 11.**

**My question is what's going on in the interim?**

GOVT:   He's doing business, Your Honor.  And he hasn't paid attention to the threat.  **He's not talking to Mr. DeCicco.**  He's not giving him a piece of the business.

Ex. 15 at 31:17-25.

### C.   The Government's Representation that the FBI Approached Mirnasiri, and Not the Other Way Around

Finally, the government represented in briefing and during argument that Mirnasiri was approached by the FBI in this investigation, and not the other way around, to support its argument that Mirnasiri did not manipulate law enforcement, nor was he vindictive, nor biased against Mr. DeCicco.  The government wrote in its opposition brief to reopening the detention hearing:

> Defendant's assertion that CW-1 "manipulates law enforcement" is argument, not evidence . . . In fact, CW-1 did not report Defendant's attempts to get a piece of CW-1's dealership initially. Even after receiving the flowers and threatening note on August 4, 2014, CW-1 did not identify Defendant as the possible culprit until after Saugus Police obtained a description of the woman who purchased the flowers . . . Only then, when asked why he thought Defendant would have sent the flowers and threat, did CW-1 tell Saugus Police that Defendant wanted to be a partner in the business . . . There is no evidence that CW-1 knew this information would render the case a federal Hobbs Act extortion case, and in fact it was the Saugus Police who referred the case to the FBI, not CW-1. . . . ***The FBI subsequently reached out to CW-1 about the incident, not the other way around.*** The actual facts of this case do not support Defendant's baseless and repeated allegation that CW-1 is "vindictive," or that he reported this incident to the FBI in order to punish Defendant.

Dkt. No. 87 at 16 (emphasis in original).  The government tried to drive this point home during the final detention hearing, arguing:

> I think what Mr. Sheketoff said is he should have known immediately that this was a federal extortion and reported it to the FBI.  What he did was as soon as he got the flowers, he reported it to the Saugus P.D.  He wasn't working for the FBI at the

time.  That's who you report getting a threat . . . you report it to the Saugus P.D.  ***It was the Saugus P.D. that called the FBI when they realized that this could be a federal crime . . . And then the FBI goes and talks to [Mirnasiri]*** in December of 2014 before he's beaten[.]"

Ex. 15 at 66:22-67:6 (emphasis added).  Yet Mirnasiri's phone records are strongly indicative that these representations were not true:  after the flower delivery but before Saugus PD referred the case to the FBI, it was ***Mirnasiri*** who repeatedly contacted Agent Chizmadia, not the other way round.  *See* Section V, *supra*.

## X.     The Government's Failure to Produce or Suppression of Material and Exculpatory Evidence During Pretrial Discovery

While the automatic discovery rules in this district mandate that the government produce documents and things that are required to be produced under Fed. R. Crim. P. 16(a) without need for a request from the defense, the defense has indeed made specific requests for (1) Mirnasiri's phone records; (2) Mirnasiri's communications to others regarding Mr. DeCicco, including specifically communications with the FBI; and (3) notes and the information therein underlying Agent Chizmadia's various, inconsistent reports of interviews of Mirnasiri.  *See* Ex. 5.

The government did not produce Mirnasiri's phone records until May 17, 2018, and when it did, they were incomplete.  The defense did not obtain a complete set of Mirnasiri's phone records until May 22, 2018, the day before the final pretrial conference.

The circumstances under which Mirnasiri's phone records were sought and produced in this case are troubling.  First, the government represented that it never was in possession of Mirnasiri's phone records, stating that they (1) subpoenaed the wrong phone number; and, regardless, (2) subpoenaed the phone records too late, in April 2017,[11] because the provider

---

[11] The government inexplicably waited until after the charges were filed in March 2017 before subpoenaing this evidence in April 2017.

overwrites the records after 24 months (making August 2016 the latest that the government could have sought to obtain them).  But the government had been working with Mirnasiri directly in this case since August 27, 2014 (when they first made contact), or December 28, 2014 (when Mirnasiri was interviewed), or July 2015 (when he was re-opened as a CHS).[12]  The government also had been diligent in subpoenaing the phone records of every other conceivable witness in this case, including Mr. DeCicco, Prime, Witham, Lundrigan, Scourtas, and DeBenedictis, to name a few.  But for whatever reason, the FBI purportedly determined not to obtain Mirnasiri's phone records, in a case that involved threatening phone calls in the context of a potential extortion.

Second, on May 4, 2018, when the defense sought the government's assent to file a motion for a Rule 17(c) subpoena for Mirnasiri's telephone records, the government readily gave its assent.  The defense filed the assented-to motion on that same day.[13]  *See* Dkt. No. 180.  But then, unbeknownst to the defense, the government filed its own subpoena to T-Mobile seeking the same records.  *See* Ex. 23.  And on May 17, 2018, the government produced Mirnasiri's phone records to the defense.  The production contained a cover document from T-Mobile purporting to report that "no records were found" for Mirnasiri's number.  *See* Ex. 24.  Consistent with the reply that the government had received from T-Mobile in response to its April 2017 grand jury subpoena, T-Mobile explained that it overwrites its records after 24 months.  Yet the 2014-2015 records accompanied the May 2018 subpoena response.

---

[12] The defense understands that Mirnasiri has been using the same mobile phone from 2014 until the present.

[13] The defense ultimately subpoenaed the wrong provider and obtained no records in response to its Rule 17(c) subpoena, believing from investigation that Mirnasiri's phone provider was Tracfone/Omnipoint, a prepaid phone service.

Third, the production on May 17, 2018 was incomplete.  The phone records that were missing coincided with the most critical juncture of the case:  the January 8, 2015 statement, which would have reflected records for December 9, 2014-January 8, 2015, shortly before the January 11, 2015 assault.  Instead of the January 8, 2015 statement, however, the December 8, 2014 statement was produced in its place, and therefore was produced *twice*, making it difficult on a preliminary review to discern that the section was missing.  *See* Ex. 26 (comparing USAO_DECICCO_00025283 with USAO_DECCICCO_00025321).  When confronted about this irregularity, the government agreed to "follow-up" with T-Mobile, and within 48 working hours, the government produced the missing statement.  *See* Ex. 12.

Given these myriad issues, on the evening of May 23, 2018, the defense requested to inspect the originals of the production.  On May 24, 2018, the government represented there was "nothing to inspect" because the records were produced by T-Mobile to the government electronically rather than in hard copy.  *See* Ex. 7.  The government then forwarded the apparent production emails from T-Mobile to the defense for reference, but given the time restraints, the defense has been unable to obtain any independent forensic review of the records.  *See* Ex. 28. The government has since been interviewing telephone providers and producing additional telephone record and other information throughout the morning of May 24, 2018—at this eleventh hour, almost five years after the beginning of the relevant time period.  *See* Ex. 29

### A.    The Failure to Produce Mr. DeCicco's Recorded Statements

To this day, the government still has not produced critical statements made by Mr. DeCicco in the months between the flower delivery and the assault, which were due with automatic discovery on May 26, 2017.  *See* Fed. R. Crim. P. 16(a)(1); L.R. 116.1, 116.2.  These statements include at least one, arguably case-dispositive voice message that Mr. DeCicco left in Mirnasiri voice mailbox on December 9, 2014, directly preceding Mirnasiri's assault.  In this

voice message, Mr. DeCicco told Mirnasiri that he had heard about Mirnasiri's backstabbing and gossip, and strongly and profanely advised Mirnasiri to stop talking about him and his family, or else he would "beat the sh*t out of" him.  No reference is ever made to AEG, or wanting to be a partner in AEG, or wanting to be a partner with Mirnasiri.  The records show that, after Mirnasiri retrieved his voice messages (including Mr. DeCicco's message) on December 9, Mirnasiri *called Agent Chizmadia repeatedly*.  Then, immediately after hanging up on his second call with Agent Chizmadia, Mirnasiri called Mr. DeCicco and left him a voicemail lasting 3 minutes.  He then immediately texted Agent Chizmadia, reporting back that he had left Mr. DeCicco a voicemail.  A similar exercise occurred on October 8, 2014.  *See* Section V, *supra*. Given these circumstances, it is strains credulity that the FBI never took possession, custody, or control of Mr. DeCicco's statements, especially with a cooperating witness in Mirnasiri.  But the government has not produced them.

### B.    The Selective Failure to Produce Mirnasiri's Communications with the Government

The government's production of Mirnasiri's communications with Agents Elio and Chizmadia are incomplete based on Mirnasiri's phone records.  The communications produced with respect to Agent Chizmadia begin on January 12, 2015, the day after Mirnasiri's assault. The defense now understands, however, that Agent Chizmadia and Mirnasiri began text messaging in September 2014.  *See* Ex. 22.  During the May 23, 2018 hearing before the Court, the government acknowledged that there may be earlier text messages within its possession.

On May 24, 2018, the government produced Agent Chizmadia's text messages with Mirnasiri from 2014, stating they were "inadvertently omitted."  *See* Ex. 27.  The texts appear to show Mirnasiri leaving voicemails with Agent Chizmadia, and also meeting with him in person. *See* Ex. 13.

### C.      The Failure to Interview or Review Information with Agent Chizmadia

During the pretrial conference, the government admitted that it had not spoken with

Agent Chizmadia, even though he was noticed on the defense's witness list and trial was less

than one week away.  (Agent Chizmadia was not noticed on the government's witness list.)  The

government expressed surprise that there were such a high number of text messages and calls

before December 28, 2014, but offered several possible benign—but implausible—explanations:

(1) Mirnasiri may not have been talking about Mr. DeCicco; (2) Mirnasiri and Agent Chizmadia

may not have been talking substantively at all, but instead the short calls were perhaps to set up

meetings; (3) Agent Chizmadia was simply exploring, over 5 months, whether Mirnasiri was

suitable or willing to serve as a confidential human source.  This ignores, however, that it was

Mirnasiri who first initiated contact with the FBI after the flower delivery, on August 27, 2014.

Moreover, given that Mirnasiri was not a CHS at the time, it was entirely improbable that the

communications were unrelated to Mr. DeCicco.  Indeed, the obvious reading of the phone

records—especially on October 8, October 9, and December 9, 2014—was that Agent

Chizmadia was closely supervising, if not instructing the communications Mirnasiri was making

to Mr. DeCicco.

### D.      The Irregular and Untimely Production of Other Key and Exculpatory Documents

Finally, the production of various (and invariably) exculpatory pieces of evidence have

been untimely, irregular, or both, as follows:

### 1.      <u>The March 2017 FBI 302 Reports</u>

The First 302 Report produced with automatic discovery on May 26, 2017 was troubling

on its face, but it was not until the late production of the complete, Second 302 Report that the

irregularity became more acute.  At the defense's request, the government produced the Second

302 Report on March 26, 2018.  The Second 302 Report was produced in the middle of a Bates range, however, that was responsive to a different request that had sought documents about the alleged incidents of August 4-6, 2014, including deliveries of flowers, pizza, and alleged anonymous threatening calls.[14]  Ex. 20.  In response to the defense's request for drafts and metadata pertaining to the First 302 Report, the government declined to produce, arguing that it "is not required to provide such information under Local Rule 116.1(c)(1) and Local Rule 116.2(b)(1)." Ex. 32.

The defense then requested production of the missing page of the report, as well as any metadata, drafts, and notes related to this and other 302 Reports based on (1) the incompleteness of the report; (2) the inexplicable 18-month delay between the alleged drafting of the report and its entry into the investigative file; (3) the suspicious and questionable timing of the "date of entry" one day before the filing of the Criminal Complaint; (4) the absence of any other law enforcement reports in the production—whether 302 reports, agent notes, or other reports—contemporaneously documenting the 2014 and 2015 events described in the First 302 Report; and (5) the apparent violation of FBI policy evidenced by this delay and the FBI's apparent failure to prepare separate 302s for each interview of a confidential source. The defense also requested all documents, reports, and notes within the government's possession that pertain to the interviews that the Agent Chizmadia and TFO Frenzo conducted with Mirnasiri in 2014 and 2015.  During the hearing on the defense's Motion to Compel on May 10, 2018, the government represented that there was no metadata, and agreed to review Agent Chizmadia's notes and turn over any information that reflect inconsistent statements.

---

[14] The Second 302 Report contains no reference to the August 4-6, 2014 incidents, making its production in the midst of documents responsive to a request relating to those incidents puzzling.

On May 21, 2018, the government reported that it had completed its review and was not required to produce anything.  *See* Ex. 30.  However, during the afternoon hearing on May 23, the government admitted that it had not recently spoken with Agent Chizmadia, and expressed uncertainty about the scope of his role in the investigation of the alleged crime at issue in this case, despite the fact that trial was merely days away and he was expected to be called as a witness.

### 2.     The FD-1057 Laboratory Forms

Automatic discovery was scheduled to be produced on May 26, 2017.  On February 12, 2018, the government provided a "supplement" to the automatic discovery that included reports of examinations and tests that the government concedes that the defense was entitled to under Fed. R. Crim. P. 16(a)(1)(F), but were "inadvertently omitted from prior productions in this case."  Included in this supplemental automatic discovery were two Form FD-1057 laboratory forms, dated February 17, 2015 and November 10, 2015 (the "Laboratory Forms").  Ex.2; Ex. 18.  The Laboratory Forms both stated that the January 11, 2015 assault against CW-1 was believed to be "in response to an alleged debt owed by the cooperating witness to the subject." Ex. 2 at 2; Ex. 18 at 2.

### 3.     Telephone Records

Aside from Agent Chizmadia's 2014 text messages with Mirnasiri, Mr. Scourtas's phone records—which are centrally relevant to the events of December 9, 2014, described *supra*—were also "inadvertently" produced late on May 16, 2018.  *See* Ex.31.

## ARGUMENT

**I.    Dismissal of the Indictment With Prejudice Is Warranted In Light of the Government's Bad Faith Destruction of Critical Exculpatory Evidence**

The defense seeks dismissal of the indictment, with prejudice, because Mr. DeCicco has suffered grave prejudice as a result of "outrageous government conduct . . . [that] amounts to a due process violation." *United States v. Chapman*, 524 F.3d 1073. 1084 (9th Cir. 2008) (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)).  The government has (1) destroyed exculpatory evidence; (2) made multiple, material misrepresentations to the Court in support of its motion to detain Mr. DeCicco pretrial; (3) withheld exculpatory evidence until the eve of trial, and (4) deliberately failed to investigate facts—and one can only infer because it knew that the evidence uncovered would have been exculpatory.  *See Brady v. Maryland*, 373 U.S. 83 (1963).  The circumstances in this case meet the First Circuit's standard, where dismissals should be ordered where there is "serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process."  *See United States v. Rivera-Santiago*, 872 F.2d 1073, 1088 (1st Cir. 1989).  In its zeal to pursue Mr. DeCicco, the government has thrown its lot in with Mirnasiri:  an inveterate liar with a vindictive streak, a deep animus against Mr. DeCicco, and a track record of manipulating or exploiting law enforcement to settle business and personal disputes, evidence of which was plainly before the government's view.  The government has lost sight of its duty to safeguard the constitutional rights of the accused to a fair trial, an effective defense, and an equal application of the law.

As a result of a badly-distorted judicial process, Mr. DeCicco has spent over one year in pretrial detention, deprived of his liberty upon a liar's uncorroborated say-so and the government's acquiescence.  He has been wrongly isolated from his family, who rely on him for financial and emotional support.  His businesses and projects have suffered from his absence,

causing him financial harm.  And this does not even begin to scratch the surface of the prejudice

that Mr. DeCicco has suffered in the preparation of his defense in his criminal trial resulting

from the government's mishandling of evidence, of Mirnasiri, and of the entire investigation

itself.  Nothing but dismissal of the indictment would begin to redress these harms.

A.     **The Government's Spoliation of Exculpatory Evidence Is a *Youngblood* Violation and, Standing Alone, Warrants Dismissal**

First, the government knowingly destroyed the voicemails that Mr. DeCicco left for

Mirnasiri on December 9, October 8, and October 9, 2014.[15]  These voicemails would have

gutted the government's theory of the case because they would show that, shortly before

Mirnasiri was assaulted, Mr. DeCicco was incensed at Mirnasiri because of his unceasing

smearing of Mr. DeCicco and his family members.  Not only did Mr. DeCicco openly express

his disdain and revulsion of Mirnasiri to Mirnasiri himself, making it unlikely that he would have

wanted to seek a partnership with him, the voicemails portended the reason for the violence that

followed, taking this case squarely out of federal reach.  *See Scheidler v. NOW, Inc.*, 547 U.S. 9,

15-16 (2006) ("We hold that physical violence unrelated to robbery or extortion falls outside the

scope of the Hobbs Act.").  These voicemails—and particularly the December 9, 2014 voicemail,

given its proximity in time to Mr. DeCicco's outreach to Jeffrey Prime and the January 11, 2015

assault—are nothing if not exculpatory, and their destruction was massively prejudicial to the

defense.

In *Femia*, the First Circuit fashioned a three-part test from *Youngblood* and *Trombetta* to

establish when a constitutional violation is at issue as a result of the destruction of evidence.

First, the evidence "must possess an exculpatory value that was apparent before the evidence was

---

[15] Mr. DeCicco also left a voicemail for Mirnasiri on August 5, 2014, the day after the flower delivery.  The government has failed to produce that voicemail too.

destroyed," second, the defendant is "unable to obtain comparable evidence by other reasonably available means," and third, "bad faith" on the part of law enforcement.  *United States v. Femia*, 9 F.3d 990, 993 (1st Cir. 1993) (quoting *Trombetta*, 467 U.S. at 488-89 and *Youngblood*, 488 U.S. at 58).  These factors are amply met here.  First, the voicemails possess clear exculpatory value, as already explained above.  Second, the defendant is unable to obtain comparable evidence.  The voicemails were contemporaneous snapshots and best evidence of Mr. DeCicco's state of mind at the time he left them, and only the recipient, Mirnasiri—and anyone with access to Mirnasiri's voice mailbox—would have had the chance to obtain them.  Any substitute evidence—in the form of witness testimony or otherwise—would not carry the same emotional impact and hallmarks of trustworthiness that the furious voice of Mr. DeCicco's in a live recording would.[16]

Finally, bad faith has been clearly established.  As the late-produced phone records newly show, Agent Chizmadia had access to Mirnasiri for weeks well before the voicemails were left.  Agent Chizmadia interacted with Mirnasiri in real time in reaction to Mr. DeCicco's voicemails in October and December, coaching him on how to respond.  It beggars belief that Agent Chizmadia would not have learned of the content of the voicemails through Mirnasiri's contemporaneous account, through listening to them himself, or most likely:  through collecting them from Mirnasiri's phone, given their central relevance to the conflict between Mirnasiri and Mr. DeCicco.  Having established possession, custody, and control over the voicemails, the government's failure to produce them, as part of automatic discovery, as *Brady* material, or even in response to the defense's direct requests, clearly establishes bad faith.  But to compound bad

---

[16] Moreover, the government is trying to exclude Mr. DeCicco's out-of-court statements reflecting his loathing of Mirnasiri as "self-serving" statements.  *See* Dkt. No. 260.  While these statements would not be not hearsay as they are not offered for the truth of the matter asserted, they would necessarily be more antiseptic and less impactful.

faith further, the government's misrepresentation that the investigation did not begin until

December 28, 2014 gave the Court and the defense the misleading impression that the FBI was

not even involved by October or early December, severely prejudicing the preparation of the

defense and potentially leading to the loss or destruction of the evidence itself.

Even assuming *arguendo* that the conduct here "does not rise to the level of a due process

violation," the Court has the inherent supervisory powers to dismiss the indictment. *Id*.  In order

"[t]o justify dismissal under the Court's supervisory powers, the government's conduct must be

(1) flagrant and (2) cause substantial prejudice to the defendant." *United States v. Fitzgerald*, 615

F. Supp. 2d 1156, 1159 (S.D. Cal. 2009) (citing *United States v. Jacobs*, 855 F.2d 652, 655 (9th

Cir. 1988) and *Chapman*, 524 F.3d at 1085). The government's conduct can be flagrant without

being intentional—"'reckless disregard' satisfies the standard for dismissal. *Jacobs*, 855 F.2d at

655; *Chapman* 524 F.3d at 1085.   The government's contemporaneous access to the voicemails

in 2014—the key exculpatory evidence in this case—and its reckless disregard in allowing them

to be lost or destroyed, easily meets this standard.

**B.**      **The Government's Misrepresentations to the Court Were Knowing, Material, and Violated Mr. DeCicco's Constitutional Due Process Rights, Independently Warranting Dismissal**

Misrepresentations to the tribunal may be considered as a basis for dismissal of an

indictment based on prosecutorial misconduct. *See United States v. Chapman*, 524 F.3d 1073,

1089 (9th Cir. 2008) ("[T]he dismissal was purely intended to sanction the government's flagrant

*Brady/Giglio* and procedural violations and the misrepresentations used to conceal these

violations"). The government violated *Brady* and *Giglio* when it withheld evidence that Agent

Chizmadia and Mirnasiri were communicating from August 2014 until December 28, 2014. The

government then used affirmative misrepresentations to hide that evidence of their pre-December

28 discussions. Were it not for the recent production of Mirnasiri's phone records, which was

obtained from T-Mobile by the government due to the defense's renewed efforts to subpoena

them separately, the government's serial misrepresentations about the investigation and about

Mirnasiri would not have been brought to light.  And were it not for the Court's hearing on May

23, 2018, the additional supplemental productions of exculpatory evidence under *Brady* and

*Giglio* likewise would have remained concealed from the defense. The indictment should be

dismissed as sanctions for the government's flagrant willingness to distort the facts in

proceedings that directly impact the liberty rights of the defendant.

**C.      The Government's Withholding of Exculpatory Evidence Until the Eve of
          Trial Is a *Brady* Violation, Warranting Dismissal**

 "The egregious failure of the government to disclose plainly material exculpatory

evidence in this case extends a dismal history of intentional and inadvertent violations of the

government's duties to disclose in cases assigned to this court." *United States v. Jones*, 620

F.Supp.2d 163, 165 (D. Mass. 2009) (quoting *United States v. Jones*, 609 F.Supp.2d 113, 119 (D.

Mass 2009)) (characterizing "[t]his [as] yet another matter that arises out of 'misconduct

committed by a federal prosecutor who should have known better.'" (citation omitted)).

As argued above, the evidence that was withheld is material, and the withholding of these

materials from the defense has prejudiced its ability to prepare its defense.  For example, were

Mirnasiri's phone records never produced, the defense would have been unable to cross-examine

Mirnasiri or Agent Chizmadia about their extended contact before the December 28, 2014

interview.  Similarly, the defense would have been unable to challenge the holes in the

government's evidence, such as missing notes, 302s, and the lack of basis for the several

misrepresentation sin this case.  Finally, the exculpatory voicemails that were destroyed in this

case have substantially prejudiced the defense's case, as they provided the best evidence of Mr.

DeCicco's intent in this case—the critical element of the attempted extortion charge.  "Under the

Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness.  We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed 'an area of constitutionally guaranteed access to evidence.'" *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532 (1984) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)).  The violation of this right here warrants dismissal of the indictment.

### D.   The Government's Unjustifiably Reckless and Flawed Investigation Violated Mr. DeCicco's Constitutional Rights

While there is no constitutional right to an error-free investigation, "a reckless or intentional failure to investigate other leads offends a defendant's due process rights." *Wilson v. Lawrence Cty.*, 260 F.3d 946, 955 (8th Cir. 2001); *see also* S*anders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992) (denying qualified immunity where evidence could support a finding that defendant had deliberately ignored exonerating information indicating he had arrested the wrong person); *Whitley v. Seibel*, 613 F.2d 682, 686 (7th Cir. 1980) (noting that while negligent acts in an investigation do not violate due process, intentional acts do); *Brockinton v. City of Sherwood, Arkansas*, 503 F.3d 667, 672 (8th Cir. 2007) (plaintiff "must show that [defendant's] failure to investigate was intentional or reckless, thereby shocking the conscience" because negligently failing to investigate further does not violate due process); *Thompson v. Sanborn*, 568 F. Supp. 385, 388 (D.N.H. 1983) (finding issues with investigation included actions beyond simple errors in investigation).  Furthermore, "as the Supreme Court stated, 'the individual prosecutor has a duty to learn any favorable evidence known to others acting on the government's behalf in the case, including the police.'" *United States v. Diabate*, 90 F. Supp. 2d 140, 142 (D. Mass. 2000) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

The government here failed to obtain and investigate Mirnasiri's phone records, a decision made even more egregious by its decision to obtain all other witnesses' phone records. Indeed, the government has conducted extensive analysis of several phone records plans to use them as inculpatory evidence against Mr. DeCicco. *See* Dkt. No. 274. Its decision to refrain from doing the same with respect to Mirnasiri's phone records—and especially given that it may yield exculpatory evidence—offends Mr. DeCicco's due process rights.

In a factually similar case,[17] *Russo v. City of Bridgeport*, law enforcement failed to properly investigate a crime, the government failed to produce exculpatory evidence (both on motion and under their *Brady* obligations), and the prosecuting attorney purposefully remained ignorant of the exculpatory evidence until one day before seeking dismissal of the case, which resulted in an unlawful seven-month incarceration of the defendant. 479 F.3d 196 (2d Cir. 2007). The Second Circuit highlighted three relevant failures on the part of the government that evidenced substantive failures in due process for the defendant: (1) "failure to investigate the tape to see if the tape was in fact exculpatory, [which] would readily support a jury finding of either intentional violation of, or deliberate indifference to, [defendant]'s constitutional rights;" (2) "failure to investigate the tape to see if the tape was in fact exculpatory, [which] would readily support a jury finding of either intentional violation of, or deliberate indifference to, [defendant]'s constitutional rights;" and (3) "failure to follow police procedures with respect to the storage of the exculpatory evidence adds further evidence on the basis of which a jury could find deliberate indifference to [defendant]'s incarceration and to his asserted innocence." *Id.* at 209-10.

---

[17] Although the findings in *Russo v. City of Bridgeport* were pursuant to an action under 42 U.S.C. § 1983, the analysis related to substantive due process violations are still relevant to the misconduct at issue here.

### E.   Taken as a Whole, the Government's Misconduct Necessitates the Dismissal of the Indictment

While each of the categories of misconduct above, standing alone, warrant dismissal of the indictment—whether to vindicate Mr. DeCicco's due process rights or to sanction the government—the combined weight of misrepresentations, *Brady* violations, and spoliation together amply cross the threshold required to order dismissal with prejudice.  *See Chapman*, 524 F.3d at 1089 ("[T]he dismissal was purely intended to sanction the government's flagrant *Brady/Giglio* and procedural violations and the misrepresentations used to conceal these violations").

## II.   If the Court Needs More Information, An Evidentiary Hearing Is Necessary

To the extent that the Court needs more information to rule on this Motion, especially in light of the last-minute, relevant productions from the government mere hours before the defense was due to file these papers, the defense requests an evidentiary hearing to provide the Court with the full picture, insofar as it is able given the circumstances.

## III.   If the Case Is to Proceed to Trial, Relief Is Necessary to Redress the Prejudice Mr. DeCicco Has Suffered as a Result of the Government's Misconduct

### A.   Mr. DeCicco's Pretrial Detention Should Be Reversed

Mr. DeCicco has spent over one year in pretrial detention, deprived of his liberty solely upon Mirnasiri's dubious attestations and the government's eagerness to believe him.  He has been unjustly removed from his family, who depend on him for financial and emotional support. His businesses and projects have suffered from his absence, causing him financial harm.  All of this is aside from the prejudice Mr. DeCicco has suffered in the preparation of his defense in his criminal trial as a result of the government's mishandling of evidence.  Mr. DeCicco should be granted pretrial release to allow him to assist in his defense should this case continue to trial.

### B.      Mirnasiri Should Not Be Allowed to Testify at Trial

The Court should exercise its broad discretion and inherent supervisory powers and disallow Mirnasiri from testifying at trial.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (discussing the Court's inherent supervisory powers). The government has irreversibly tainted Mirnasiri as a witness by concealing and affirmatively misrepresenting Mirnasiri's role in the investigation and prosecution.  Far from the hapless victim and unwillingly participant in this federal investigation, as the government has portrayed him, Mirnasiri was actively involved in recruiting the FBI to investigate Mr. DeCicco and developing evidence against him.  *See* Section IX, *supra*.  But the government falsely represented that the FBI came to Mirnasiri, and further falsely represented that he never spoke to the FBI until December 28, 2014, while in fact he had been setting the stage for carefully-orchestrated contacts with Mr. DeCicco in October and December, all with the help of the FBI.  The government has further ignored the significantly inconsistent versions of the facts of this case as recounted by the so-called victim, including the dubious existence of the threatening calls, the ever-changing timeline of when Mr. DeCicco allegedly made his partnership request, and the non-existent prior report to the FBI establishing the so called pattern of "harassment" that Mirnasiri claims to have suffered.  And yet the government is prepared to put Mirnasiri on the stand, where his testimony represents the lion's share of evidence against Mr. DeCicco.  Any disadvantage to the prosecution of this case that results from excluding Mirnasiri from testifying at trial—which may very well result in dismissal—is an appropriate sanction in relation to the harm caused by the government.

### C.      The Government Should Be Ordered to Review Its Files and Produce All Withheld, Material, and Exculpatory Evidence Immediately

The government should be ordered to thoroughly search its files and the files of the prosecution team and produce all withheld, material evidence immediately, as it should have

done from the beginning of these proceedings.  *See United States v. Agurs*, 427 U.S. 97, 108

(1976) ("[T]he prudent prosecutor will resolve doubtful question sin favor of disclosure.").  The

burden of obtaining and disclosing exculpatory evidence always lies with the prosecution.  *Kyles*,

514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence

known to the others acting on the government's behalf in the case[.]"); *United States v. Osorio*,

929 F.2d 753, 761 (1st Cir. 1991) ("An Assistant United States Attorney using a witness with an

impeachable past has a constitutionally derived duty to search for and produce impeachment

information requested regarding the witness.").

       The government has made multiple assurances throughout this prosecution that it had

reviewed, searched, and produced all relevant, material, and exculpatory evidence, including

notes and electronic devices.  Yet the defense continues to receive today a stream of

supplemental disclosures that were "inexplicably" or "inadvertently" omitted from the

government's prior productions, including the latest disclosure that the government reviewed but

did not produce text messages and emails between Mirnasiri and Agent Chizmadia from

Mirnasiri's phone, even though the government represented *just the day before* that it had

completed review of the content of Mirnasiri's phone, implying that there was nothing further to

produce.  *Compare* Exs. 101 and 102.  This but being one example of a string of similar

"inadvertent" omitted disclosures of material information throughout the prosecution, the

defense can no longer take the word of the government that it has complied with its discovery

obligations.  The government should be ordered by the Court to turn over all withheld material

evidence to allow inspection and independent evaluation of its potentially exculpatory value.

**D.      If the Government Is Unable to Produce All Material Evidence, the Court Should Enter a Punitive Jury Instruction Against the Government for Spoliation**

A spoliation instruction should be entered against the government relating to all material evidence that the government is unable to produce, including the destroyed voicemails of Mr. DeCicco to Mirnasiri in the relevant time period.  *United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010).  "A 'spoliation' instruction . . . is commonly appropriate in both civil and criminal cases where there is evidence from which a reasonable jury might conclude that evidence favorable to one side was destroyed by the other."  *Id.*

## IV.      The Government Should Be Otherwise Sanctioned for this Eve of Trial Ambush

In addition to any or all of the relief requested above, it is within the court's discretion to order any other sanctions it deems appropriate, given the facts of the case. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (citing *Roadway Express v. Piper*, 447 U.S. 752, 765); *see also Hutto v. Finney*, 437 U.S. 678, 689, n. 14 (1978); *see also Jones,* 620 F.Supp. at 167 (considering monetary sanctions to reimburse Court "for at least some of the time spent by Jones' Criminal Justice Act counsel in dealing with issues caused by her failure to disclose material exculpatory information").

## CONCLUSION

For these reasons, the motion to dismiss the indictment for government misconduct should be granted.

Respectfully submitted,

GARY P. DECICCO

By his attorneys,

/s/ Thomas C. Frongillo
Thomas C. Frongillo (BBO# 180690)
Caroline K. Simons (BBO# 680827)
Jessica L. Perry (BBO# 696392)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, Massachusetts 02210
frongillo@fr.com
simons@fr.com
jperry@fr.com
TEL: (617) 542-5070
FAX: (617) 542-8906

James J. Cipoletta (BBO# 084260)
Law Offices of James J. Cipoletta
Citizens Bank Building
385 Broadway Suite 307
Revere, Massachusetts 02151
jim@cipoletta.com
Tel: (781) 289-7777
Dated: May 29, 2018        Fax: (781) 289-9468

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was filed on May 29, 2018 through the CM/ECF system and will be served electronically to registered CM/ECF participants as identified on the Notice of Electronic Filing.

/s/ Thomas C. Frongillo
Thomas C. Frongillo